# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In re:  THE ALLSTATE CORPORATION
      SECURITIES LITIGATION

Case No. 16-cv-10510

Hon. Robert W. Gettleman

## MEMORANDUM OF LAW IN SUPPORT OF ALL DEFENDANTS'
## MOTIONS TO DISMISS THE AMENDED COMPLAINT

Of Counsel:

John J. Clarke, Jr.*
john.clarke@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020
Tel.:   212.335.4500


*Admitted *pro hac vice*



Dated:  June 1, 2017

Raja Gaddipati
raja.gaddipati@dlapiper.com
DLA PIPER LLP (US)
444 W. Lake Street, Suite 900
Chicago, IL 60606-0089
Tel.:   312.368.4000

Attorneys for Defendants
  The Allstate Corporation, Thomas J. Wilson,
  and Matthew E. Winter

Table of Contents

Page

PRELIMINARY STATEMENT ...................................................................................1

SUMMARY OF THE ALLEGATIONS.........................................................................3

STANDARD OF REVIEW...........................................................................................13

ARGUMENT – THE AMENDED COMPLAINT SHOULD BE DISMISSED .......................14

I.      PLAINTIFFS' SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED
        FOR SEVERAL DIFFERENT REASONS .....................................................14

        A.      The Complaint Does Not Identify Any False or
                Misleading Statement of Material Fact. ...........................................15

                1.      Allstate Timely Disclosed Its Auto Claims
                        Frequency Data ...............................................................15

                2.      Plaintiffs Have Not Alleged That Opinion Statements
                        Concerning the Reasons for the Claims Frequency
                        Increase Were False or Misleading .......................................17

                3.      Statements Mentioning Allstate's "Comprehensive Plan for
                        Profitable Growth" Were Not False or Misleading.................................21

        B.      The Complaint Fails to Plead Facts Giving Rise to the
                Required "Strong Inference" of Scienter ..........................................22

                1.      There Are No Allegations of Conscious Wrongdoing ...........................23

                2.      Plaintiffs' Motive Allegations Do Not Raise
                        any Inference of Scienter ....................................................25

        C.      Plaintiffs Have Failed to Plausibly Allege That Their Losses
                Were Caused By the Alleged "Fraud" .............................................28

II.     THE "CONTROL PERSON" CLAIMS UNDER SECTION 20(a) ALSO
        SHOULD BE DISMISSED .........................................................................29

CONCLUSION.........................................................................................................30

Table of Authorities

Page(s)

<u>Cases</u>

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ................................................................................28

*Anderson v. Abbott Labs.*,
   140 F. Supp. 2d 894 (N.D. Ill.), *aff'd sub nom.*
   *Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001) ......................................... 16, 22, 23

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ..............................................................13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955 (2007) ..........................................................3, 13

*Brasher v. Broadwind Energy, Inc.*,
   No. 11 CV 991, 2012 WL 1357699 (N.D. Ill. Apr. 19, 2012)...............................16

*Catogas v. Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) ......................................................................29

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605, 2017 WL 1753276 (9th Cir. May 5, 2017)....................................18

*City of Livonia Employees' Ret. Sys. v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ................................................................ 14, 15, 16, 25

*City of New Orleans Employees' Ret. Sys. v. PrivateBancorp, Inc.*,
   No. 10 CV 6826, 2011 WL 5374095 (N.D. Ill. Nov. 3, 2011).......................24, 25

*Davis v. SPSS, Inc.*,
   385 F. Supp. 2d 697 (N.D. Ill. 2005)...................................................................24

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) ................................................................................22

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336, 125 S. Ct. 1627 (2005) ........................................................3, 28-29

*Fulton Cty. Employees Ret. Sys. v. MGIC Inv. Corp.*,
   675 F.3d 1047 (7th Cir. 2012) ...............................................................................2

*Gallagher v. Abbott Labs.*,
   269 F.3d 806 (7th Cir. 2001) ................................................................................16

Page(s)

*Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*,
    No. 09 CV 5641, 2012 WL 1068761 (N.D. Ill. Mar. 29, 2012) ............................................27

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ......................................................16, 22, 23, 25, 28

*In re Ariad Pharm., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) ........................................................................27

*In re Bally Total Fitness Sec. Litig.*,
    No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ..............................24

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) .................................................................27

*In re Tyco Int'l, Inc. Sec. Litig.*,
    185 F. Supp. 2d 102 (D.N.H. 2002) ...............................................................26

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ......................................................................27

*Inst. Investors Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) .........................................................................26

*Johnson v. Tellabs, Inc.*,
    262 F. Supp. 2d 937 (N.D. Ill. 2003) .............................................................24

*Katyle v. Penn Nat'l Gaming, Inc.*,
    637 F.3d 462 (4th Cir. 2011) ........................................................................29

*Lauria v. Biosante Pharms., Inc.*,
    968 F. Supp. 2d 951 (N.D. Ill. 2013) ........................................................13, 14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) .........................................................................28

*Livingston v. Cablevision Sys. Corp.*,
    966 F. Supp. 2d 208 (E.D.N.Y. 2013) .....................................................18, 24, 25

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .....................................................................29

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008) ..........................................................................28

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016) .........................................................................14

Page(s)

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. ___, 135 S. Ct. 1318 (2015). ................................................................. 1, 3, 18-21

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
632 F.3d 762 (1st Cir. 2011) ................................................................................. 19

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ................................................................................. 29

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ................................................................................. 28

*Roth v. OfficeMax, Inc.*,
527 F. Supp. 2d 791 (N.D. Ill. 2007)..................................................................... 26

*Searls v. Glaser*,
64 F.3d 1061 (7th Cir. 1995) ................................................................................. 22

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ................................................................................. 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499 (2007) ...........................................................2, 3, 14, 23, 26

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) .............................................................................. 18, 19

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,
475 F.3d 824 (7th Cir. 2007) ............................................................................ 15, 29

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015)..................................................................... 28

*Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*,
No. 15 CV 3187, 2016 WL 5720375 (N.D. Ill. Sept. 30, 2016)........................... 16

*Zerger v. Midway Games, Inc.*,
No. 07 CV 3797, 2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)............................ 22

Page(s)

## Statutes, Regulations, and Rules

15 U.S.C. § 78j(b) ................................................................................................ 1, 14

15 U.S.C. § 78t(a) ............................................................................................ 1, 3, 30

15 U.S.C. § 78u-4(b) ............................................................................................ *passim*

17 C.F.R. § 229.303 ...........................................................................................2, 15-16

17 C.F.R. § 240.10b-5(b) ...........................................................................1, 14-15, 20

Fed. R. Civ. P. 9(b) .............................................................................................. 1, 14

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1, 13

Defendants The Allstate Corporation ("Allstate"), Thomas J. Wilson, and Matthew E. Winter respectfully submit this memorandum of law in support of their motions, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all claims asserted against them under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.

## PRELIMINARY STATEMENT

This is a putative class action asserting claims of securities "fraud" on behalf of investors who purchased Allstate common stock between October 29, 2014 and August 3, 2015. Securities "fraud" is a claim of deceit that amounts to an accusation that a defendant lied or at least exhibited such reckless disregard for the truth that his conduct amounted to deception. Nothing in plaintiffs' amended complaint bears even a passing resemblance to such conduct.

The complaint describes disclosures over a nine-month period in which Allstate told investors undisputed details about an uptick in claims frequency that began in late 2014 for its Allstate-brand auto insurance and Allstate executives explained their views of the reasons for that development. Plaintiffs contend that defendants *must have known* that the increase in claims frequency resulted from Allstate's earlier, well-publicized decision to grow its auto insurance business, announced in early 2013, instead of external factors such as the improving economy – even though claims frequency *declined* for the six quarters after the early 2013 announcement. *See* Compl. ¶ 49 (plaintiffs' chart). The claims should be dismissed for several reasons.

*First*, plaintiffs have not plausibly alleged any actionable misstatement or omission. Nearly all of the statements at issue – those concerning the perceived reasons for an increase in auto claims – are opinion statements subject to the demanding standards of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. ___, 135 S. Ct. 1318 (2015). Yet plaintiffs do not allege that any defendant stated an opinion he did not honestly believe at the

time, as *Omnicare* requires for misstatement claims, nor have plaintiffs identified any contemporaneous fact known to the defendants that conflicted with their explanations, as *Omnicare* requires for omissions claims. Instead, plaintiffs' claims are based on the contention that defendants revised their views about the reasons for the increase in auto claims as more information became available, which amounts to inactionable "fraud by hindsight." *See Fulton Cty. Employees Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050-51 (7th Cir. 2012).

To the extent the complaint challenges non-opinion statements, the claims also are factually unsupported. Plaintiffs' argument that Allstate was required to disclose a "known trend" concerning its claims experience under Item 303 of Regulation S-K misstates the governing rule and disregards disclosures that plaintiffs admit Allstate provided. A comment by Mr. Winter in October 2014 that Allstate's claims experience had been "extremely favorable to prior year," Compl. ¶ 63, is consistent with plaintiffs' allegations showing that it was, *see id.* ¶ 49. Plaintiffs' challenges to statements mentioning Allstate's "plan to generate profitable growth" are just another species of hindsight pleading. None of the eleven "false statements" at issue amounts to actionable "securities fraud."

*Second,* plaintiffs do not allege particularized facts giving rise to the strong inference of scienter required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S. Ct. 2499, 2509-10 (2007). Even if Messrs. Wilson and Winter had regular access to Allstate claims data because of their positions with the company, as plaintiffs' allege, nothing in the complaint supports an inference that data they saw differed from what was said to investors. Unable to point to evidence of conscious misconduct, plaintiffs instead attempt to allege scienter based on two stock option transactions by Mr. Wilson in November 2014 and May 2015. Courts

are skeptical of such "motive" allegations, however, and skepticism is called for here. The most plausible inference, given the timing of the transactions and Mr. Wilson's substantial holdings after them, is that they reflected typical estate planning and asset diversification rather than evidence of "fraud."

*Third,* plaintiffs have not alleged facts showing that any purported misrepresentations "caused the loss for which the plaintiff[s] seek[] to recover." 15 U.S.C. § 78u-4(b)(4); *see Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345-46, 125 S. Ct. 1627, 1633 (2005). Plaintiffs' own allegations support the inference that Allstate stock price changes reflected normal market movements or reactions to adverse business news rather than the revelation of alleged "fraud."

*Finally,* the failure to allege a primary violation also requires dismissal of the "control person" claims against Messrs. Wilson and Winter under section 20(a) of the Exchange Act.

## SUMMARY OF THE ALLEGATIONS[1]

### A.   The Parties

Allstate is based in Northbrook, Illinois. It is the holding company for Allstate Insurance Company, which, among other businesses, is "the third largest personal passenger auto insurer in the United States." Compl. ¶ 22. Mr. Wilson is Allstate's chief executive officer and the chairman of its board of directors. *Id.* ¶ 23. Mr. Winter also is an Allstate officer. From 2009 to

---

[1] The well-pleaded allegations of the complaint are assumed to be true solely for purposes of this motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007). In considering this motion, however, the Court is not limited to the complaint itself but also may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. Public statements challenged as false or misleading under the securities laws must be evaluated "fairly and in context" rather than "in a vacuum." *Omnicare*, 135 S. Ct. at 1330, 1332. To place plaintiffs' allegations in their proper context, defendants have attached as exhibits to the accompanying Request for Judicial Notice and Recognition That Certain Documents Have Been Incorporated By Reference dated June 1, 2017 ("RJN") the complete texts of the public statements from which the complaint excerpts limited quotations.

2014, he was president of Allstate Personal Lines, which includes Allstate-brand auto insurance. He was promoted to president of Allstate in December 2014. *Id.* ¶ 24.

Plaintiffs allegedly purchased Allstate common stock between October 29, 2014 and August 3, 2015, which is the alleged "class period." Compl. ¶¶ 1, 21. In an order entered on January 17, 2017, plaintiffs were appointed "lead plaintiffs" under the PSLRA. [Doc. No. 35].

**B.     The Alleged Misstatements and Omissions**

The complaint "primarily relates to Allstate's auto insurance business." Compl. ¶ 2. Plaintiffs allege that "[a]t the start of 2013, Allstate announced to investors that it was reordering its priorities and making growth its number one goal." *Id.* ¶ 38. According to plaintiffs, during 2013 Allstate "loosened its underwriting guidelines" to grow its Allstate-brand auto policies-in-force and "encouraged" its independent agents to "roll over" customers from other carriers. *Id.* ¶¶ 39-45. As a result, plaintiffs allege, "no later than Q3 2014, Allstate experienced a steep increase in [auto] claims paid frequency." *Id.* ¶ 48.

Plaintiffs admit that Allstate disclosed that increase no later than its earnings release on February 4, 2015. *Id.* ¶ 70 ("An increase in claims frequency in the first two months of the quarter [October and November 2014] adversely impacted the combined ratio for auto insurance, with Allstate brand auto combined ratio rising to 97.0, [which] was 1.7 points higher than the prior year.") (quoting Allstate press release). Plaintiffs also concede that Allstate updated the markets on its auto claims frequency experience in its earnings releases on May 5, 2015 and August 3, 2015. *Id.* ¶¶ 103, 104.

The complaint does not allege that the auto claims data disclosed in these statements were mistaken, false, or misleading in any respect. Instead, plaintiffs contend that defendants "made material misstatements and omissions with respect to the *proximate cause* for [this] large spike in

auto claims frequency . . . which had a material negative impact on the Company's financial condition throughout the Class Period." *Id.* ¶ 2 (emphasis added); *see also id.* ¶¶ 57, 64, 69, 72, 74, 78, 83, 85, 90, 95.

> ### 1. October 29-30, 2014: Statements Regarding Results for Third Quarter 2014 (Statement Nos. 1, 2, and 3)

Plaintiffs challenge three statements made in connection with Allstate's announcement of its results for the third quarter of 2014. First, plaintiffs allege that an Allstate press release announcing quarterly results on October 29, 2014 and a Form 10-Q that Allstate filed with the U.S. Securities and Exchange Commission ("SEC") on the same date were false and misleading because they failed to discuss an increase in Allstate's auto claims frequency while mentioning Allstate's "'comprehensive plan to generate profitable growth.'" Compl. ¶¶ 56-59. According to the complaint, however, the rapid increase in auto claims frequency did not begin until October 2014, after the third quarter ended. *Id.* ¶ 11; *see id.* ¶ 49.

The complaint fails to mention that in the October 29, 2014 press release Allstate warned that "short-term level[s] of claim frequency we experience may vary from period to period and may not be sustainable over the longer term." *See* RJN Exh. A at 14. Similarly, the Form 10-Q disclosed that "claim frequency in the bodily injury coverage and property damage decreased 1.5% and increased 0.5%, respectively, in the first nine months of 2014, compared to the first nine months of 2013," which was "within historical ranges." RJN Exh. B at 64.

Plaintiffs also allege that statements in an October 30, 2014 conference call with securities analysts were false and misleading. In the call, Mr. Winter allegedly reported that "'our frequency so far has been extremely favorable to prior year,' adding, 'so our frequency trends have been good.'" Compl. ¶ 63 (emphasis omitted). Plaintiffs contend that these comments were false and misleading because "Allstate's bodily injury paid claims frequency had

spiked between Q2 and Q3 from a negative 3.8% year-over-year to a positive 0.2%." *Id.* ¶ 64. But plaintiffs' own allegations show that Mr. Winter's statement was accurate. *See id.* ¶ 49 (chart).

During the same call, Mr. Wilson explained that auto claims "frequency and severity can bounce around," RJN Exh. C at 17, and that "[s]ometimes we get growth and it's not profitable and then we shrink it," *id.* Mr. Winter stated that Allstate would "keep[] an eye on both [auto claims] frequency and severity," and, if necessary, "react[] accordingly" to "manag[e] [its] margins." *Id.* at 11.

## 2. December 9, 2014 Investor Conference (Statement No. 4)

Plaintiffs next challenge statements made at an investor conference on December 9, 2014 by Mr. Wilson and Allstate's chief financial officer Steven Shebik. Compl. ¶¶ 65-69. Plaintiffs allege that Mr. Wilson stated that Allstate had "'tweaked [its] models'" to "'spread[] . . . rate changes more effectively'" among its customers and thereby "'improve retention.'" *See id.* ¶ 65. Although that statement concerned auto premiums for *existing* customers, plaintiffs allege it was "false and misleading" because Allstate "greatly lowered [its] underwriting standards in order to aggressively grow the Company's business." *Id.* ¶ 66.

Mr. Wilson also allegedly stated that, while he felt "'good about auto insurance in general in terms of its profitability[,] [i]t doesn't mean frequency won't tick up . . . .'" *Id.* ¶ 65 (emphasis omitted). Plaintiffs allege that this statement was misleading because "paid bodily injury claims frequency already increased by 4% in the third quarter of 2014, turning from negative to positive." *Id.* ¶ 67. Plaintiffs admit that claims frequency rose only to a net positive 0.2% in the third quarter (versus a 3.8% decline in the prior quarter), *id.* ¶ 49, which Mr. Shebik said was "'consistent with what you [would] assume from the normal trends in the [Consumer Price Index],'" *id.* ¶ 68 (emphasis omitted).

### 3. February 4, 5 & 19, 2015: Statements Regarding Year-End 2014 Results (Statement Nos. 5, 6, and 7)

The next series of allegedly false and misleading statements occurred in early February 2015. On February 4, 2015, Allstate issued a press release announcing results for the fourth quarter of 2014. Compl. ¶ 70. The press release reported that an increase in claims frequency had reduced the profitability of Allstate's auto insurance business:

> [A]uto margins . . . were impacted by higher claim frequency. . . . An increase in claim frequency in the first two months of the quarter adversely impacted the combined ratio for auto insurance, with the Allstate brand auto combined ratio rising to 97.0. This was 1.7 points higher than the prior year. The impact of precipitation in select markets and general economic trends will both be reflected in pricing as necessary to maintain adequate returns.

RJN Exh. E at 2; *see also* Compl. ¶¶ 70-71. Plaintiffs do not allege that the reported data were false. Instead, they allege that the press release was "materially false and misleading because" it "attribut[ed] the increase in claims frequency on [*sic*] 'precipitation' and 'general market conditions'" and "omitted the material fact that the Company's greatly reduced underwriting standards were a proximate cause of the increased claims frequency." Compl. ¶ 72.

On February 5, 2015, Allstate held a conference call with analysts to discuss its reported results. *Id.* ¶ 73. During the call, Mr. Winter and Allstate's vice president of investor relations Patrick Macellaro expressed the view that the increase in auto claims frequency was "likely related to" weather and economic factors. RJN Exh. F at 6, 12; *see also* Compl. ¶ 73. Mr. Winter said that Allstate "'saw nothing to indicate that it's a quality of business issue or that it's being driven by growth.'" Compl. ¶ 73(b). In portions of the transcript not quoted in the complaint, he explained how Allstate came to that view:

> [W]e looked at new to renewal ratios. We looked at state mix ratio. We looked at rating plan relativities . . . .

RJN Exh. F at 12.  Plaintiffs claim that the statements attributing the increase to external factors were "false and misleading" because they "omitted the material fact that Allstate's greatly reduced underwriting standards were a proximate cause of the increased frequency."  Compl. ¶ 74.

On February 19, 2015, Allstate filed its annual report on Form 10-K with the SEC, which plaintiffs allege was "false and misleading" for the same reason.  *Id.* ¶¶ 77-78.  The complaint alleges that the Form 10-K "failed to disclose the increase in claims frequency."  *Id.* ¶ 79.  To the contrary, that document disclosed a general "increase in pending claims as of December 31, 2014 compared to December 31, 2013 relate[d] to growth and auto frequency," with approximately 6.3 million new auto claims in 2014 compared to 5.9 million in 2013.  *See* RJN Exh. G at 66-67. The Form 10-K also stated that Allstate "experienced increased property damage frequency . . . in the first two months of fourth quarter 2014 . . . with improved unemployment rates leading to higher miles driven and areas that experienced higher precipitation," and that "[b]odily injury . . . paid claim severities increased 2.7% . . . ."  *Id.* at 57.

### 4.    May 5-6, 2015:  Statements Regarding Results for First Quarter 2015 (Statement Nos. 8, 9, and 10)

In a May 5, 2015 press release announcing Allstate's first quarter 2015 results, Mr. Wilson was quoted stating:  "'Allstate's strategy of building a broad-based business model continued to generate profitable growth'" and the "'Allstate brand had good growth and returns in auto, home and other lines of insurance.'"  RJN Exh. H  at 1 (press release); *see also* Compl. ¶ 81.  Plaintiffs contend that these statements were false and misleading because they "omitted the material fact that . . . [Allstate's] greatly reduced underwriting standards . . . proximately caus[ed] an increase in claims frequency . . . ."  Compl. ¶ 83.  The complaint fails to mention other disclosures contained in the press release, including that:  "Auto losses were elevated in the

first quarter, reflecting seasonal winter weather *and higher non-weather levels of frequency* . . . in all three brands where we underwrite risk"; that "Allstate brand bodily injury frequency increased 6.8% from low levels in the first quarter of 2014"; that "[p]roperty damage frequency increased 2.1%, and was impacted *in part* by adverse winter weather experienced predominantly in the east, *as well as higher frequency trends broadly across the country*"; and that "[p]rice increases in auto insurance originally planned for later in 2015 have been accelerated due to *increased non-weather related loss trends*." RJN Exh. H at 2 (emphasis added).

On May 5, 2015, Allstate filed its Form 10-Q for the first quarter. Compl. ¶ 84. Plaintiff alleges that the filing was false and misleading because it "again misattributed the cause of the increase in claims frequency to 'adverse winter weather.'" *Id.* ¶ 85 (emphasis omitted). Once again, however, the complaint omits relevant disclosures, including the following:

> Auto loss ratio for the Allstate brand increased 3.8 points in the first quarter of 2015 compared to the first quarter of 2014, primarily due to higher claim frequency and severity and unfavorable reserve reestimates, partially offset by increased premiums earned. . . . The increase in bodily injury frequency reflects . . . increases broadly across the country. . . . The increase in property damage frequency was impacted *in part* by adverse winter weather experienced predominantly in the east, *as well as higher frequency trends broadly across the country*. . . . Bodily injury and property damage coverage paid claim severities (average cost per claim) increased 3.9% and 4.8%, respectively, in the first quarter of 2015 compared to the first quarter of 2014. Bodily injury severity results in the first quarter of 2015 increased in line with historical Consumer Price Index trends. . . . *Given current loss cost trends*, we expect the level of rate increases to accelerate.

RJN Exh. I at 50-51 (emphasis added).

On May 6, 2015, Allstate hosted a conference call with securities analysts. Compl. ¶ 87. During the call, Mr. Macellaro reported that an increase in auto claims frequency "began to emerge in the fourth quarter of [2014]." RJN Exh. J at 6. The Allstate participants in the call reiterated that Allstate "believe[d]" that claims frequency was attributable to weather and

economic factors and not the "quality" of Allstate's "new and renewal business." *Id.* at 6; *see also id.* at 12 ("[W]e *feel like* this is . . . everybody's problem.") (emphasis added). Nevertheless, Mr. Winter acknowledged that "I can't say that we have a very good handle on the trend." *Id.* at 14. Mr. Winter further disclosed that Allstate was considering tightening its underwriting guidelines: "[R]ate is not our only lever on managing loss cost. We look at things *like our underwriting guidelines*." *Id.* at 13 (emphasis added).

These remarks are not mentioned in the complaint. Instead, plaintiffs allege that statements during the call were "false and misleading because they omitted the material fact that [Allstate's] greatly reduced underwriting standards . . . were a proximate cause of the increase in claims frequency . . . ." Compl. ¶ 90. The complaint does not attempt to reconcile that assertion with plaintiffs' own extended quotation of Mr. Winter's explanation of what Allstate did to reach the view that the increased frequency was caused by external factors:

> '. . . As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather. And I believe I said last quarter we thought that miles driven was about three times as influential as the weather. That pattern seemed to hold up again this quarter.
>
> . . . we did a very intense deep dive into our business *to ensure that the increases in the frequency we are seeing are proportional and consistent across multiple segments of the business no matter how you cut it, to make sure in effect that these aren't our problems but are in fact external.*
>
> *And so we looked at new and renewal business, we looked at higher growth states versus lower growth states. We looked across quality characteristics, we looked across driver age, household composition, insurance scores, full coverage versus liability[,] across different rating plans to see whether or not perhaps rating plans had influenced it.*
>
> And all of that review showed that this trend is externally driven primarily by miles driven.'

*Id.* ¶ 88 (original emphasis omitted, new emphasis added).

10

### 5. May 28, 2015 Investor Conference (Statement No. 11)

The final public statement challenged in the complaint allegedly occurred at an investor conference on May 28, 2015. Compl. ¶ 94. During the conference, Mr. Wilson stated that "on a longer-term basis" Allstate's increased auto claims frequency was within the range of "normal volatility." RJN Exh. K at 12; *see* Compl. ¶ 94. Plaintiffs allege that this statement was "false and misleading because [it] omitted the material fact that the increase in claims frequency" was the result of "greatly reduced underwriting standards . . . ." Compl. ¶ 95. Plaintiffs fail to mention Mr. Wilson's statements during the same conference that Allstate would "see, in the short term, a continued increase in frequency and severity," *see* RJN Exh. K at 12, and that Allstate had responded to "[h]igher auto frequency" in the first quarter "by increasing pricing, *changing underwriting guidelines* and reducing spending, *id.* at 2 (emphasis added).

### C. Subsequent Events

In a press release issued on August 3, 2015, Allstate announced its results for the second quarter 2015. *Id.* ¶ 104. In the press release, Allstate reported operating income of $262 million, which was significantly lower than its operating income of $445 million for the same period in 2014, reflecting "increased frequency and severity of auto accidents." *Id.*; *see* RJN Exh. L at 1. The press release quoted Mr. Wilson, who explained that "[w]hile recent growth in Allstate brand auto policies in force did increase frequency, since new business typically has higher relative frequency, *this was not the primary driver of a higher combined ratio.*" RJN Exh. L at 1 (emphasis added). The next day, Allstate hosted a conference call with securities analysts to discuss its results. Compl. ¶ 106. During the call, Mr. Winter stated that Allstate continued to believe that claims frequency "trends are principally driven by external factors" and that "new business growth rate" was only "having between half a point and a point [of] impact on the auto loss ratio." RJN Exh. M at 6, 7.

Plaintiffs allege that in the press release and analyst call, Mr. Wilson "admitt[ed], for the first time, that "'recent growth in Allstate brand auto policies . . . did increase . . . frequency'" and Mr. Winter "admitted" that "new business growth . . . contributed 'to the higher frequency . . . .'" Compl. ¶¶ 105-06 (emphasis omitted). These assertions disregard earlier public statements in which Allstate acknowledged that it might not "have a very good handle on the trend" and was evaluating its underwriting guidelines among other possible measures. RJN Exh. J at 13, 14.

### D. Plaintiffs' Scienter Allegations

Plaintiffs allege that Messrs. Wilson and Winter "had (A) the motive and opportunity to defraud Allstate's shareholders, as . . . Wilson personally enriched himself by trading on inside information, and (B) had knowledge of information which contradicted the false statements recklessly made to investors during the Class Period." Compl. ¶ 121. Plaintiffs do not allege that either Messrs. Wilson or Winter did not genuinely believe their views at the time.

Plaintiffs' principal scienter allegation is that, on November 25, 2014, Mr. Wilson exercised stock options for 750,000 shares of Allstate common stock, at "a strike price of approximately $16 when [Allstate] stock was trading at . . . more than $67 per share." Compl. ¶¶ 122-23. After satisfying the exercise price, Mr. Wilson allegedly sold the shares obtained resulting in proceeds of $33 million. *Id.* ¶ 122. Plaintiffs allege that the stock options exercised in November 2014 were not scheduled to expire until 2019 and that, at the time of this transaction, Allstate "was experiencing two consecutive months of large, ***undisclosed increases*** in year-over-year claims frequency . . . ." *Id.* (emphasis in original). Separately, plaintiffs allege that, on May 26, 2015, Mr. Wilson exercised stock options for additional shares of Allstate common stock that were due to expire the next week, on June 1, 2015, and then sold

approximately 90,000 shares for approximately $6.2 million. Compl. ¶ 125 n.5. In both stock option transactions, the alleged sales were at prices well below the high price for Allstate common stock during the "class period" of just under $73 per share. *Id.* ¶ 17.

According to plaintiffs, after the November 2014 transaction, "[Mr.] Wilson was left with only 113,000" Allstate shares. *Id.* ¶ 123. In conflict with that allegation, Allstate's annual proxy statements during 2014-16 reported that he beneficially owned 3,089,812 Allstate shares as of March 1, 2014, 3,043,184 Allstate shares as of March 1, 2015, and 3,085,723 Allstate shares as of March 1, 2016. *See* RJN Exh. N at 63, Exh. O at 67, Exh. P at 73.

### E. The Claims Asserted in the Amended Complaint

Plaintiffs assert claims on behalf of a putative class of investors who purchased Allstate common stock between October 29, 2014 and August 3, 2015 against all defendants under sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5, and against Messrs. Wilson and Winter for "control person" liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Compl. ¶¶ 152-60.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim under Federal Rule 12(b)(6), "the court takes all facts alleged in the complaint as true and draws all reasonable inferences from those facts in the plaintiffs' favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth." *Lauria v. Biosante Pharms., Inc.*, 968 F. Supp. 2d 951, 956 (N.D. Ill. 2013). A motion to dismiss should be granted if the plaintiff fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). In evaluating claims of securities fraud, a court must "consider the complaint in its entirety, as well

as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322, 127 S. Ct. at 2509.

Securities plaintiffs also must satisfy heightened pleading requirements under the PSLRA. The complaint must "'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . .'" *Biosante Pharms.*, 968 F. Supp. 2d at 957 (quoting 15 U.S.C. § 78u-4(b)(1)); *see also* Fed. R. Civ. P. 9(b) (party claiming fraud must "state with particularity the circumstances constituting fraud"). "[W]ith respect to each act or omission alleged to violate [the Exchange Act]," the complaint also must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see City of Livonia Employees' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 756-57 (7th Cir. 2013). "Only a complaint that provides sufficiently particularized factual pleading and gives rise to a strong inference of scienter can survive a motion to dismiss." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d Cir. 2016).

## ARGUMENT

## THE AMENDED COMPLAINT SHOULD BE DISMISSED

I.  **PLAINTIFFS' SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED FOR SEVERAL DIFFERENT REASONS.**

"Section 10(b) of the [Exchange Act] forbids any person 'to use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . .'" *Boeing*, 711 F.3d at 755-56 (quoting 15 U.S.C. § 78j(b)). Rule 10b-5(b), in turn, "forbids a person 'to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Boeing*, 711 F.3d at 756 (quoting 17 C.F.R. § 240.10b-5(b)).

Courts have implied a private right of action under these provisions. To state a claim for securities fraud under them, a private plaintiff must allege: "'(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages.'" *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (citation omitted). Plaintiffs' claims here founder on at least three of these requirements.

### A. The Complaint Does Not Identify Any False or Misleading Statement of Material Fact.

The eleven statements challenged in the complaint fall into three categories: (1) claims that Allstate failed to timely disclose a "known trend[] or uncertaint[y]" regarding claims frequency for Allstate brand auto insurance, Compl. ¶¶ 58-62, 67-69, 77-79, 86; *see* 17 C.F.R. § 229.303(a)(ii); (2) claims that Allstate executives mischaracterized the reasons for an increase in auto claims frequency, Compl. ¶¶ 2, 57, 64, 69, 72, 74, 78, 83, 85, 90, 95; and (3) claims that references to Allstate's "comprehensive plan for profitable growth" misled investors because of problems with auto claims frequency, *id.* ¶¶ 56-57, 59, 83. The claims in each category suffer from debilitating flaws.

### 1. Allstate Timely Disclosed Its Auto Claims Frequency Data.

Plaintiffs admit that Allstate disclosed information regarding its Allstate brand auto insurance claims frequency in connection with the announcement of its annual and quarterly results in February 2015, May 2015, and August 2015. *See* Compl. ¶¶ 70, 78, 81, 85, 104. The complaint does not allege that the data reported were false, incomplete, or mistaken in any way,

and no further disclosure of a "known trend[] or uncertaint[y]" was required under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(ii).

"The securities laws create a system of periodic rather than continual disclosures." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007). As Judge Posner has explained, within this system "[t]here is no duty of total corporate transparency – no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time,' forming a running commentary, a baring of the corporate innards, day and night." *Boeing*, 711 F.3d at 759. A "[p]rudent" issuer "conduct[s] inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention." *Baxter*, 495 F.3d at 760-61. "Taking the time necessary to get things right is both proper and lawful." *Id.* at 761.

Similarly, the courts have recognized that "Regulation S-K does not replace periodic with continuous disclosure." *Gallagher v. Abbott Labs.*, 269 F.3d 806, 809 (7th Cir. 2001). When it applies, Item 303(a)(ii) of Regulation S-K "requires disclosure of 'known trends or uncertainties,'" not "immediate[] disclos[ure]." *Brasher v. Broadwind Energy, Inc.*, No. 11 CV 991, 2012 WL 1357699, at *16 (N.D. Ill. Apr. 19, 2012) (citing 17 C.F.R. § 229.303).

In addition, "[w]ithin this district, . . . it has been recognized that [Item] 303(a) does not give rise to a private right of action under Rule 10(b)." *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15 CV 3187, 2016 WL 5720375, at *14 (N.D. Ill. Sept. 30, 2016); *see Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 909 (N.D. Ill. 2001) ("caselaw is clear that Item 303(a) does not give rise to private action under Rule 10(b)") (collecting citations), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001).

The complaint alleges that the "trend" of increasing claim frequency "rapidly accelerated in October 2014," which was in Allstate's fourth fiscal quarter, and that Allstate's third quarter

Form 10-Q filed on October 29, 2014, "should have disclosed" an increase in Allstate brand auto insurance claims frequency. Compl. ¶¶ 61, 62. But the Form 10-Q did disclose that the "[a]uto loss ratio for the Allstate brand increased 0.3 points in the first nine months of 2014 compared to the same period of 2013 . . . ," RJN Exh. B at 63, and that "claim frequency in the bodily injury coverage and property damage decreased 1.5% and increased 0.5%, respectively, in the first nine months of 2014, compared to the first nine months of 2013," which was "within historical ranges," *id.* at 64.[2]

Moreover, Allstate's next periodic report – its Form 10-K filed on February 19, 2015 – informed investors that Allstate "experienced increased property damage frequency . . . in the first two months of fourth quarter 2014 . . . with improved unemployment rates leading to higher miles driven and areas that experienced higher precipitation[,]" and that "[b]odily injury . . . paid claim severities increased 2.7% . . . ." RJN Exh. G at 57. Similar disclosures were provided in press releases or SEC filings for the first and second quarters. *See* RJN Exh. H at 2 (May 5, 2015 press release), Exh. I at 50-51 (Form 10-Q filed May 5, 2015), Exh. L at 2 (August 3, 2015 press release). Defendants therefore provided investors with timely and adequate disclosures concerning Allstate's auto insurance claims frequency experience.

### 2. Plaintiffs Have Not Alleged That Opinion Statements Concerning the Reasons for the Claims Frequency Increase Were False or Misleading.

Plaintiffs' central contention is that defendants "misleadingly attributed the increase [in auto claims frequency] to temporary external factors, such as the economy and the weather, rather than to their own decision to greatly reduce Allstate's underwriting standards." Compl.

---

[2] Plaintiffs assert that Mr. Winter misled analysts during an ensuing conference call on October 30, 2014 when he reported that "our frequency so far has been extremely favorable to prior year," Compl. ¶ 63, but the statistics reported in the Form 10-Q establish that this statement was true. Plaintiffs' own charts support that conclusion too. *See id.* ¶ 49.

¶ 12; *see also id.* ¶¶ 2, 57, 64, 69, 72, 74, 78, 83, 85, 90, 95.  The complaint fails to support that assertion with any allegation of contemporaneous fact.

Defendants' discussions of the reasons for an increase in auto claims frequency are opinion statements subject to the standards articulated in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. ___, 135 S. Ct. 1318 (2015).  In *Omnicare*, the Supreme Court recognized that the securities laws are not "an invitation to Monday morning quarterback an issuer's opinions."  135 S. Ct. at 1327.  "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Id.* at 1325.  A sincerely held statement of opinion admits the possibility of error, and as a result, will remain true – and is not an "untrue statement of . . . fact" – even if ultimately it proves to have been incorrect.  *Id.* at 1326-27.[3]

The challenged statements here fall into the "opinion" category because, rather than stating determinable fact, they expressed the speakers' interpretation of a much larger universe of data, as defendants themselves explained in some of those statements.  *See, e.g.,* Compl. ¶ 88 ("we did a very intense deep dive into our business to ensure that the increases in the frequency we are seeing are proportional and consistent across multiple segments of the business . . . to make sure in effect that these aren't our problems but are in fact external") (emphasis omitted).  Similar interpretive statements have been recognized to be opinions.  *See, e.g., Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 218-19 (E.D.N.Y. 2013) (CEO's statements explaining perceived reasons for fourth quarter "spike" in subscriber losses were statements of

---

[3] The claims in *Omnicare* arose under section 11 of the Securities Act of 1933, but the framework for analyzing opinion statements applies to securities fraud claims under Rule 10b-5 with equal force.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 2017 WL 1753276, at *2, *7 (9th Cir. May 5, 2017); *Tongue v. Sanofi*, 816 F.3d 199, 209-10 (2d Cir. 2016).

opinion, not statements of fact); *see also Sanofi¸* 816 F.3d at 214 (statements interpreting data from ongoing clinical trials were opinion statements subject to *Omnicare*).  In addition, many of those statements were framed expressly in the language of opinion.[4]

Under *Omnicare*, an opinion is actionable as an affirmative misstatement only if the speaker did not "actually hold[] the stated belief."  *Omnicare*, 135 S. Ct. at 1326.  An opinion statement also can be materially misleading under an omissions analysis, but only if the plaintiff has identified "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement *fairly and in context*."  *Id.* at 1332 (emphasis added).  The *Omnicare* decision recognized that under the plausibility standard of *Iqbal* and *Twombly*, pleading such an omissions claim would be "no small task for an investor."  *Id.*

The complaint does not plausibly allege that any defendant stated an opinion that he did not believe at the time.  Nor can plaintiffs' disagreement with defendants' interpretation of data state a claim under *Omnicare*.  *Sanofi¸* 816 F.3d at 214 (challenge to statements about clinical trial results "are little more than a dispute about the proper interpretation of data, a dispute this Court [has] rejected as a basis for liability");  *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 774–75 (1st Cir. 2011) ("The complaint includes acknowledgments from S&P and Moody's executives conceding, in hindsight, that the models

---

[4] *See* Compl. ¶ 68 ("'We've seen much more of an increase *consistent with what you assume* from the normal trends in the [CPI]'"); *id.* ¶ 73(b) ("'*we saw nothing to indicate* that it's a quality of business issue'"); *id.* ¶ 87 (Allstate's "'analysis also *reinforces our conclusion* that recent frequency fluctuations are due primarily to macroeconomic trends [and] weather and while we believe industry-wide auto frequency will continue its long-term downward slope over time, there will be periods of variability within that trend'"); *id.* ¶ 88 ("'is this our problem or is this everybody's problem? . . .  So *we feel like* this is at this point everybody's problem, Matt can help you understand *why we believe* that is the case'") (all original emphasis omitted; all emphasis added).

and data that the rating agencies were using were deficient.  But the ratings were not false or misleading because rating agencies should have been using better methods and data."); *see Omnicare*, 135 S. Ct. at 1326 ("although a plaintiff could later prove [an] opinion erroneous, the words 'I believe' themselves admitted that possibility, thus precluding liability for an untrue statement of fact").

Similarly, the statements are not actionable under the omissions prong of Rule 10b-5.  To state such a claim, plaintiffs must "identify particular (and material) facts going to the basis for the issuer's opinion" the omission of which makes the statement "misleading to a reasonable person reading [it] fairly and in context."  *Omnicare*, 135 S. Ct. at 1332.  There are no such allegations here.  According to the complaint, Allstate informed investors of its "increased emphasis on growth" at the beginning of 2013.  Compl. ¶ 38.  Subsequent press releases and SEC filings accurately reported statistics concerning both the growth of policies-in-force and Allstate's auto claims experience.  There are no allegations of contemporaneous fact to support plaintiffs' repeated contention that underwriting was the "real" reason for the increase in claims frequency.[5]

In addition, even though defendants acknowledged that they did not yet "have a very good handle on the trend," RJN Exh. J at 14, defendants explained the work they did to reach their views.  *See, e.g.,* Compl. ¶ 88 ("we looked at new and renewal business, we looked at higher growth states versus lower growth states.  We looked across quality characteristics, we looked across driver age, household composition, insurance scores, full coverage versus liability[,] across different rating plans to see whether or not perhaps rating plans had influenced it."); RJN Exh. F at 12  ("we looked at new to renewal ratios.  We looked at state mix ratio.  We

---

[5] For reasons discussed below, plaintiffs' "confidential witness" allegations add nothing to the analysis. *See infra* at 24-25.

looked at rating plan relativities."); Exh. J at 6 ("Some examples of items we've been investigat[ing] include the impact of new to renewal loss ratio relativities, . . . state mix and geographic mix within states, higher growth books of business versus stable or moderately growing books, monoline versus multiline, liability only versus full coverage, and quality characteristics such as insurance core, driver age and household composition."). Given these explanations, a reasonable investor would have understood that defendants' views contained some measure of uncertainty. *See Omnicare*, 135 S. Ct. at 1328-29.

Finally, the disclosures Allstate provided conflict with plaintiffs' theory. For example, in its earnings release and Form 10-Q issued on May 5, 2015, Allstate disclosed that "property damage frequency increased 2.1%, and was impacted *in part* by adverse winter weather experienced predominantly in the east, *as well as higher frequency trends broadly across the country*." RJN Exh. H at 2; *see* Exh. I at 50 (emphasis added). Then, in a conference call with analysts, Mr. Winter disclosed that Allstate was considering tightening its underwriting guidelines: "[R]ate is not our only lever on managing loss cost. We look at things *like our underwriting guidelines*." RJN Exh. J at 13 (emphasis added).

A reasonable investor would have considered the challenged statements "'in light of all [the] surrounding text, including hedges, disclaimers and apparently conflicting information.'" *Tongue*, 816 F.3d at 212 (quoting *Omnicare*, 135 S. Ct. at 1330). No omissions claim can be maintained based on the allegations here.

### 3. Statements Mentioning Allstate's "Comprehensive Plan for Profitable Growth" Were Not False or Misleading.

The final category of challenged statements are those that refer to Allstate's "comprehensive plan to generate profitable growth," which plaintiffs allege were false and

misleading because, in their view, Allstate had underwritten "riskier and less profitable business." *See* Compl. ¶¶ 56-59, 65-66, 80-83. These claims suffer from at least two problems.

*First*, the contention that Allstate's business turned out to be risky and less profitable is a species of impermissible fraud by hindsight. *Baxter*, 495 F.3d at 760. Even if Allstate's growth strategy ultimately reduced its margins, such an "ordinary business revers[al]" does not give rise to a plausible inference that Allstate *planned* to generate unprofitable growth, and that is the inference that would be needed for Allstate's comments about its "plan to generate profitable growth" to be rendered misleading. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud").

*Second*, expressions of confidence in Allstate's ability to generate profitable growth are simply not actionable. *Searls v. Glaser*, 64 F.3d 1061, 1066 (7th Cir. 1995) ("predictions and forecasts which are not of the type subject to objective verification are rarely actionable under [section] 10(b) and Rule 10b-5"); *see Zerger v. Midway Games, Inc.*, No. 07 CV 3797, 2009 WL 3380653, at *6 (N.D. Ill. Oct. 19, 2009) ("'[v]ague statements about . . . unquantified growth . . . are generally not actionable'") (citation omitted); *Anderson*, 140 F. Supp. 2d at 905 ("statements about industry leadership and unquantified growth are classic puffery, and are generally not actionable") (collecting citations).

### B. The Complaint Fails to Plead Facts Giving Rise to the Required "Strong Inference" of Scienter.

Under the Exchange Act, as amended by the PSLRA, plaintiffs are required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "required state of mind" for the claims here is scienter,

that is, "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Baxter*, 495 F.3d at 756.

In evaluating whether a securities fraud plaintiff has pleaded facts giving rise to the required "strong inference" of scienter, a court "must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314, 127 S. Ct. at 2504. "An inference of fraudulent intent," the Court recognized in *Tellabs*, "may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct." *Id.* "To qualify as 'strong,' . . . an inference of scienter must be *more than* merely plausible or reasonable – it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Id.* at 314, 127 S. Ct. at 2504-05 (emphasis added). Plaintiffs fall far short of pleading facts that would support such a showing here.

### 1. There Are No Allegations of Conscious Wrongdoing.

The essence of scienter is evidence of conscious wrongdoing, that is, particularized allegations of fact demonstrating that the statements at issue were knowingly false or, at a minimum, were made with such reckless disregard for the truth that it amounts to the same. *Baxter*, 495 F.3d at 756. The complaint in this case contains no such allegations.

*First*, the complaint does not include factual allegations to support plaintiffs' contention that "greatly loosened" underwriting standards were the reason for an increase in auto claims frequency or that defendants knew that was so. *See* Compl. ¶ 126. Even if Allstate altered underwriting standards to foster growth, as plaintiffs allege, nothing connects such a decision to rising claims frequency *six quarters later* nor have plaintiffs plausibly alleged that defendants were aware of such a connection.[6] *See Baxter*, 495 F.3d at 758 ("there is a big difference

---

[6] Indeed, claims frequency trended *down* for a year-and-a-half after Allstate announced its growth strategy. *See* Compl. ¶¶ 38, 49.

between knowing about the reports from Brazil and knowing that the reports are false"); *Anderson*, 140 F. Supp. 2d at 910 ("The complaint does not identify any facts suggesting defendants knew the FDA planned to impose sanctions anywhere approaching the draconian penalties [later] included in the [unprecedented consent] decree.").

*Second*, plaintiffs cannot escape their pleading burden through the formulaic allegation that Messrs. Wilson and Winter, "by virtue of their position[s] within the Company, are assumed to have knowledge about Allstate's underwriting practices and the related rise in claims frequency starting in Q3 2014," Compl. ¶ 128, and had an "ability to identify trends and the causes of trends in claims frequency" because of the "their close monitoring of claims frequency." *Id.* ¶¶ 132-33. Whether or not these defendants were in a position to "identify trends," the complaint does not point to any fact that either defendant knew but disregarded. *See Cablevision*, 966 F. Supp. 2d at 219 (CEO's "close monitoring of the video subscription losses" does not give rise to an inference that defendants "knew of, or recklessly turned a blind eye to, the *reason* Cablevision customers were leaving for Verizon"). Scienter "may not rest on the inference that defendants must have been aware of a misstatement based simply on their positions within the company." *In re Bally Total Fitness Sec. Litig.*, No. 04 CV 3530, 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006); *see Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 713-14 (N.D. Ill. 2005) (same); *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 957 (N.D. Ill. 2003) (same); *City of New Orleans Employees' Ret. Sys. v. PrivateBancorp, Inc.*, No. 10 CV 6826, 2011 WL 5374095, at *8 (N.D. Ill. Nov. 3, 2011) (same) (collecting citations).

*Third*, plaintiffs' "confidential witnesses" do not aid plaintiffs scienter allegations. Those witnesses allegedly included a "former Allstate licensed insurance agent," a "former Allstate actuary assistant," a former owner of a Colorado Allstate insurance agency, and a former Allstate

24

"senior compliance consultant." *See* Compl. ¶¶ 36-45. None of these "confidential witnesses" was in a position to know company-wide loss ratios or auto claims frequency data. Instead, these witnesses described general facts concerning Allstate's underwriting practices and an alleged change in those practices in connection with Allstate's announced strategy to grow its business. None of these allegations indicate that any of the defendants ever knew, but failed to disclose, that the increase in claims frequency beginning in late 2014 was attributable to those changes in underwriting. *See Cablevision*, 966 F. Supp. 2d at 219 (confidential witness allegations did "not indicate[] that the Individual Defendants ever possessed, but failed to disclose, empirical proof of why . . . Cablevision suffered a spike in subscriber losses in the fourth quarter of 2010"); *PrivateBancorp.*, 2011 WL 5374095 at *6 (confidential witnesses were not "alleged to have heard any of the officer defendants or anyone else describe or acknowledge a plan to sacrifice quality for quantity of loans"). The closest plaintiffs come to such an allegation is the opinion of "CW3," the former owner of a Colorado agency, that he "'knew the quality of the business was going to go down and the loss ratio was going to be outrageous,'" *id.* ¶ 39, but that opinion is unsupported by fact.

The Seventh Circuit has recognized that "confidential witness" allegations "require a heavy discount." *Boeing*, 711 F.3d at 759; *see also Baxter*, 495 F.3d at 756-57. Such witnesses "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent . . . ." *Boeing*, 711 F.3d at 759. An outsider's alleged opinions about what might have been going on inside Allstate's business do not establish the existence of any contrary fact that defendants knew or should have known at the time. *See id.* at 760 (outside contractor unlikely to know information concerning product tests attributed to him in complaint).

### 2. Plaintiffs' Motive Allegations Do Not Raise any Inference of Scienter.

Unable to allege facts showing conscious wrongdoing, plaintiffs instead point to two stock options transactions by Mr. Wilson, in November 2014 and May 2015, as alleged evidence of scienter. Since the decision in *Tellabs*, however, "'motive and opportunity' may no longer serve as an independent route to scienter," which must be assessed by weighing "culpable and nonculpable inferences" from the allegations as a whole. *Inst. Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 277 (3d Cir. 2009); *see Tellabs*, 551 U.S. at 325, 127 S. Ct. at 2511. Scienter must be alleged on a defendant-by-defendant basis, and allegations concerning stock options transactions by Mr. Wilson therefore cannot be the basis for any inference of scienter for Mr. Winter. *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 797-98 (N.D. Ill. 2007). Nor do Mr. Wilson's two stock option transactions give rise to any inference of scienter as to him that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314, 127 S. Ct. at 2505.

*First*, the most plausible inference is that Mr. Wilson's transactions reflected normal estate planning and diversification of his investments. Both stock option transactions occurred within weeks after Allstate announced its quarterly results, which would be the typical "trading window" for corporate officers. *In re Tyco Int'l, Inc. Sec. Litig.*, 185 F. Supp. 2d 102, 112 n.6 (D.N.H. 2002) ("most publicly traded companies have adopted policies which prevent insiders from trading except during narrow windows that are open for only brief periods following the release of accounting information") (citation omitted); *see* Compl. ¶¶ 56-58 (press release and Form 10-Q on October 29, 2014), ¶¶ 80-85 (press release and Form 10-Q on May 5, 2015). Plaintiffs do not allege that Allstate was unaware of the transactions or that Mr. Wilson engaged in them without consulting Allstate first.

*Second*, both transactions occurred months before August 3, 2015, when plaintiffs allege Allstate "shocked investors by reporting disappointing financial results," Compl. ¶ 104, contradicting any inference that Mr. Wilson was "prescient" in his timing. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002) (sale of 74% of chairman's holdings, while unusual, did not plead scienter when most sales occurred "well over a year" before negative disclosure); *Garden City Employees' Ret. Sys. v. Anixter Int'l, Inc.*, No. 09 CV 5641, 2012 WL 1068761, at *13 (N.D. Ill. Mar. 29, 2012) (nine-month lapse between stock sale and negative disclosures undermined any inference of scienter); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter.").

*Third*, according to the complaint, the November 2014 exercise and sale occurred when the price of Allstate common stock was above $67 per share, Compl. ¶ 123, and had gained nearly 25% in 2014, *id.* ¶ 124, which would be a logical time for anyone to consider a sale. *See In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 754 (1st Cir. 2016) ("the defendants' trades are readily explainable by the steady increase in [the company's] share price during the class period, which 'create[d] a substantial incentive for holders to sell' regardless of any material non-public information").[7] Yet the price of Allstate stock continued to rise for several months, to nearly $73 per share, Compl. ¶ 17, which again contradicts plaintiffs' suggestion that the transaction was well-timed. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 369 (5th Cir. 2004) (insider stock sales did not show scienter where "the stock generally

---

[7] The complaint acknowledges that the stock options Mr. Wilson exercised on May 26, 2015 were scheduled to expire one week later, Compl. ¶ 125 n.5, which alone explains the timing for that transaction.

continued to climb until the revelations . . . , suggesting the timing of the March sales was not unusually prescient").

*Fourth*, the two transactions did not represent the sale of a substantial portion of Mr. Wilson's overall holdings that plaintiffs imply. Several months after the November 2014 transaction, Allstate's proxy statement reported that Mr. Wilson continued to beneficially own 3,043,184 Allstate shares as of March 1, 2015; one year after that, the Allstate proxy statement reported that he beneficially owned 3,085,723 Allstate shares. *See* RJN Exh. O at 67, Exh. P at 73. The transactions therefore were not unusual in their amounts any more than in their timing. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

*Finally*, "[m]anagers sell stock all the time," *Baxter*, 495 F.3d at 759, and the absence of other sales works against any inference of fraud. *Id.*; *see Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 944 (N.D. Ill. 2015) ("Plaintiff names two individuals as defendants and alleges a corporate scheme to inflate InnerWorkings' stock prices, yet fails to allege that insiders other than Belcher profited."); *see also Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) ("One insider's well timed sales do not support the 'strong inference' required by the statute"); *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 56-57 (1st Cir. 2008) ("a strong inference of scienter . . . cannot be drawn" based on the trading of a single insider).

### C. Plaintiffs Have Failed to Plausibly Allege That Their Losses Were Caused By the Alleged "Fraud."

Under the PSLRA, a private plaintiff asserting Exchange Act claims has the burden to prove that the act or omission at issue "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In *Dura Pharm., Inc. v. Broudo*, the Supreme Court held that this provision also requires a plaintiff to plausibly allege such "loss causation" to avoid

dismissal. 544 U.S. at 345-46, 125 S. Ct. at 1633-34. This requires plausible allegations that an alleged omission "concealed something from the market that, *when disclosed*, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis added); *see Tricontinental Indus.*, 475 F.3d at 842-44 (affirming dismissal for failure to allege loss causation). A corrective disclosure therefore "'must present facts to the market that are new, that is, publicly revealed for the first time.'" *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th Cir. 2013) (citation omitted); *see also Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 317 (5th Cir. 2008).

The complaint here alleges that Allstate "shocked investors" on August 3, 2015 "by reporting disappointing financial results that reflected the third consecutive quarter of increases in claims frequency. It reported quarterly operating income of $262 million, which was $350 million (57%) less than the prior quarter, and disappointing operating EPS of $0.63, a $0.34 (35% shortfall from analysts' consensus." Compl. ¶ 104.[8] Plaintiffs attribute the ensuing decline in Allstate's stock price to Allstate's "key admission that its prior, greatly reduced underwriting standards were causing the increase in claims frequency." *Id.* ¶ 105. But Allstate previously had disclosed in May 2015 that it had increased auto premiums, tightened underwriting guidelines, and reduced expenses to combat the negative auto claims frequency trend. *See* RJN Exh. H at 2, Exh. I at 50-51, Exh. J at 6, Exh. K at 2. Plaintiff has not plausibly alleged that the alleged losses after the August 2015 disclosure were attributable to some new

---

[8] Plaintiffs allege that Allstate's February 4, 2015 and May 5, 2015 disclosures, which also preceded declines in the Allstate's stock, were only partial disclosures and that after those disclosures "the price of Allstate stock remained artificially inflated." Compl. ¶¶ 102, 103. However, "'artificially inflated purchase price' is not itself a relevant economic loss." *See Dura*, 544 U.S. at 347, 125 S. Ct. at 1634.

revelation to the market rather than normal market movements following a disappointing earnings report.

## II.    THE "CONTROL PERSON" CLAIMS UNDER SECTION 20(a) ALSO SHOULD BE DISMISSED.

Because plaintiffs have failed to plead a primary violation, their "control person" claims against Messrs. Wilson and Winter also should be dismissed. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court dismiss the Exchange Act claims in their entirety.

Dated: Chicago, Illinois        DLA PIPER LLP (US)
          June 1, 2017

                                 By:   /s/ *Raja Gaddipati*
                                       Raja Gaddipati (IL-6289527)
                                       raja.gaddipati@dlapiper.com

Of Counsel:                      444 W. Lake Street, Suite 900
                                 Chicago, IL 60606-0089
John J. Clarke, Jr.*             Tel.:  312.368.4000
john.clarke@dlapiper.com
DLA PIPER LLP (US)               Attorneys for Defendants
1251 Avenue of the Americas        The Allstate Corporation, Thomas J. Wilson, and
New York, NY 10020-1104            Matthew E. Winter
Tel.:   212.335.4500

* Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 1, 2017, I electronically filed the foregoing **Memorandum of Law in Support of All Defendants' Motions to Dismiss the Amended Complaint** using the ECF System for the United States District Court for the Northern District of Illinois.  Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record registered on the ECF system.


_/s/ Raja Gaddipati_____
Raja Gaddipati
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089