**Exhibit A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE THE ALLSTATE CORPORATION SECURITIES LITIGATION | Case No. 16-cv-10510 |

**EXPERT REPORT OF JOHN D. FINNERTY, Ph.D.**

**IN SUPPORT OF LOSS CAUSATION AND DAMAGES**

Table of Contents

I. **Qualifications** ........................................................................................................ **1**
II. **Assignment** ........................................................................................................... **3**
III. **Summary of Opinions** ........................................................................................ **4**
IV. **Background** ............................................................................................................ **5**
    A. Overview of Allstate's Business During the Class Period ........................ 5
    B. Alleged False and Misleading Statements and Omissions Identified by Plaintiffs ................................................................................................................ 7
    C. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions ................................................................................. 9
V. **Calculation of Abnormal Returns on Allstate's Common Stock** ............. **10**
VI. **Loss Causation Analysis on the Corrective Disclosure Dates** .................. **15**
    A. February 4-6, 2015 ................................................................................ 17
        i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions ............................................ 17
        ii. Securities Analysts' Commentary ............................................... 18
        iii. The Information Contained in Allstate's Earnings Release for the Fourth Quarter of 2014 Was a Corrective Disclosure ............................ 24
        iv. Price Impact of the Corrective Disclosures ................................ 24
    B. May 5-6, 2015 ....................................................................................... 27
        i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions ............................................ 27
        ii. Securities Analysts' Commentary ............................................... 28
        iii. The Information Contained in Allstate's Earnings Release for the First Quarter of 2015 Was a Corrective Disclosure ............................... 33
        iv. Price Impact of the Corrective Disclosures ................................ 34
    C. August 3-4, 2015 ................................................................................... 35
        i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions ............................................ 35
        ii. Securities Analysts' Commentary ............................................... 37
        iii. The Information Contained in Allstate's Earnings Release for the Second Quarter of 2015 Was a Corrective Disclosure ............................ 44
        iv. Price Impact of Corrective Disclosures ...................................... 46
VII. **Calculation of Damages per Share** .............................................................. **49**
    A. February 5-6, 2015 ............................................................................... 50
    B. May 6, 2015 .......................................................................................... 52
    C. August 4, 2015 ...................................................................................... 53

**VIII.   Calculation of Inflation per Share during the Class Period ....................................... 53**

## I. Qualifications

1. I am an Academic Affiliate at AlixPartners, LLP, a financial and operational consulting firm, where I was previously a Managing Director. I have extensive experience in market efficiency analysis, securities valuation, business valuation, derivatives valuation, solvency analysis, damages calculations, and litigation support for matters involving securities fraud, breach of contract, commercial disputes, valuation disputes, solvency, fairness, and breach of fiduciary duty. I have testified as an expert in securities and other financial matters, broker hiring disputes, and valuation disputes, in federal and state court and in arbitration and mediation proceedings. I have also testified as an expert in bankruptcy court proceedings concerning the valuation of securities and businesses, the economics of debt-for-debt exchanges, and the fairness of proposed plans of reorganization.

2. Prior to joining AlixPartners, I was a Managing Principal at Finnerty Economic Consulting, LLC, which provided financial consulting and valuation services to law firms, corporations, industry associations, and government agencies. Prior to forming Finnerty Economic Consulting in 2003, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner (non-audit) in the PricewaterhouseCoopers Financial Advisory Services Group. I have also held investment banking positions at Morgan Stanley, Lazard Frères, McFarland Dewey, and Houlihan Lokey Howard & Zukin. I previously served as a Director, Executive Vice President, Treasurer, and as Chief Financial Officer of College Savings Bank, an FDIC-insured and New Jersey-chartered thrift institution.

3. I am a Professor of Finance at Fordham University's Gabelli School of Business, where I was the founding Director of the school's Master of Science in Quantitative Finance Program. I

was awarded early tenure in 1991, and I received the Gladys and Henry Crown Award for Faculty Excellence in 1997.  I have published 16 books, including Corporate Financial Management, 5th ed., Project Financing, 3rd ed., and Debt Management, and I have published more than 120 articles and professional papers concerning corporate finance, fixed income, and business and securities valuation. I co-hold four patents on financial products, including a life insurance product that paid off in units of a specially designed certificate of deposit that would pay the cost of the beneficiary's college education.

4.     I have previously published a paper on the calculation of damages in securities fraud cases entitled, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," which was published in the Spring 2003 issue of the Stanford Journal of Law, Business & Finance.  I have also published a paper on the settlement amounts in securities fraud class actions entitled, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," which was published in the Summer 2006 issue of the Hastings Business Law Journal.  I have extensive experience testing for market efficiency, performing loss causation analysis, and calculating damages in securities fraud cases. I have previously worked on 10b-5 securities fraud class action matters in which the defendant was an insurance company.

5.     My teaching and research deal mainly with corporate finance, investment banking, fixed income securities valuation, fixed income portfolio management, and the design and valuation of complex securities.  My corporate finance and investment banking courses cover business valuation, securities valuation, public offerings of securities, and equity financing.  I was inducted into the Fixed Income Analysts Society Hall of Fame in 2011.

6.     I previously served as the Chair of the Trustees, President, and Director, and I am currently

2

serving as a Trustee of the Eastern Finance Association, an academic finance organization. I am a former Director of the Financial Management Association. I have served as the President and Director of the Fixed Income Analysts Society, an association of finance professionals based in New York City. I am a former editor of *Financial Management*, one of the leading academic finance journals, and a former editor of *FMA Online*. I am also a former member of the editorial boards of the *Journal of Portfolio Management* and the *International Journal of Portfolio Analysis & Management* and a former associate editor of the *Journal of Applied Finance*.

7. I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University, where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within at least the past four years.

8. I am being compensated at a rate of $1,150 per hour for my work on this matter. I have been assisted in the preparation of this expert report by AlixPartners's staff working under my direction and supervision. I will also receive compensation based on the professional fees earned by AlixPartners in conjunction with their support of my work in writing this report. Neither my compensation nor AlixPartners's compensation is contingent on my findings or on the outcome of this matter.

9. The materials that I considered in coming to my opinions in this matter are referenced in this expert report and accompanying exhibits or are listed in Appendix B to this expert report.

## II.   Assignment

10. Labaton Sucharow LLP ("Counsel"), counsel for the Plaintiffs in this matter, has asked me to

(1) perform a loss causation analysis and opine on whether the declines in the price of the common stock of The Allstate Corporation ("Allstate" or the "Company") on the alleged disclosure dates were attributable to and substantially caused by identifiable news events relating to the disclosure of the fraud allegedly committed by Allstate during the period extending from October 29, 2014 through August 3, 2015 inclusive (the "Class Period") and (2) calculate the amount of damages per share experienced by class members who purchased shares of Allstate's common stock when the fraud-related inflation was removed from the stock price during the Class Period.[1]

## III.  Summary of Opinions

11.  Based on my education, knowledge, and training in economics; my experience in performing loss causation and damages analysis in connection with securities class action matters; and my review of the case documents, company filings, and other information relevant to this matter, I have reached the following opinions to a reasonable degree of certainty in the financial economics profession after conducting appropriate studies, the results of which are described in this expert report:

   a.  Allstate's common stock price declined on February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015 (the "Disclosure Dates") immediately following the public revelation of previously undisclosed facts regarding the Company's increase in auto claims frequency (*See* Exhibit 1);

   b.  I find that the abnormal return on Allstate's common stock on each of the Disclosure Dates, after adjusting for market-wide and industry-wide factors in an appropriately designed event study, is statistically significant at the 5 percent level or better, as follows:

---

[1] Second Amended Consolidated Class Action Complaint, filed September 12, 2018 (the "Complaint").

| Disclosure Date | Actual Return | Abnormal Return | p-value | Statistical Significance |
|---|---|---|---|---|
| 2/5/2015 | -0.39% | -1.34% | 0.012 | 5% |
| 2/6/2015 | -1.89% | -1.86% | 0.001 | 1% |
| 5/6/2015 | -3.84% | -3.58% | 0.000 | 1% |
| 8/4/2015 | -10.15% | -10.02% | 0.000 | 1% |

    c.    After further adjusting for non-fraud-related Allstate-specific information released on each Disclosure Date, the residual abnormal returns on February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015 were -1.21 percent, -1.68 percent, -3.09 percent, and -7.39 percent, respectively. These residual abnormal returns were not due to any macroeconomic factors, industry-specific factors, or non-fraud-related Allstate news, but were substantially caused by a series of disclosures concerning the increase in auto claims frequency due to Allstate's aggressive growth strategies that the Company had misrepresented prior to the Disclosure Dates; and

    d.    The amount of damages suffered by purchasers of the shares of Allstate's common stock as a result of the disclosures of the truth about the increase in auto claims frequency on the Disclosure Dates is, in total, up to $9.38 per share, depending on when the shares were bought and sold during the Class Period.

## IV.    Background

### A.    Overview of Allstate's Business During the Class Period

12.    The Allstate Corporation was incorporated on November 5, 1992 to serve as the holding company for Allstate Insurance Company.[2] It provides, primarily through Allstate Insurance Company, Allstate Life Insurance Company and other subsidiaries, property-liability insurance, life insurance, and retirement and investment products in the United States and Canada. Shares of Allstate's common stock are traded under the ticker symbol ALL on the New York Stock Exchange ("NYSE").

13.    Allstate has four business segments – Allstate Protection, Allstate Financial, Discontinued

---

[2] Allstate Form 10-K for the fiscal year ending December 31, 2014, filed on February 19, 2015, page 1.

Lines and Coverages, and Corporate and Other. The Allstate Protection segment is the Company's core business line, which accounted for 93% of Allstate's consolidated insurance premiums and contract charges with $29.61 billion in premiums written in 2014.[3] In the Allstate Protection segment, Allstate sells auto, homeowners, and other property and casualty insurance products through agencies and directly through contact centers and the internet under the brand names Allstate®, Esurance® and Encompass®.

14. In its 2014 SEC Form 10-K filing, Allstate stated that it had focused on five operating priorities for 2014 and 2015 - growing insurance policies in force;[4] maintaining the underlying combined ratio;[5] proactively managing its investments to generate attractive risk-adjusted returns; modernizing its operating model; and building long-term growth platforms.[6]

15. Insurance companies have underwriting guidelines that specify underwriting policies, such as the lines of insurance that are covered, the prohibited exposures, the amount of coverage for certain exposures, any prohibited geographic areas, and any other restrictions. Based on these underwriting guidelines, insurance companies determine whether to offer or decline to offer their products and also determine appropriate premiums to charge.

16. In its 2014 SEC Form 10-K filing, Allstate specified that, in its property and casualty business, it used "sophisticated pricing algorithms to more accurately price risks."[7] Allstate further

---

[3] *Id.*

[4] Policies in force means policies that are active at a given point in time when payments are made on time or before the grace period expires.

[5] "Combined ratio" measures an insurance company's profitability expressed as a ratio of total costs divided by total revenue. Specifically, the combined ratio is calculated as the sum of incurred losses and expenses divided by earned premiums. Incurred losses refer to actual monies paid out in claims plus the change in "loss reserves." Loss reserves are liabilities—these are claims that have occurred but have not been paid out yet by an insurer. "Underlying combined ratio" is calculated excluding catastrophe losses from the incurred losses. A combined ratio below 100 percent indicates that the company earns an underwriting profit, while above 100 percent indicates an underwriting loss.

[6] Allstate Form 10-K for the fiscal year ending December 31, 2014, filed on February 19, 2015, page 1.

[7] *Id.*, page 3.

noted that:

> Sophisticated pricing and underwriting methods use a number of risk evaluation factors. For auto insurance, these factors can include but are not limited to vehicle make, model and year; driver age and marital status; territory; years licensed; loss history; years insured with prior carrier; prior liability limits; prior lapse in coverage; and insurance scoring utilizing certain credit report information. For property insurance, these factors can include but are not limited to amount of insurance purchased; geographic location of the property; loss history; age, condition and construction characteristics of the property; and insurance scoring utilizing certain credit report information.

17. According to the Complaint, Allstate started focusing on growth in early 2013 and subsequently relaxed its underwriting standards in 2013 in order to increase the number of policies in force.[8] I have been advised by Counsel that discovery in this matter has revealed that, as part of Allstate's growth strategy, the Company also implemented various other initiatives (*e.g.*, BTT, CGR, and Drivewise).[9]

### B. Alleged False and Misleading Statements and Omissions Identified by Plaintiffs

18. Plaintiffs allege both material misrepresentations and material omissions that it attributes to Allstate and the Individual Defendants. The distinction between the two is economically important. Both misrepresentations and omissions result in artificial stock price inflation: the misrepresentations (fraud by commission) trigger a price increase or mitigate an otherwise expected price decrease that would have occurred but for the fraud, and the omission of material negative information (fraud by omission) avoids a price decrease that would have occurred but for the fraud. The repetition of a misrepresentation can also avoid a price decrease that would have occurred but for the fraud – in such instances, a repeated misrepresentation can act as an omission, *i.e.*, the omission of the truth that the

---

[8] Complaint, ¶¶39-40.
[9] *See* Pls.' Responses and Objections to Defs' Second Set of Interrogatories No. 4.

misrepresentation was and is false.

19. Plaintiffs allege that the Defendants made several misrepresentations and omissions during the Class Period primarily relating to Allstate's auto insurance business.  Specifically, Plaintiffs allege that Allstate experienced a steep increase in auto claims frequency, which represents the number of claims filed against an insurer's auto insurance policies, no later than the third quarter of 2014.[10]  However, Plaintiffs allege that Defendants failed to disclose this increase to the public until February 4, 2015, even though Defendants were aware of the auto claims frequency increase at least as of October 2014.[11]

20. Plaintiffs also allege that Defendants made false and misleading statements concerning what was responsible for the significant increase in auto claims frequency.[12]  Plaintiffs allege that Allstate launched a new strategy in 2013 to grow its "insurance policies in force."[13]  As a result of this new growth strategy, Plaintiffs allege that Allstate experienced an increase in its auto claims frequency in the third quarter of 2014 that continued through the third quarter of 2015.[14]  Nevertheless, Defendants allegedly failed to disclose that Allstate's new growth strategy was the proximate cause of the significant increase in its auto claims frequency.[15] Allstate instead allegedly misrepresented to investors that the increasing auto claims frequency trend was consistent with its normal auto claims frequency trend in 2014.[16]  In early 2015, Allstate further misrepresented that the spike in its auto claims frequency was due to temporary external factors, including the economy (increasing the number of miles driven) and the

---

[10] Complaint, ¶¶49-53.
[11] Complaint, ¶¶54, 71.
[12] Complaint, ¶2.
[13] Complaint, ¶3. *See also*, Pls.' Responses and Objections to Defs' Second Set of Interrogatories No. 4.
[14] Complaint, ¶4. Allstate allegedly experienced an initial increase in its auto claims frequency in the third quarter of 2014 when claims increased sharply from the second quarter of 2014.
[15] Complaint, ¶7.
[16] Complaint, ¶10.

weather (greater precipitation in certain geographic regions).[17]

## C. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions

21. Plaintiffs allege that the misrepresentations and omissions that Defendants had concealed from the market were revealed through a series of partial disclosures beginning on February 4, 2015, and continuing through the close of the market on August 4, 2015.[18] Specifically, Plaintiffs allege that, on August 4, 2015, Allstate first disclosed to the public the information that Allstate's poor financial performance resulting from the recent significant increases in its auto claims frequency was caused by its aggressive growth strategies, not by temporary, external factors.[19]

22. As noted herein, Plaintiffs allege certain misstatements of economically significant adverse information, which involved both misrepresentations and omissions of critical information.[20] The alleged misstatements would not be expected to cause Allstate' stock price to increase to the extent that the critical information maintained or confirmed the market's expectations or that the Company failed to disclose information that would enable investors to determine that the information had been misrepresented. Allstate's stock price will not react to a misrepresentation of economically significant information that maintains or confirms investors' expectations. Rather, the stock price will react to the release of the corrective information that corrects the previous misrepresentation concerning the increase in claims frequency in the Company's auto insurance business and its aggressive growth strategies.

---

[17] Complaint, ¶¶12, 15.
[18] Complaint, ¶102.
[19] Complaint, ¶¶8, 106.
[20] Complaint, ¶¶4-5.

## V. Calculation of Abnormal Returns on Allstate's Common Stock

23.   In order to perform a loss causation analysis, I first calculated the abnormal returns on Allstate's common stock for the three corrective Disclosure Dates to focus on the impact of the Allstate-specific news on Allstate's stock price. In the calculation process, I calculated the daily total return on Allstate's common stock, which is the daily percentage change in the price of a share, adjusted for any cash dividend distributions.

24.   A security's abnormal return is the difference between the security's actual return and its expected return. A security's expected return is the return one would expect based on general market price movements and industry-related factors that are unrelated to the specific event that is being examined, as reflected in the changes in the prices of stocks of firms in the same industry. Once one has calculated a security's abnormal returns, one can use standard statistical tests to determine whether any of these abnormal returns are statistically significant.

25.   I calculated the expected returns on shares of Allstate's common stock by applying the widely accepted Fama-French Three-Factor Model.[21] Eugene Fama and Kenneth French developed what is now known as the Fama-French Three-Factor Model in 1993.[22] The Fama-French Three-Factor Model expresses the excess return on a common stock on day t ($R_t$) over the return on Treasury bills that day ($R_F$) in terms of three key factors. The return on Treasury bills represents the return one would expect on a risk-free investment. This model "has become widely known and adapted."[23] The model identifies the following three factors that explain excess stock returns:

---

[21] Fama, Eugene F., and Kenneth R. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33, 1993, pages 3-56.

[22] *Id.*

[23] Emery, Douglas R., John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 191.

- $(R_m - R_F)$ – the excess return on the equity market portfolio $(R_m)$ over the return on Treasury bills $(R_F)$;[24]

- $SMB$ ("small minus big") – the difference between the returns on small-capitalization stocks and the returns on large-capitalization stocks; and

- $HML$ ("high minus low") – the difference between the returns on high book-to-market stocks (commonly known as value stocks) and the returns on low book-to-market stocks (commonly known as growth stocks).

26. The regression formula for the Fama-French Three-Factor Model, which is fitted to daily data, is:

$$R_t - R_F = \alpha + \beta(R_m - R_F) + s(SMB) + h(HML) + \epsilon \qquad (Equation\ 1)$$

27. The variables $R_m - R_F$, $SMB$, and $HML$ are defined above. The coefficients $\beta$, $s$, and $h$ measure the contributions of the respective factors to the excess return on the stock, $R_t - R_F$. A positive coefficient suggests a direct relationship between the factor and the return on the analyzed stock. The larger the coefficient, the more responsive the stock's return will be to that factor on any given day. The Fama-French Three-Factor Model has become widely accepted for event study analysis.[25] It is a significant improvement over the (unadjusted) Capital Asset Pricing Model ("CAPM") because it prices the risks associated with small firm size and financial distress.[26]

---

[24] The equity market portfolio return, $R_m$, represents the value-weighted return on all NYSE, AMEX and NASDAQ stocks.

[25] *See*, *e.g.*, Boehme, Rodney D., and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Chance," *Journal of Finance,* 57, 2002, pages 871-900; and Ang, James S., and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274. Eugene Fama also won the Nobel Prize in Economics in 2013. "Eugene F. Fama – Facts," Nobelprize.org. Nobel Media AB 2014. Available at http://www.nobelprize.org/nobel_prizes/economic-sciences/laureates/2013/fama-facts.html.

[26] Emery, Douglas R., John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 192.

28. Morningstar's *Cost of Capital Yearbook*, which has been widely relied upon for historical rate of return data in the investment management industry, uses the Fama-French Three-Factor Model, among other models, to calculate the cost of equity capital for firms in various industries.[27]  The Morningstar *Cost of Capital Yearbook* was discontinued after 2013 and replaced by the Duff & Phelps *Valuation Handbook*, which also employs the Fama-French Three-Factor Model, among other models, to calculate the cost of capital.[28]

29. Controlling for industry factors that can affect the price of a company's stock is appropriate in an event study, as several articles in the academic and professional literature have previously noted.[29]  Indeed, academic research has pointed out the importance of making sure that estimates of returns to investors on securities are free of the bias that can occur with the omission of an explanatory factor when using a market model, such as the CAPM or the Fama-French Three-Factor Model, to conduct an empirical study.[30]

---

[27] Morningstar, <u>Cost of Capital 2013 Yearbook</u>, 2013, page 12.

[28] Duff & Phelps, <u>2014 Valuation Handbook</u>, Industry Cost of Capital, page 6.

[29] Tabak, David I., and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., <u>Litigation Services Handbook</u>, 3rd ed., Wiley, New York, 2001, chapter 19.  *See* also Alexander, Janet C., "The Value of Bad News," *UCLA Law Review*, 41, August, 1994, pages 1421-69; Macey, Jonathan R., Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Virginia Law Review Association*, 1017, August 1991, pages 1021-28; MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35, March 1997, pages 13-39; Mitchell, Mark L., and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, 49, February 1994, pages 545-90; and Cornell, Bradford, and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review,* 37, June 1990, pages 883-923.

[30] Bartholdy, Jan, and Paula Peare, "Unbiased Estimation of Expected Return Using CAPM," *International Review of Financial Analysis*, 2003, pages 69-81.  The article specifically mentions the CAPM but its analysis applies equally to the Fama-French Three-Factor Model because that model is really just an extended version of the CAPM.  *See* Brealey, Richard A., Stewart C. Myers, and Franklin Allen, <u>Principles of Corporate Finance</u>, 9th ed., McGraw-Hill, New York, 2008, pages 225-227.  Mark M. Carhart also constructed a four-factor model, which takes the Fama-French three-factor model and extends it by adding a momentum factor.  The momentum factor is calculated as the equal-weighted average of firms with the highest 30 percent eleven-month return lagged one month *less* the equal-weighted average of firms with the lowest 30 percent eleven-month return lagged one month.  *See* Carhart, Mark M., "On Persistence in Mutual Fund Performance," *Journal of Finance*, 52, March 1997, pages 57-82 and Fama, Eugene F. and Kenneth R. French, "Size, value, and momentum in international stock returns," *Journal of Financial Economics*, 105, 2012, pages 457-472.

30.  A multiple regression model is estimated using an estimation period that is ideally untainted by fraud and comparable to the event period (i.e., the Class Period).[31]  However, in this instance, the Fama-French Three-Factor Model provides a better fit to Allstate's common stock price behavior during the Class Period than it does to the behavior of Allstate's common stock price in the year prior to the Class Period as reflected in the higher adjusted R-squared statistic and higher F-statistic when the statistical goodness of fit of the two models are compared.[32]  I also find that the volatility of Allstate's common stock for the one year after the Class Period was higher than the volatility during the Class Period, and thus the one-year period after the Class Period would be unsuitable to use for the estimation period.  (*See* Exhibit 2.)

31.  Accordingly, it is my opinion that it is appropriate to use the Class Period as the estimation period because the Fama-French Three-Factor Model achieves a better statistical fit for the purpose of estimating Allstate's abnormal returns during the Class Period.  A better statistical fit leads to a more robust model, which provides more reliable estimates of Allstate's abnormal returns.

32.  When using the event period to fit the model, it is also necessary to isolate the effects of any alleged fraud on the security's price prior to calculating the security's abnormal returns.  One manner of estimating abnormal returns during the Class Period is to augment the regression model to include dummy variables for the event dates to control for the effect of fraud-related events on the parameter estimation.[33]  Another procedure that is similar is to drop the event

---

[31] For event studies, there are four choices for the estimation period, (1) before the event period, (2) during the event period, (3) after the event period, or (4) around the event period.  *See* Henderson, Glenn V., Jr., "Problems and Solutions in Conducting Event Studies," *The Journal of Risk and Insurance*, 57, 1990, pages 282-306.

[32] The adjusted R-squared statistics of the regression models based on the Class Period and the one year prior to the Class Period are 0.6671 and 0.4753, respectively. The F-statistics of the regression models based on the Class Period and the one year prior to the Class Period are 93.1945 and 57.8411, respectively.

[33] A study by Binder describes an approach that parameterizes the abnormal returns in the regression model by including a set of dummy variables.  Each dummy variable takes on the value one for a particular event, and the coefficient of the dummy variable measures the abnormal return associated with the event.  *See* Binder, John J.,

dates during the estimation period, which is the method I selected.[34]

33. I compiled a list of news events related to the alleged fraud during the Class Period, including any allegedly false and misleading statements, material omissions, and disclosures that the Complaint identifies.[35] I dropped all these fraud-related news event dates in the estimation period I used to fit the Fama-French Three-Factor Model in order to avoid having the returns on these dates bias the parameter estimates in my regression model.

34. I modified the Fama-French Three-Factor Model to include the returns on an industry index of common stocks that are comparable to Allstate to take into account the sensitivity of Allstate's common stock price to movements in the comparable companies' common stock prices during the Class Period. The regression formula for my Modified Fama-French Three-Factor Model is:

$$R_t - R_F = \alpha + \beta(R_m - R_F) + s(SMB) + h(HML) \\ + i(Industry\ Index) + \epsilon \qquad (Equation\ 2)$$

35. *Industry Index* represents the return on a market-weighted custom index comprised of members of the Standard & Poor's 500 Property and Casualty Insurance Index ("S5PROP Index"), excluding Allstate.[36] The coefficient $i$ measures the contribution of industry-wide factors, as measured by the daily percentage change in the *Industry Index*, to the daily excess returns on Allstate's common stock.

36. I applied the Modified Fama-French Three-Factor Model for the three corrective Disclosure

---

"The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting*, 11, 1998, pages 111-137. *See also* Binder, John J., "Measuring the Effects of Regulation with Stock Price Data," *RAND Journal of Economics*, 16, 1985, pages 167-183; and Henderson, Glenn V., Jr., "Problems and Solutions in Conducting Event Studies," *Journal of Risk and Insurance*, 57, 1990, pages 282-306.

[34] I note that the estimated regression coefficients would be identical under both methods.

[35] The Complaint identifies six event dates. If information released after 4:00PM or during *non*-trading days, the next trading day is used to explain stock returns.

[36] The members include The Progressive Corporation, The Travelers Companies, Inc., The Chubb Corporation, Cincinnati Financial Corporation, XL Group Ltd, and Chubb Limited (formerly ACE Limited).

14

Dates to test whether the stock market's reactions to the alleged corrective information were statistically significant.  (*See* Exhibit 3.)  In each case, I used a two-tailed test of statistical significance to test whether the daily abnormal return on Allstate's common stock is zero (the null hypothesis) against the alternative hypothesis that the daily abnormal return is different from zero (the alternative hypothesis).[37]

37.   I distinguish when the abnormal stock return is significantly different from zero at the 1% significance level (highly statistically significant), 5% level (statistically significant), or 10% level (weakly statistically significant).  Academic articles in the financial economics literature typically identify results that are statistically significant at all three levels of statistical significance but place the most weight on statistical results that are significant at the 1% level, less weight on those that are significant at the 5% level, and the least weight on those that are only significant at the 10% level.

## VI.    Loss Causation Analysis on the Corrective Disclosure Dates

38.   A loss causation analysis investigates whether the disclosure of information that corrects the alleged misrepresentations and omissions was substantially the cause of the stock price drop on each corrective Disclosure Date.  A loss causation analysis involves performing an event study to investigate the relationship between the change in the affected security's price on each corrective Disclosure Date and the economically significant news concerning the particular security released into the market on the Disclosure Date.  An event study is a standard statistical technique that financial economists use to test whether a security's price reaction to a

---

[37] The two-tailed test is conservative because I would normally expect that a corrective disclosure would elicit a negative stock market reaction, in which case the alternative hypothesis is that the abnormal stock market return is less than zero and a one-tailed test would seem more appropriate.  Thus, the two-tailed test with a 10% critical significance level is equivalent to a one-tailed test with a more conservative 5% critical significance level.

news announcement (or some other event) is statistically significant. Typically, a loss causation analysis involves examining the information released into the market in connection with an alleged fraud by reviewing news articles, commentators' reports, the company's public announcements, and other public reports released on, or around, each corrective Disclosure Date.

39. The price impact of an alleged misrepresentation can be established either: (1) by analyzing the price impact "directly" in response to an alleged misrepresentation or omission; or (2) by analyzing the price impact "indirectly" in response to the corrective disclosure that corrects the previous misrepresentation or omission.[38] As discussed herein, Plaintiffs allege both misrepresentations and omissions of critical information, which maintained or confirmed the market's expectations on the misrepresentation dates. Allstate's stock price will not react to a misrepresentation of economically significant information that maintains or confirms investors' expectations, but rather, will react to the release of the corrective information that corrects the previous misrepresentation. I thus established the "indirect" price impact focusing on the three corrective Disclosure Dates when the corrective information concerning the significant increases in auto claims frequency and the proximate cause of the significant increase were released to the public.

40. As shown in Exhibit 3, Panel B, the abnormal returns on Allstate's common stock and their statistical significance on the three corrective Disclosure Dates are summarized as follows:

| Disclosure Date | Actual Return | Abnormal Return | p-value | Statistical Significance |
|---|---|---|---|---|
| 2/5/2015 | -0.39% | -1.34% | 0.012 | 5% |
| 2/6/2015 | -1.89% | -1.86% | 0.001 | 1% |
| 5/6/2015 | -3.84% | -3.58% | 0.000 | 1% |
| 8/4/2015 | -10.15% | -10.02% | 0.000 | 1% |

---

[38] *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 284 (2014).

16

As discussed in detail below for each of the corrective Disclosure Dates, all the evidence, including the negative abnormal return on Allstate's stock on the Disclosure Date and its statistical significance and contemporaneous securities analysts' commentary that acknowledge the causal link, support my loss causation analysis.

### A. February 4-6, 2015

#### i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions

41. On Wednesday, February 4, 2015, after the market closed, Allstate released its earnings results for the fourth quarter of 2014.[39] Allstate reported revenue of $8,759 million, net income of $795 million, and operating income of $736 million for the quarter.[40] It reported operating EPS of $1.72, which was above the consensus EPS estimate of $1.67. The Company highlighted in the press release that its "strategy to serve customers with unique value propositions enabled the property-liability businesses to increase policies in force across all three underwritten brands… The underlying combined ratio was at the favorable end of the full-year outlook range, as the negative impact of adverse fourth quarter frequency on auto margins was more than offset by [its] focus on profitable growth."[41] Allstate further stated regarding the increase in auto claims frequency that:[42]

> An increase in claim frequency in the first two months of the quarter adversely impacted the combined ratio for auto insurance, with the Allstate brand auto combined ratio rising to 97.0. This was 1.7 points higher than the prior year. The impact of precipitation in select markets and general economic trends will both be reflected in pricing as necessary to maintain adequate returns. Excellent homeowners profitability brought the property-liability recorded combined ratio to 90.0 for the quarter.

---

[39] Allstate Press Release, "Allstate Sustains Growth and Profitability," February 4, 2015.
[40] *Id.*, at 1.
[41] *Id.*, at 1.
[42] *Id.*, at 2.

42. The next day on February 5, 2015 at 9:00 AM ET, Allstate held a conference call to discuss its earnings results with securities analysts.[43] During the call, Allstate provided an overview of its earnings results for the fourth quarter of 2014 and discussed its strategies and 2015 operating priorities. The discussion during the call primarily focused on the growth in the Allstate brand, an increase in auto claims frequency in October and November, pricing and margin, and capital management. In response to an analyst's question concerning the uptick in auto claims frequency, Allstate's CEO answered that there was no indication that the uptick was related to the quality of the business or driven by growth.[44] He reiterated that the higher auto claims frequency was primarily driven by economic activity, such as a falling unemployment rate, as well as increased precipitation in certain areas of the country.

43. Plaintiffs allege that Allstate's earnings release revealed a significant increase in claims frequency, which partially disclosed the negative impact of Allstate's aggressive growth strategies.[45]

### ii.  Securities Analysts' Commentary

44. In response to Allstate's fourth quarter of 2014 earnings release, a number of securities analysts issued reports.

45. Wells Fargo, in an analyst report issued on February 4, 2015, noted that Allstate's fourth quarter operating EPS of $1.72 beat its expectation of $1.60.[46] Wells Fargo stated that the earnings beat was primarily due to better-than-expected non-life insurance underwriting results, reflecting a lower level of catastrophe losses and higher reserve releases. However, it

---

[43] Bloomberg L.P., Transcript, "Allstate Earnings Q4 2014 Earnings Call Teleconference," February 5, 2015.
[44] *Id.*
[45] Complaint, ¶103. However, Counsel has advised me that that Plaintiffs do not assert that Allstate's earnings release disclosed that the significant increase in claim frequency was attributable to Allstate's growth strategy. *See*, Pls.' Responses and Objections to Defs' Second Set of Interrogatories Nos. 1 & 2.
[46] Wells Fargo Securities, "ALL: Q4 First Look—Frequency Blip Overshadows Earnings Beat," February 4, 2015, at 1.

added that the positive underlying results were offset by an increase in auto frequency trends

during the quarter. Wells Fargo also commented that it expected "a negative bias to Allstate

share price movement reflecting the higher frequency trends seen in the quarter."[47]

46. Wells Fargo, in its subsequent report released after the conference call on February 5, 2015,

noted concerning the high auto claims frequency that:[48]

> Allstate attributed the higher auto claims frequency to greater economic activity
> fueled by a falling unemployment rate as well as precipitation (causing slick roads) in
> several markets during prime driving hours. Frequency was up in October and
> November but dropped in December. Company commentary on the call pointed to
> satisfactory frequency experience in January as well. Beyond this, Allstate also
> illustrated a recurring pattern of higher frequency in Q4 results in recent years
> including 2010 and 2011 while attributing seasonality in 2012 as getting caught up in
> catastrophe losses associated with Superstorm Sandy.

47. Evercore issued an analyst report on February 4, 2015 stating that it was "incrementally more

cautious" on its Hold rating on Allstate's stock because the underlying combined ratio was

higher than forecasted "due to an increase in personal auto claim frequency."[49]  It suspected,

however, that the higher personal auto claims frequency for Allstate could have been driven by

the significant growth in policies in force of the Company, given that its competitors had not

cited similar issues for the same quarter. Citing these concerns, Evercore reduced its price

target for Allstate's common stock from $72 to $71.

48. In a subsequent report released after the conference call on February 5, 2015, Evercore stated

that the uptick in auto claims frequency could be "a bump in the road for a couple of months

rather than significant mid-pricing of the business or growth issues."[50]  However, given that it

---

[47] *Id*.
[48] Wells Fargo Securities, "ALL: Conference Call Round-up – Frequency Concern Overblown," February 5, 2015,
at 1.
[49] Evercore ISI, "ALL Brand PIF Growth Accelerated But AYCR Ex Cats Misses," February 4, 2015, at 1.
[50] Evercore ISI, "More Comfortable with Frequency Uptick in Oct/Nov Post Conference Call, Improving
Encompass Results," February 5, 2015, at 1.

did not see a similar tick up in frequency reported by Allstate's competitors, it noted that it would wait to draw any conclusions.

49.     Janney, in an analyst report issued on February 4, 2015, noted that while Allstate's overall earnings results for the fourth quarter were in line with its expectations, the Company's underlying worsened underwriting results primarily due to an increase in claims frequency were disappointing, which it expected would have a negative impact on Allstate's common stock price.[51]

50.     UBS, in an analyst report issued on February 4, 2015, noted that Allstate's fourth quarter EPS was slightly below its estimate of $1.76 primarily due to a worse-than-estimated underlying loss, higher underwriting expenses, and lower investment income, which were partially offset by lower catastrophe losses, more favorable reserve development, and higher life insurance operating income.[52]  UBS highlighted the Company's deterioration in its combined ratio, which was primarily driven by "an acceleration in standard auto bodily injury frequency and severity in the quarter."[53]  UBS also expressed its concern noting that the increase in frequency would have a potential negative impact on the Company's profit margin.

51.     Deutsche Bank, in an analyst report released on February 4, 2015, noted that Allstate's fourth quarter EPS was in line with its forecast, mainly driven by the mixed results with lower-than-forecast catastrophe losses and higher auto accident frequency trends in October and November.[54]  The Deutsche Bank analyst warned that Allstate's bottom line forecast, which was modestly below the consensus, would likely have a negative impact on Allstate's common

---

[51] Janney Capital Markets, "Allstate, Initial Thoughts on 4Q14 Results," February 4, 2015, at 1.
[52] UBS Securities, "Allstate Corp., Earnings in Line, but Auto Frequency and Severity Tick Up," February 4, 2015, at 1.
[53] *Id.*
[54] Deutsche Bank Securities, "4Q14 EPS In-Line: 87-89% 'Core' Combined Ratio for 2015," February 4, 2015, at 1.

stock price.

52.  Sandler O'Neill released an analyst report on February 4, 2015 noting that Allstate beat its fourth quarter operating EPS estimate because the Company's underwriting outperformance and higher-than-expected earned premium served to more than offset lower-than-estimated life insurance operating income and net investment income.[55]  However, Sandler O'Neill expressed the view that, while the bottom-line results were better than expected, the worse-than-expected combined ratio and higher claims frequency were concerning.

53.  J.P. Morgan, in its analyst report released on February 5, 2015, commented on the price reaction of Allstate's stock that day stating that "Allstate shares face pressure today after it reported an uptick in auto insurance loss frequency and severity trend in 4Q."[56]

54.  RBC noted in its analyst report released on February 5, 2015 that it "viewed Q4 as a strong overall result even though auto loss cost trends ticked up a bit relative to recent quarters."[57] RBC perceived the increased auto loss cost as a "blip," while Allstate's "premium, policies in force, ROEs, and overall margins are all heading in the right direction."[58]  RBC acknowledged that "the auto combined ratio deteriorated in Q4 due to higher auto frequency (+4%) and severity (+6%) trends during October & November."[59]

55.  Furthermore, certain securities analysts lowered their EPS estimates for 2015-2016 and/or their price targets for Allstate's common stock while expressing their concerns about the increase in Allstate's auto claims frequency.  For instance, Sterne Agee, in its analyst report released on

---

[55] Sandler O'Neill + Partners, "4Q14 First Look: Reports $1.72 vs. $1.67 SOP," February 4, 2015, at 1.
[56] J.P. Morgan Securities, "Price Increases Could Offset Higher Loss Cost Trends: Buy on the Dip," February 5, 2015, at 1.
[57] RBC Capital Markets, "Staying on Board; Dialing up Capital Management," February 5, 2015, at 1.
[58] *Id*., at 1.
[59] *Id*., at 3.

February 5, 2015, commented that: [60]

> Deterioration in the core LR [loss ratio] (due to increased auto frequency), lower NII [net investment income], and lower life income vs. our forecast was offset by low cat activity. While it is too early to know if this quarter's uptick in frequency is indicative of a trend, we have some concern in the deterioration at a time when ALL is working to drive growth and recent pricing increases on the total portfolio are moderating. Management reiterated its AY ex cat CR guidance range of 87% to 89%. This compares to full year 2014 at 87.1%. We are lowering our 2015 and 2016 EPS on a higher CR forecast and lower NII partly offset by higher share repurchase forecasts.

56. After the market closed on February 5, 2015, securities analysts continued to release analyst reports discussing Allstate's fourth quarter earnings results. Morgan Stanley, in its analyst report released on February 5, 2015, noted that:[61]

> Allstate PIF growth is gaining momentum. However, 2015 core combined guidance of 87-89% leaves little room for margin improvement. Tough comps in cats and partnership income provide challenge for EPS growth.

57. Sandler O'Neill, in a follow-up report released on February 6, 2015, suggested that Allstate's underlying combined ratio was not anticipated to improve in 2015.[62] It also reiterated Allstate's remark that the increase in claims frequency was attributable to increased miles driven. Accordingly, Sandler O'Neill downgraded Allstate's common stock to Hold from Buy and reduced its price target from $78 to $76 based on its concerns regarding Allstate's worse-than-expected underlying combined ratio due to an increase in auto claims frequency.

58. Compass Point, in an analyst report released on February 6, 2015, noted that:[63]

> The company is a leader in the auto industry, but we believe growth will remain in the low single digit range in 2015. Allstate's 4Q14 results benefitted from lower CAT losses YoY and while top line growth exceeded expectations in the P&C segment, the

---

[60] Sterne, Agee & Leach, "4Q14 Core Miss on Increased Auto Loss Trend, NII and Life Income; Reducing Ests [Estimates] and Price Target," February 5, 2015, at 1.

[61] Morgan Stanley & Co., "2015 Guidance Points to Limited EPS Growth," February 5, 2015, at 1.

[62] Sandler O'Neill + Partners, "4Q14 Earnings Review: Downgrading to HOLD from BUY," February 6, 2015, at 1-2.

[63] Compass Point Research & Trading, "Lower CAT Losses Help Beat, 2015 Goals Look A Lot Like 2014," February 6, 2015, at 1-2.

source of the growth stems from the auto business, with homeowners growth weaker than we anticipated. We believe the company will continue to attempt to cross sell products to diversify premiums (auto/ home) as well as expand its distribution footprint (primarily through Esurance) to target changing buyer habits. With fewer growth opportunities, we believe the company will remain committed to stock repurchases. Stock repurchases were lower than expected in 4Q14 and the company expects to complete its prior repurchase authorization by the end of 1Q15. In addition, the Company has already announced a new repurchase reauthorization of $3B to be completed by mid-2016. The Tangible book value declined from 3Q14 as lower interest rates forced a large adjustment in the company's pension benefits. With shares trading at peak multiples on a P/E basis, and closing in on the peer group, we don't believe there is much room for multiple expansion given that management's 2015 goals are unchanged from 2014.

Accordingly, Compass Point slightly lowered its price target for Allstate stock from $68 to $67.

59. Overall, Allstate's fourth quarter of 2014 earnings results were broadly above or in-line with analysts' forecasts. (*See* Exhibit 4 for securities analysts' EPS estimates.) The majority of the securities analysts, after the earnings press release on February 4, 2015, initially raised concerns about Allstate's reduced combined ratio, which was primarily driven by an increase in auto claims frequency. However, the analysts later indicated that the increase in auto claims frequency was less of a concern after hearing Allstate management's explanation during the conference call that the increase was primarily driven by the weather and the number of miles driven. As discussed above, in light of the increase in auto claims frequency, certain securities analysts lowered their EPS estimates for 2015-2016 and/or their price targets for Allstate's common stock.[64]

---

[64] *See*, *e.g.*, Evercore ISI, "More Comfortable with Frequency Uptick in Oct/Nov Post Conference Call, Improving Encompass Results," February 5, 2015, at 1; and Sterne, Agee & Leach, "4Q14 Core Miss on Increased Auto Loss Trend, NII and Life Income; Reducing Ests [Estimates] and Price Target," February 5, 2015, at 1.

### iii. The Information Contained in Allstate's Earnings Release for the Fourth Quarter of 2014 Was a Corrective Disclosure

60. Allstate's fourth quarter 2014 earnings results were broadly in-line with or better than analysts' forecasts. In an efficient market like the one for Allstate's common stock during the Class Period, Allstate's positive earnings results for the fourth quarter of 2014, which beat the market's EPS consensus, would normally be expected to elicit a positive stock price reaction. However, in assessing Allstate's outlook, investors and securities analysts raised concerns about Allstate's reduced auto combined ratio, which was primarily driven by an increase in Allstate's auto claims frequency, as discussed above.

61. Therefore, Allstate's earnings announcement for the fourth quarter of 2014 provided new information that led to concerns regarding the increase in auto claims frequency, which was, from an economic perspective, corrective of alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the concerning outlook.

### iv. Price Impact of the Corrective Disclosures

62. On Thursday, February 5, 2015, Allstate's common stock price declined 0.39 percent from $72.58 to $72.30. (See Exhibit 3, Panel B.) Based on the Modified Fama-French Three-Factor Model, including the percentage change in the Industry Index as an explanatory variable, the abnormal return on Thursday, February 5, 2015 was -1.34 percent for Allstate's common stock. (*See* Exhibit 3, Panel B.) The abnormal return is statistically significant at the 5 percent level. Such a significance level means that there is less than a 1 in 20 chance that the abnormal return happened by mere chance.

63. On Friday, February 6, 2015, Allstate's common stock price declined 1.89 percent from $72.30 to $70.93. (See Exhibit 3, Panel B.) Based on the Modified Fama-French Three-Factor

Model, including the percentage change in the Industry Index as an explanatory variable, the abnormal return on Friday, February 6, 2015 was -1.86 percent for Allstate's common stock. (*See* Exhibit 3, Panel B.) The abnormal return is statistically significant at the 1 percent level. Such a significance level means that there is less than a 1 in 100 chance that the abnormal return happened by mere chance.

64. But-for Allstate's positive earnings results for the fourth quarter of 2014, Allstate's stock price would have declined further. Therefore, being conservative in favor of Defendants, I did not parse out the *positive* impact of confounding information (*i.e.*, the positive earnings results) from the negative price impact of the corrective disclosure. Furthermore, as discussed above, a few analysts attributed Allstate's stock price decline on February 5, 2015 to the increase in Allstate's auto claims frequency or expected the price to decline due to the increase in auto claims frequency.[65] Consequently, it is my opinion that the corrective information contained in Allstate's earnings release regarding the increase in its auto claims frequency was the cause of the significant price decline of Allstate's stock on February 5, 2015.

65. Also, after the market closed on February 5, 2015, securities analysts continued to release their analysts' reports commenting on Allstate's earnings results for the fourth quarter of 2014. As discussed above, a few analysts raised concerns about Allstate's increased auto claims frequency and, consequently, lowered their EPS estimates for 2015-2016, price targets, and/or ratings for Allstate's common stock. In particular, Sandler O'Neill, in a report released on February 6, 2015, downgraded Allstate's common stock from Buy to Hold and reduced its price target from $78 to $76 based on its concerns regarding Allstate's worse-than-expected

---

[65] *See*, *e.g.*, Janney Capital Markets, "Allstate, Initial Thoughts on 4Q14 Results," February 4, 2015; J.P. Morgan Securities, "Price Increases Could Offset Higher Loss Cost Trends: Buy on the Dip," February 5, 2015; Wells Fargo Securities, "ALL: Conference Call Round-up – Frequency Concern Overblown," February 5, 2015.

underlying combined ratio due to an increase in auto claims frequency.[66]  The Sandler O'Neill report specifically cited to Allstate's February 4 earnings release.[67]  Consequently, it is my opinion that the information contained in the analysts' reports that were released after the market closed on February 5, 2015 or during the trading day of February 6, 2015 was the cause of the significant price decline of Allstate's stock on February 6, 2015.

66.  In addition, I understand that claims frequency is typically affected by 1) external factors, such as weather, miles driven, and gas price, and 2) internal factors, such as changes in a company's strategies to aggressively grow its business.  Because the corrective disclosures on February 5 and 6, 2015 involve the Company's misrepresentations regarding the increase in auto claims frequency that was caused by its aggressive auto insurance growth strategies, I measure the price impact of corrective information concerning Allstate's aggressive auto insurance growth strategies, exclusive of the impact of any external factors, in performing my loss causation and damages analyses.

67.  In measuring the impact of Allstate's aggressive growth strategies that were implemented in 2013 on its auto claims frequency, I relied on the Leverty Report.[68]  The Leverty Report opines that, for the fourth quarter of 2014, no more than 9.64 percent of the increase in auto claims frequency was attributable to external factors, such as precipitation and miles driven.[69]  Thus, I applied an adjustment factor of 90.36 percent (= 100% - 9.64%) to the abnormal returns on Allstate's common stock on February 5 and 6, 2015 because it represents the portion of the growth rate in Allstate's auto claims frequency that resulted from Allstate's aggressive growth

---

[66] Sandler O'Neill + Partners, "4Q14 Earnings Review: Downgrading to HOLD from BUY," February 6, 2015, at 1-2.
[67] *Id.*, at 1.
[68] Expert Report of Tyler Leverty, PhD, dated February 27, 2020 (the "Leverty Report").
[69] Leverty Report, ¶188, Table 3 and ¶198, Table 6. Being conservative, I treated the negative impact of precipitation on frequency values as zero.

strategies whose impact Allstate allegedly misrepresented at the beginning of the Class Period.

I calculated the portion of the abnormal return on Allstate's common stock on February 5,

2015 that was caused by the corrective information regarding the impact of its aggressive

growth strategies in its auto insurance business and found it to be -1.21 percent (= -1.34% ×

90.36%).  Also, I calculated the portion of the abnormal return on Allstate's common stock on

February 6, 2015 that was caused by the corrective information regarding the impact of its

aggressive growth strategies in its auto insurance business and found it to be -1.68 percent (= -

1.86% × 90.36%).

> ### B. May 5-6, 2015
>
> #### i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions

68. On Tuesday, May 5, 2015, after the market closed, Allstate released its earnings results for the

first quarter of 2015.  Allstate reported revenue of $8,952 million, net income of $648 million,

and operating income of $616 million for the quarter.[70]  It reported operating EPS of $1.46,

which was slightly above the consensus EPS estimate of $1.44.  The Company highlighted in

its press release that the "Allstate brand had good growth and return in auto, home and other

lines of insurance. The strength of homeowners returns, including low catastrophe losses, more

than offset the impact of increased economic activity on auto margins which is being factored

into our pricing."[71]  Regarding its first quarter operating results compared to the prior year

quarter, Allstate emphasized its slightly improved property-liability combined ratio, higher

underwriting income, but slightly worse underlying combined ratio.[72]  Allstate also highlighted

---

[70] Allstate Press Release, "Allstate's Broad-Based Business Model Generates Profitable Growth," May 5, 2015, at 1.
[71] *Id.*
[72] *Id.*, at 2.

that: [73]

> Auto losses were elevated in the first quarter, reflecting seasonal winter weather and higher non-weather levels of frequency and severity in all three brands where we underwrite risk. Allstate brand auto had a first quarter combined ratio of 96.8, and an underlying combined ratio of 95.6, which was 1.8 points unfavorable to the prior year quarter. Allstate brand bodily injury frequency increased 6.8% from low levels in the first quarter of 2014. Property damage frequency increased 2.1%, and was impacted in part by adverse winter weather experienced predominantly in the east, as well as higher frequency trends broadly across the country. Prior year reserve reestimates negatively impacted the Allstate brand auto recorded combined ratio by 0.8 points in the first quarter of 2015, with approximately half due to litigation settlement accruals. While losses were elevated in the quarter, Allstate brand auto continued to generate a good combined ratio. Price increases in auto insurance originally planned for later in 2015 have been accelerated due to increased non-weather-related loss trends.

69.     The next day on May 6, 2015 at 9:00 AM ET, Allstate held a conference call to discuss its earnings results with securities analysts.  During the call, Allstate provided an overview of its earnings results for the first quarter of 2015 and discussed its strategies and 2015 operating priorities.[74]  The main topics during the call included the Company's auto claims frequency and severity trends, non-catastrophe weather-related losses, plans for the pricing actions on the auto book, and the sustainability of the growth in its policies in force.

70.     Plaintiffs allege that Allstate's earnings release "revealed a second consecutive increase in claims frequency, partially disclosing the negative impact of Defendants' strategy to aggressively grow Allstate's insurance business."[75]

### ii.     Securities Analysts' Commentary

71.     A number of securities analysts issued reports in response to Allstate's first quarter 2015 earnings release.

72.     Wells Fargo, in an analyst report issued on May 5, 2015, stated that Allstate's first quarter

---

[73] *Id.*, at 2.

[74] Bloomberg L.P., Transcript, "Allstate Earnings Q1 2015 Earnings Call Teleconference," May 6, 2015.

[75] Complaint, ¶104. *see also*, Pls.' Responses and Objections to Defs' Second Set of Interrogatories No. 4.

operating EPS of $1.46 slightly beat its expectation of $1.45 noting that:[76]

> The modest upside reflects better-than-expected life results and a lower corporate loss. Non-life results came in as expected as stronger investment income offset weaker underwriting results. Lower-than-expected catastrophe losses were more than offset by adverse reserve development. Auto results were impacted by elevated frequency trends for the second consecutive quarter, something that we had [been] looking to lessen. While ALL saw continued policy growth, a strong level of capital return, and maintained its full-year outlook, we think this will be more than overshadowed by the loss trend. We expect ALL shares to trade down (5/6) on the continued higher frequency trends.

73. Regarding Allstate's weakened combined ratio for the first quarter, Wells Fargo attributed the deterioration of the ratio to the higher auto frequency trends stating that:

> The deterioration from last year reflected weaker results within ALL Brand auto as the underlying margin rose by 1.8 points (to 95.6%) reflect higher frequency trends (both bodily injury and property damage). Auto bodily injury (BI) frequency was +6.8%, compared to+4% in Q4. Auto property damage (PD) frequency rose 2.1%, compared to +0.5% in Q4.

74. In a subsequent report issued on May 6, 2015 after the earnings conference call, Wells Fargo noted that the main focus during the conference call was on "elevated frequency trends, pricing actions, and the sustainability of policies in force growth" and pointed out Allstate's higher auto claims frequency for the second consecutive quarter.[77]

75. Deutsche Bank in an analyst report released on May 5, 2015 noted that Allstate's EPS was better than its forecast of $1.37.[78] It noted that the outperformance was primarily driven by the Company's property and casualty investment income from limited partnership and stronger than forecasted share repurchases. It further commented that the factors including adverse development in property and casualty, increasing auto frequency trends and the worse-than-

---

[76] Wells Fargo Securities, "ALL: First Look at Q1 Results—Frequency Concerns Remain," May 5, 2015, at 1.
[77] Wells Fargo Securities, "ALL: Conference Call Round-up: Frequency Is Everyone's Problem," May 6, 2015, at 1.
[78] Deutsche Bank Securities, "Modest 1Q15 Beat on Solid P&C Alt Investment Income," May 5, 2015, at 1.

expected total property and casualty underlying combined ratio would have a negative impact on Allstate's stock price on May 6, 2015.

76. Janney, in its analyst report released on May 5, 2015, also expected a modest negative stock price reaction on May 6, 2015 due to the heightened auto claims frequency.[79]

77. UBS issued an analyst report on May 5, 2015 noting that Allstate's operating EPS beat its estimate of $1.27.[80] UBS attributed the positive earnings results, including a favorable variance of $0.19, to the following elements:[81]

1) the Company's lower-than-expected catastrophe losses ($0.23 p/sh),
2) higher limited partnership income ($0.10 p/sh), and
3) a lower expense ratio ($0.05 p/sh),
[which were] partly offset by a higher underlying loss ratio ($0.11 p/sh) and adverse reserve development ($0.12 p/sh).

UBS also noted the positive elements of the 2.0% sequential increase in BVPS and better than expected share buybacks. However, UBS raised concerns about the Company's increase in its auto claims frequency and a deteriorating company-wide underlying combined ratio, which were "largely driven by an acceleration in auto bodily injury and physical damage frequency in the quarter."[82]

78. RBC, in an analyst report issued on May 6, 2015, stated that Allstate's operating EPS was in line with its estimate.[83] However, RBC expressed its concern about the Company's uptick in auto claims frequency and severity for the second straight quarter, noting that "the overall combined ratio was weaker than expected due to a higher auto combined ratio (non-cat weather and frequency claims trends), which was offset by better-than-anticipated investment

---

[79] Janney Capital Markets, "Initial Thoughts on 1Q15 Results," May 5, 2015, at 1.
[80] UBS Securities, "Allstate Corp., Beat on Lower Cat Losses, but Auto Frequency Ticks Up Again," May 5, 2015, at 1.
[81] *Id*.
[82] *Id*.
[83] RBC Capital Markets, "Rising Auto Claims Frequency Overshadows Solid Q1," May 6, 2015, at 1.

income and lower corporate expenses."[84]   Accordingly, RBC lowered its price target for Allstate's common stock from $78 to $77.

79.   Credit Suisse, in an analyst report released on May 6, 2015, noted that Allstate's first quarter operating EPS was lower than its estimate of $1.50.[85]   Credit Suisse attributed the negative impact, which included an unfavorable variance of $0.04, to the following elements:[86]

> 1) 7c of lighter than expected catastrophes,
> 2) 10c of favorable limited partnership income relative to our 11% yield runrate,
> 3) 1c for the better than modeled results in corporate,
> [which] all partially offset by 14c less of favorable PYD [Prior Year Development].

Credit Suisse lowered its price target for Allstate's common stock from $84 to $80, reflecting the Company's "pricing action following consecutive quarters of weaker than expected auto underwriting results."[87]

80.   Morgan Stanley, in an analyst report released on May 5, 2015, commented on Allstate's "solid" first quarter results noting the Company's operating EPS was in-line with its estimate of $1.46.[88]   Morgan Stanley, however, highlighted the Company's rising auto claims frequency and severity for two consecutive quarters.

81.   Morgan Stanley, in a subsequent report released on May 7, 2015, again highlighted Allstate's rising auto claims frequency for two consecutive quarters.[89]   Accordingly, Morgan Stanley lowered its price target for Allstate's common stock from $72 to $70.[90]

---

[84] *Id.*
[85] Credit Suisse Securities, "Lowering TP Following Continuation of Soft (Though Somewhat Expected) Auto," May 6, 2015, at 1.
[86] *Id.*
[87] *Id.*
[88] Morgan Stanley & Co., "Allstate Corporation, 1Q15: Solid Results But Auto Frequency Ticked up (Again)," May 5, 2015, at 1.
[89] Morgan Stanley & Co., "Allstate Corporation, Rising Auto Frequency A Near Term Overhang," May 7, 2015, at 1.
[90] I note that the analyst report that contained this price target change was released on May 7, 2015 and consequently did not affect Allstate's stock price on May 6, 2015.

82. JMP Securities, in its analyst report released on May 6, 2015, noted that Allstate missed its EPS estimate of $1.55.[91]  JPM Securities explained that the earnings miss of $0.09 was driven by a "higher-than-forecast accident year loss ratio (…$0.16 miss) and net adverse development (…$0.14 miss)," which were "partially offset by lighter-than-forecast catastrophe losses."[92]

83. Sandler O'Neill, in its analyst report released on May 6, 2015, noted Allstate's earnings miss relative to its EPS estimate of $1.87, pointing out that:[93]

> The earnings miss relative to our estimate was driven by underwriting underperformance along with lower than expected life insurance operating income and a higher than anticipated effective tax rate that served to more than offset higher than expected net investment. The underlying combined ratio - which excludes catastrophes, prior year reserve reestimates and amortization of purchased intangibles - deteriorated by 60 basis points to 89.0% from 88.4% in 1Q14.

Incorporating the negative trend, Sandler O'Neill reduced the Company's EPS estimates for 2015 and 2016 and also reduced its price target for Allstate's common stock from $76 to $71.

84. William Blair, in its analyst report released on May 6, 2015, noted Allstate's earnings beat relative to its EPS estimate of $1.30.[94]  Nevertheless, William Blair highlighted Allstate's increased "auto accident-year loss ratios," noting that:[95]

> Allstate generated solid results during the quarter, with operating EPS coming in at $1.46, compared with $1.30 in the prior-year period. Earnings were driven by improvement in the homeowners book, which helped counter pressure on the auto book. Tougher auto trends should be a near-term EPS headwind and overhang on the stock. Over the longer term, earnings should be helped by growth of the profitable homeowners book, a high level of capital return, and solid top-line prospects.

Reflecting a 100-basis-point increase in its auto loss ratio assumptions, William Blair lowered

---

[91] JMP Securities, "1Q15 Results: EPS in Line With Street; PIF Trends Remain Positive but Auto Loss Trends Remain Elevated," May 6, 2015, at 1.
[92] *Id.*
[93] Sandler O'Neill + Partners, "1Q15 Earnings Review: Maintaining HOLD rating," May 6, 2015, at 1.
[94] William Blair & Company, "Near-Term Clouds Formed by Declining Auto Margins; Look to 2016," May 6, 2015, at 1.
[95] *Id.*

its EPS estimate for Allstate for 2015 and 2016.

85.     Overall, Allstate's first quarter 2015 earnings results were largely in-line with or above analysts' forecasts.  (*See* Exhibit 5 for securities analysts' EPS estimates.)  However, the majority of securities analysts raised concerns about the higher auto claims frequency trends that were evident for the second quarter in a row.  As discussed above, a number of securities analysts lowered their EPS estimates for 2015/2016 and/or their price targets for Allstate's common stock in response to the Company's higher auto claims frequency.[96]

### iii.     The Information Contained in Allstate's Earnings Release for the First Quarter of 2015 Was a Corrective Disclosure

86.     Allstate's fourth quarter 2014 earnings results were broadly in-line with or better than analysts' forecasts.  In an efficient market like the one for Allstate's stock during the Class Period, Allstate's positive earnings results for the first quarter of 2015, which were slightly above the market's EPS consensus, would normally be expected to elicit a positive stock price reaction. However, in formulating their assessments of Allstate's outlook, investors and securities analysts were again concerned about the higher auto claims frequency trends that were evident for the second consecutive quarter.

87.     Therefore, Allstate's earnings announcement for the first quarter of 2015 provided new information that led to concerns regarding the Company's increased auto claims frequency, which was, from an economic perspective, corrective of (and a materialization of the risks concealed by) alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the concerning

---

[96] *See*, *e.g.*, Sandler O'Neill + Partners, "1Q15 Earnings Review: Maintaining HOLD rating," May 6, 2015, at 1-2; Credit Suisse Securities, "Lowering TP Following Continuation of Soft (Though Somewhat Expected) Auto," May 6, 2015, at 1; and RBC Capital Markets, "Rising Auto Claims Frequency Overshadows Solid Q1," May 6, 2015, at 1.

outlook.

### iv.     Price Impact of the Corrective Disclosures

88.     On Wednesday, May 6, 2015, Allstate's common stock price declined 3.84 percent from

$70.00 to $67.31.  (*See* Exhibit 3, Panel B.)  Based on the Modified Fama-French Three-Factor

Model, including the percentage change in the Industry Index as an explanatory variable, the

abnormal return on May 6, 2015 was -3.58 percent for Allstate's common stock.  (*See* Exhibit

3, Panel B.)  The abnormal return is statistically significant at the 1 percent level.  Such a

significance level means that there is less than a 1 in 100 chance that the abnormal return

happened by mere chance.

89.     But-for Allstate's positive earnings results for the first quarter of 2015, Allstate's stock price

would have declined further.  Therefore, being conservative in favor of Defendants, I did not

parse out the *positive* impact of confounding information (*i.e.*, the positive earnings results)

from the negative price impact of the corrective disclosure.  Furthermore, as discussed above, a

few analysts attributed Allstate's stock price decline on May 6, 2015 to the increase in its auto

claims frequency or expected Allstate's stock price to decline due to the increase in the auto

claims frequency.[97] Consequently, it is my opinion that the corrective information contained in

Allstate's earnings release regarding the increase in its auto claims frequency was the cause of

the significant price decline of Allstate's stock on May 6, 2015.

90.     In addition, as with my price impact analysis for the February 5, 2015 Disclosure Date,

because the corrective disclosure on May 6, 2015 involves the Company's misrepresentations

regarding the increase in auto claims frequency that was caused by its aggressive auto

insurance growth strategies, I measure the price impact of corrective information concerning

---

[97] *See*, *e.g.*, Wells Fargo Securities, "ALL: First Look at Q1 Results—Frequency Concerns Remain," May 5, 2015;
Deutsche Bank Securities, "Modest 1Q15 Beat on Solid P&C Alt Investment Income," May 5, 2015; and Janney
Capital Markets, "Initial Thoughts on 1Q15 Results," May 5, 2015.

Allstate's aggressive auto insurance growth strategies, exclusive of the impact of any external factors, in performing my loss causation and damages analyses.

91. In measuring the impact of Allstate's aggressive growth strategies that were implemented in 2013 on its auto claims frequency, I relied on the Leverty Report. As noted above, the Leverty Report opines that, for the first quarter of 2015, no more than 13.65 percent of the increase in auto claims frequency was attributable to external factors, such as precipitation and miles driven.[98] Thus, I applied a 86.35 percent (= 100% - 13.65%) adjustment factor to the abnormal return on Allstate's common stock on May 6, 2015 because it represents the portion of the growth rate in Allstate's auto claims frequency that resulted from Allstate's aggressive growth strategies whose impact Allstate allegedly misrepresented at the beginning of the Class Period. I calculated the portion of the abnormal return on Allstate's common stock on May 6, 2015 that was caused by the corrective information regarding the impact of its aggressive growth strategies in its auto insurance business and found it to be -3.09 percent (= -3.58% × 86.35%).

### C. August 3-4, 2015

#### i. Corrective Disclosures with Regard to the Alleged False and Misleading Statements and Omissions

92. On Monday, August 3, 2015, after the market closed, Allstate released its earnings results for the second quarter of 2015. Allstate reported revenue of $8,982 million, net income of $326 million, and operating income of $262 million for the quarter.[99] It reported operating EPS of $0.63, which was significantly below the consensus EPS estimate of $0.97. The Company

---

[98] Leverty Report, ¶188, Table 3 and ¶198, Table 6. Being conservative, I treated the negative impact of precipitation on frequency values as zero.
[99] Allstate Press Release, "Allstate Maintains Focus on Profitability," August 3, 2015, at 1.

noted in the press release concerning the spike in auto losses that:[100]

> Allstate's proactive approach to strategy and operating performance resulted in a rapid adjustment to continued increases in auto losses. Our second quarter operating income of $262 million was lower than last year, reflecting increased frequency and severity of auto accidents. The increase in auto accidents is broad-based by state, risk class, rating plans and the maturity of the business, and consequently appears to be driven by external factors. While recent growth in Allstate brand auto policies in force did increase frequency, since new business typically has higher relative frequency, this was not the primary driver of a higher combined ratio. We have responded aggressively to improve profitability with rate increases, tighter underwriting standards and expense reductions.

93.     In addition, regarding the combined ratio, Allstate stated that:[101]

> Allstate Protection had an underwriting loss of $8 million and a combined ratio of 100.1 in the second quarter of 2015, as underwriting income of $86 million from the Allstate brand was more than offset by investments in Esurance's growth strategy and higher non-catastrophe losses in the Encompass brand. Allstate brand underwriting income declined from $299 million in the second quarter of 2014 as the auto combined ratio deteriorated by 6.0 points from the favorable results in the prior year to 101.4 due to higher auto claims frequency and severity. Homeowners underwriting income improved by $103 million to $91 million in the second quarter due to a consistently strong underlying combined ratio and lower catastrophe losses.

94.     The next day on August 4, 2015 at 9:00 AM ET, Allstate held a conference call to discuss its earnings results with securities analysts. During the call, Allstate provided an overview of its second quarter 2015 results and discussed its strategies and 2015 operating priorities.[102] The main topics of the call included the auto claims frequency and severity trends, its pricing actions, the growth in policies in force, and capital management. Concerning the "significantly elevated" claims frequency for the quarter, the President of Allstate reiterated that the increase was primarily driven by external factors. However, he admitted that the growth rate of

---

[100] *Id*.

[101] *Id*., at 2.

[102] Bloomberg L.P., Transcript, "Allstate Earnings Q2 2015 Earnings Call Teleconference," August 4, 2015.

Allstate's "new auto business" contributed to the increase in claims frequency. He specifically noted that:[103]

> As you know, new business normally runs at a higher frequency level than renewal customers. We often refer to this as a new business penalty. With that in mind, we want to quantify this impact in our auto book, particularly in light of the positive growth trends we've experienced over the past couple of years. So we analyzed how the volume of new auto business we've written in the past two years has impacted our results and our analysis indicated that the new business growth rate is having between a half a point and a point impact on the auto loss ratio. This impact was expected and manageable. It is, however, a contributing factor to the higher frequency we are seeing. We continue to monitor new to renewal trends across our 15 local market operating committees in the U.S. and Canada.

95.    Plaintiffs allege that Allstate's earnings release revealed "the third consecutive quarter of increase in claims frequency."[104]  Plaintiffs further allege that Allstate admitted, "for the first time, that 'recent growth in Allstate brand auto policies in force did increase [in] frequency.'"[105]

### ii.    Securities Analysts' Commentary

96.    In response to Allstate's second quarter of 2015 earnings release, a number of securities analysts issued reports.

97.    Morgan Stanley, in an analyst report issued on August 3, 2015, commented that Allstate's second quarter results were "disappointing" with the operating EPS of $0.63, which was significantly below its estimate of $1.18.[106]  Morgan Stanley highlighted that the increased combined ratio was "driven higher by a broad based increase in frequency and severity of auto accident."[107]

---

[103] *Id.*
[104] Complaint, ¶105.
[105] Complaint, ¶106.
[106] Morgan Stanley & Co., "2Q15: Disappointing Results as Auto Frequency & Severity Remain Elevated," August 3, 2015, at 1.
[107] *Id.*

98.     UBS, in an analyst report issued on August 3, 2015, noted that Allstate's operating EPS of

        $0.63 was considerably below its estimate of $1.04, which was mainly driven by a higher

        underlying loss ratio, adverse reserve development, and lower limited partnership income.[108]

        UBS attributed the EPS miss of $0.41 to: [109]

> 1) a higher underlying loss ratio ($0.29 p/sh),
> 2) adverse reserve development ($0.08 p/sh unfavorable variance), and
> 3) lower limited partnership income ($0.04 p/sh).

        UBS particularly expressed its concern about the continued increase in claims frequency to

        the extent that the companywide underlying combined ratio deteriorated due to "increases in

        auto bodily injury and physical damage frequency in the quarter."[110]

99.     Wells Fargo stated in an analyst report issued on August 3, 2015 that Allstate's operating EPS

        was below its estimate of $0.77 primarily due to "continued elevated auto claims frequency"

        and "lower investment income stemming from real estate joint ventures."[111]  Wells Fargo

        highlighted the following points concerning Allstate's increased auto claims frequency: [112]

> Across both physical damage (PD) and bodily injury (BI), Allstate saw a sustained
> rise in auto claims frequency of 6.9% and 6.8%, respectively. Claims severity was
> also up for PD and BI, 3.7% and 0.6%, respectively, but to a lesser degree. Frequency
> has been on an upswing since the fourth quarter of 2014 following several very
> favorable years.

100.    Wells Fargo, in its subsequent analyst report released on August 4, 2015, commented that

        Allstate's earnings conference call primarily focused on the uptick in its loss trends,

        particularly frequency.[113]  To reflect weaker underlying margins, Wells Fargo lowered its EPS

---

[108] UBS Securities, "Allstate Corp., 2Q15: Auto Frequency Ticks Up Again in a Tough Quarter," August 3, 2015, at 1.
[109] *Id.*
[110] *Id.*
[111] Wells Fargo Securities, "ALL: First Look at Q2 Results – Frequency Crashes Q2 Results," August 3, 2015, at 1.
[112] *Id.*
[113] Wells Fargo Securities, "ALL: Conference Call Round-Up--Allstate Runs Out of Gas in Q2," August 4, 2015, at 1.

estimates for 2015 and 2016, and consequently, lowered its price target for Allstate's common stock price from $76-$80 to $70-$74.

101. Deutsche Bank released an analyst report on August 3, 2015 stating that Allstate missed its EPS forecast of $0.83 primarily due to larger catastrophe losses and the increase in accidence frequency.[114] Deutsche Bank further noted regarding Allstate's auto claims frequency that:[115]

> The accident-year loss ratio excluding catastrophes in auto insurance rose to 72.5%, up more than 500bps over 2Q14. Back in February 2015, management had observed an October/November 2014 spike in accident-frequency that abated in December and seemed to be muted in 1Q15. Management now observes accident frequency increases broadly across all geographies, segments, rating plans and degrees of customer tenure. Allstate auto brand bodily injury and property damage claim frequencies were up 6.8% and 6.9%, respectively, from 2Q14 levels.

> Allstate, with 11% market share widespread across the country is a good proxy for auto trends industrywide. Strangely, Allstate's woes did not appear in competitor accident-year loss ratios for 2Q15… Allstate will argue that, as it has become an increasingly data-heavy business with more market share than any publicly traded company, its ability to detect trends has improved relative to peers. We believe these Allstate results are likely to seep into investor concerns over the auto line in general, but, until others confirm Allstate's experience, it will generally be viewed as an Allstate-specific problem.

As a frame of reference, Deutsche Bank estimated that "a 1% change in Allstate's auto combined ratio is equivalent to $0.33 of after-tax EPS."[116] Accordingly, Deutsche Bank expected that Allstate's stock price would decline sharply on August 4, 2015, in response to Allstate's disappointing second quarter earnings results, which were driven by the spike in auto claims frequency.

102. Credit Suisse, in an analyst report issued on August 4, 2015, stated that Allstate's operating

---

[114] Deutsche Bank Securities, "4Q14 Auto Accident Frequency Trickle Balloons in 2Q15," August 3, 2015, at 1.
[115] Id.
[116] Id.

EPS was below its estimate of $1.07, attributing the EPS miss of $0.44 to:[117]

1) "less favorable PYD and higher catastrophe losses" ($0.13) and
2) "weaker modeled underwriting results in Property Liability, most notably in Allstate Brand Auto" ($0.30).

Credit Suisse further noted that Allstate's "auto results were negatively impacted by an increase in accident frequency which the company indicated is broad-based by state, risk class, rating plan and maturity of business."[118]  Credit Suisse lowered its EPS estimates for 2015, 2016, and 2017, as a result from its views of "slightly elevated near term frequency trend and lower estimates in the aforementioned other segments (Other Commercial, Other Personal, Encompass), which was "partially offset by better than expected pace of rate increases and higher share repurchase."[119]  Accordingly, Credit Suisse lowered its price target for Allstate's common stock from $80 to $77.

103. MKM stated in an analyst report issued on August 4, 2015 that Allstate's operating EPS was below its estimate of $0.96, attributing the earnings miss to the increase in auto loss frequency.[120]

104. Sandler O'Neill, in an analyst report released on August 4, 2015, noted that Allstate's EPS was slightly lower than its estimate of $0.66.[121]  Concerning Allstate's increased claims frequency and severity, Sandler O'Neill believed that the phenomenon might be a company-specific issue relating to its auto insurance underwriting, in stating that:[122]

> ALL cited increased frequency and severity as a driver of the 2.7 point deterioration in the reported combined ratio in the quarter as compared to 2Q14. The increase in

---

[117] Credit Suisse Securities, "Magnitude of EPS Miss Distracting but Rate Action Plan on Schedule," August 4, 2015, at 1.
[118] *Id.*
[119] *Id.*
[120] MKM Partners, "Auto Frequency Increase Causes Miss; Company Addressing the Problem," August 4, 2015, at 1.
[121] Sandler O'Neill + Partners, "2Q15 First Look: Reports $0.63 vs. $0.66 SOP," August 4, 2015, at 1.
[122] *Id.*, at 1-2.

auto accidents is broad-based by state, risk class, rating plans and the maturity of the business. This has now occurred for a number of quarters in a row. Importantly, other insurers such as Progressive and Travelers have not reported a similar issue in the second quarter. Increasingly, Allstate looks like it has a company specific issue with its auto insurance underwriting that relates to both auto claim frequency and catastrophe loss exposure.

105. Sandler O'Neill, in a subsequent analyst report released on August 5, 2015, lowered its price target for Allstate's common stock from $71 to $66 in response to Allstate's increased claims frequency and severity.[123]

106. RBC, in an analyst report released on August 4, 2015, noted that Allstate's results were disappointing as the Company's EPS largely missed its estimate of $1.05.[124] RBC pointed out that the earnings miss was largely driven by higher-than-expected auto claims frequency and slightly weaker-than-expected investment income. Accordingly, RBC lowered its price target for Allstate's common stock from $77 to $69 and also lowered its rating from Outperform to Sector Perform, based on its following views:[125]

> Our reasoning is primarily due to reduced earnings visibility and expectation of slower book value growth. Since 4Q14 the company has seen consistent margin pressure from higher loss frequency and severity. While pricing action has been taken, it will take a few more quarters before the benefits of these actions will be visible in results. Equally, given Allstate's portfolio duration, we expect further pressure on book value growth as interest rates begin to rise.

107. RBC, in a research note released following the earnings conference call, raised concerns about the Company's worsening frequency trend, commenting that the continued increase in loss frequency and severity trends would not improve in the near term.[126] It summarized the

---

[123] Sandler O'Neill + Partners, "2Q15 Earnings Review: Maintaining HOLD Rating," August 5, 2015, at 1. I note that the analyst's price target change would unlikely affect Allstate's stock price on August 4, 2015.
[124] RBC Capital Markets, "Margins Disappoint, Lowering to Sector Perform," August 4, 2015, at 1.
[125] Id.
[126] RBC Capital Markets, "Allstate (ALL) Q2 Conference Call Highlights," August 4, 2015.

discussion during the conference call as follows:[127]

- The higher auto claims frequency trend is broad based by geography although management indicated that the uptick in new business (which typically has lower margins than existing customers) has been having an adverse impact on the loss ratio (management estimates 0.5 to 1.0 loss ratio points).
- The company continues to believe that macro factors & higher miles driven are largely responsible for the uptick in claims frequency, which was coming off very low levels during 2014.
- In addition to higher frequency, Allstate is watching out for higher auto severity loss trends as they are monitoring a few factors, including the increase in complexity of vehicles (i.e., technologies installed in cars), higher car parts costs, and an increase in labor repair costs.
- To address the uptick in claims trends, the company is (1) implementing price increases selectively across underperforming areas (2) tightening underwriting standards and (3) taking expense actions. Price increases won't be influenced by what its peers are doing although we believe many are seeing similar trends and are hiking rates too.
- As the company implements these initiatives to restore margins, management anticipates its auto growth rate to "dampen" over the next few quarters while still achieving positive growth.
- Capital management plans aren't impacted by the recent uptick in loss cost trends (the company's current buyback authorization is $1.9 billion).
- Allstate continues to shift invested assets into lower-duration securities and equities, which should help mitigate interest rate risk somewhat if interest rates rise but will also adversely impact investment income.

108. JMP Securities, in an analyst report released on August 4, 2015, also noted that Allstate's second quarter results missed its EPS estimate of $1.03, which was "largely driven by a higher than forecast accident year loss ratio (65% vs. 62% est.; $0.35 miss), due to increased frequency and severity driving a deterioration in auto results."[128] In response to Allstate's earnings miss in the quarter and inflated auto loss cost projections, JPM Securities lowered its EPS estimates for Allstate for 2015 and 2016.

---

[127] *Id.*
[128] JMP Securities, "2Q15 Results: Large EPS Miss Driven by Elevated Auto Loss Trends; Likely Not a Quick Fix," August 4, 2015, at 1.

109. Compass Point, in an analyst report released after the market closed on August 4, 2015, pointed out that Allstate's increased frequency and severity losses exceeded expected trends; and even after adjusting for catastrophic losses, the combined ratio also underperformed expectations.[129] Accordingly, Compass Point lowered its price target for Allstate's common stock from $70 to $66.

110. Morgan Stanley, in an analyst report released on August 5, 2015, noted that:[130]

> **2Q sees continued increased auto frequency and underwriting loss...**
> Allstate reported a challenging quarter with a small underwriting loss (2Q combined ratio 100.1%) due to above average catastrophe losses (10.6% points) and a 3rd straight quarter of elevated auto frequency (+6.9%) and severity (+3.7%). Auto losses were high across all three underwriting brands with combined ratios at Allstate brand auto of 101.4%, Encompass auto at 108.5%, and Esurance auto at 110.2%.

Morgan Stanley lowered its EPS estimates for 2015 and 2016, in response to the Company's higher auto claims frequency and severity, which were partially offset by price increase.

111. Overall, Allstate's second quarter earnings results fell substantially below analysts' forecasts and weakened their overall assessments concerning Allstate's outlook. (*See* Exhibit 6 for securities analysts' EPS estimates.) The majority of securities analysts raised concerns about Allstate's higher auto frequency trends that were evident for the third quarter in a row. As discussed above, although Allstate insisted that the deteriorating auto claims frequency trends were primarily attributable to external factors, a number of securities analysts thought other factors were responsible, including the growth in the number of auto policies in force, given that similar trends had not been reported by Allstate's main competitors during the period. Accordingly, a number of securities analysts lowered their EPS estimates for Allstate for

---

[129] Compass Point Research & Trading, "What's the Frequency Allstate?; Maintain Neutral," August 4, 2015, at 1.
[130] Morgan Stanley & Co., "Frequency and Severity Push Losses Higher for Third Straight Quarter," August 5, 2015, at 1.

2015/2016 and/or their price targets for Allstate's common stock.[131]

### iii. The Information Contained in Allstate's Earnings Release for the Second Quarter of 2015 Was a Corrective Disclosure

112. As discussed, Allstate's earnings results for the second quarter of 2015 revealed the third consecutive quarter of increases in claims frequency. Moreover, this was the first time that Allstate allegedly admitted that the "recent growth in Allstate brand auto policies in force did increase frequency."[132]

113. Securities analysts also discussed the continued increase in claims frequency trends for the third consecutive quarter and expressed their concerns about the new company-specific trend. For instance, Deutsche Bank, in its analyst report released on August 4, 2015, commented that:[133]

> Shares of Allstate fell as much a 12% intraday, closing down 10% following a 2Q15 EPS miss. Allstate reported $0.63 of EPS, against a consensus forecast of $0.89. While the miss was not small, the magnitude of this miss cannot be explained by EPS. At the heart of Allstate's miss was a spike in the trend of both auto accident bodily injury claim frequency (up 6.8% from 2Q14) and auto accident physical damage claim frequency (up 6.9% from 2Q14). This spike in claims trend is the sharpest in five years, and it also suggests a failure on Allstate's part to anticipate an emerging negative trend. Allstate experienced accelerated claims frequency in October and November of 2014, but when it abated in December and did not appear to have an antecedent in 1Q15, management seemed to dismiss the claims aberrations as "noise." However, the events of 2Q15 suggest that a much more negative overall trend was afoot.
> […]
> It would seem that three quarters in a row of elevated frequency activity coming through in the form of elevated claims numbers is a trend and not an anomaly. The anomaly seems to have been 2Q14, when the company produced an 84.7%

---

[131] *See, e.g.*, Credit Suisse Securities, "Magnitude of EPS Miss Distracting but Rate Action Plan on Schedule," August 3, 2015, at 1; Morgan Stanley & Co., "Frequency and Severity Push Losses Higher for Third Straight Quarter," August 5, 2015, at 1; Compass Point Research and Trading, "What's the Frequency Allstate?; Maintain Neutral," August 4, 2015, at 1; and Wells Fargo Securities, "ALL; Conference Call Round-Up—Allstate Runs Out of Gas in Q2," August 4, 2015, at 1.

[132] Complaint, ¶105.

[133] Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for [2]Q15 Miss," August 4, 2015, at 2-3.

underlying combined ratio. With that quarter fading out of the trailing 12 month view with 2Q15 results, the spike in loss ratio becomes apparent. The question is whether it is an industry trend or an Allstate trend. Allstate, with 11% market share widespread across the country is a good proxy for auto trends industrywide. Strangely, Allstate's woes did not appear in competitor accident-year loss ratios for 2Q15: Hartford auto down 20bps to 71.2%, Progressive personal lines up 80bps to 74.7% and Travelers agency auto up 120bps to 70.8%. If such a trend is exclusive to Allstate, given its size, it could suggest some operational control problems as the company has quickly added customers. That said, Allstate management indicated that the losses have come from all customer types of various geographies and lengths of tenure as a customer.

114. Sandler O'Neill, in a subsequent analyst report released on August 5, 2015, stated that:[134]

Its frequency and severity issues continued in the quarter. ALL cited increased frequency and severity as a driver of the 2.7 point deterioration in the reported combined ratio in the quarter as compared to 2Q14. The increase in auto accidents is broad-based by state, risk class, rating plans and the maturity of the business. This has now occurred for a number of quarters in a row. Importantly, other insurers such as Progressive and Travelers have not reported a similar issue in the second quarter. Increasingly, Allstate looks like it has a company specific issue with its auto insurance underwriting that relates to both auto claim frequency and catastrophe loss exposure.

115. As reflected in the contemporaneous securities analysts' reports, Allstate's earnings announcement for the second quarter of 2015 provided new information regarding the Company's increased auto claims frequency, which was, from an economic perspective, corrective of alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the increase in auto claims frequency. This was the first time that Allstate acknowledged that the recent growth in Allstate brand auto policies in force had contributed to the recent increases in its auto claims frequency.

---

[134] Sandler O'Neill + Partners, "2Q15 Earnings Review: Maintaining HOLD Rating," August 5, 2015, at 1.

### iv.    Price Impact of Corrective Disclosures

116. On Tuesday, August 4, 2015, Allstate's common stock price declined 10.15 percent from
     $69.38 to $62.34.  (*See* Exhibit 3, Panel B.)  Based on the Modified Fama-French Three-Factor
     Model, including the percentage change in the Industry Index as an explanatory variable, the
     abnormal return on August 4, 2015 was -10.02 percent for Allstate's common stock.  (*See*
     Exhibit 3, Panel B.)  The abnormal return is statistically significant at the 1 percent level.  Such
     a significance level means that there is less than a 1 in 100 chance that the abnormal return
     happened by mere chance.

117. Allstate's second quarter earnings results fell substantially below the securities analysts'
     forecasts and their overall assessments concerning Allstate's outlook, which was primarily
     attributable to Allstate's higher auto claims frequency trends that were evident for the third
     quarter in a row.

118. A few securities analysts commented on the negative price reaction of Allstate's stock on
     August 4, 2015.  For example, J.P. Morgan, in an analyst report released on August 4, 2015,
     commented that Allstate shares were "selling off substantially" on August 4, in response to the
     earnings miss "reflecting deterioration in loss frequency trends."[135]

119. Deutsche Bank, in its analyst report released on August 4, 2015, commented on Allstate's
     stock price reaction on the day and noted that "the miss on earnings and fundamentals caused
     shares to fall precipitously."[136]

120. Macquarie, in its analyst report released on August 5, 2015, also commented on Allstate's
     stock price decline on August 4, stating that:[137]

---

[135] J.P. Morgan Securities, "ALL Confident It Can Improve Auto Margins, But Turnaround Could Take Several
     Quarters," August 4, 2015, at 1.
[136] Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for 4Q15 Miss," August 4, 2015, at 1.
[137] Macquarie Capital, "Upgrading to Neutral from UP. It's not me, it's you.," August 4, 2015, at 1.

The miss was attributable to worsening auto loss cost trends due to external factors, such as higher miles driven. Subsequently, the stock fell 10.2% vs. S&P -0.22%.

121. UBS, in its analyst report released on August 9, 2015, commented on Allstate's stock price reaction after the Company's second quarter 2015 earnings announcement that "Allstate's shares declined 9.3% last week due to disappointing earnings driven by a higher than expected increase in auto insurance claims frequency."[138]

122. Although securities analysts attributed Allstate's stock price decline on August 4, 2015 to the worsening auto claims frequency trends, I parsed out any confounding information that may have adversely affected Allstate's stock price on August 4, 2015.[139] As shown in Exhibit 6, four securities analysts (UBS, Credit Suisse, JMP Securities, and William Blair) measured the impact of each item of new information contained in Allstate's earnings announcement for the second quarter of 2015 and calculated the variance from the $0.63 EPS Street estimate that had been expected for the second quarter 2015.[140] The four analysts' variance analyses of Allstate's actual EPS shortfall are summarized in the following table:

| Analyst | Analyst's EPS Estimate | Allstate's EPS Relative to Analyst's Estimate | Analyst's Attribution of the EPS Variance[1] | % Impact of Increased Frequency on EPS |
|---|---|---|---|---|
| UBS | $1.04 | -$0.41 | **-$0.29: higher underlying loss ratio** -$0.08: adverse reserve development -$0.04: lower limited partnership income | 71% (=-$0.29/ -$0.41) |
| Credit | $1.07 | -$0.44 | **-$0.30: weaker auto underwriting** | 68% |

---

[138] UBS Securities, "Auto claims frequency is up and margins are down, but for how long?" August 9, 2015, at 1.

[139] I note that this calculation is further conservative in favor of Defendants because I did not take into account any *positive* information in my price impact analysis.

[140] Credit Suisse Securities, "Magnitude of EPS Miss Distracting but Rate Action Plan on Schedule," August 4, 2015, at 1; UBS Securities, "Allstate Corp., 2Q15: Auto Frequency Ticks Up Again in a Tough Quarter," August 3, 2015, at 1; JMP Securities, "2Q15 Results: Large EPS Miss Driven by Elevated Auto Loss Trends; Likely Not a Quick Fix," August 4, 2015, at 1; and William Blair, "Higher Losses Suggest Earnings Have Likely Peaked," August 4, 2015.

| Suisse | | | **results**<br>-$0.13: less favorable PYD and higher catastrophe losses | (=-$0.30/<br>-$0.44) |
|---|---|---|---|---|
| JMP Securities | $1.03 | -$0.40 | **-$0.35: increased frequency and severity in auto** | 88%<br>(=-$0.35/<br>-$0.40) |
| William Blair | $1.05 | -$0.42 | **-$0.46: higher incurred losses (auto)**<br>-$0.05: decreased investment income<br>+$0.02: increased premium income<br>+$0.03: lower underwriting expenses | 100%<br>(=-$0.46/<br>-$0.42)[2] |
| Average | | | | 82% |

Notes:

[1] Analysts' attribution to increased claims frequency in bold.

[2] The % attribution to higher incurred losses is greater than 100% of the variance, thus, being conservative, 100% impact is attributed to the incurred losses.

123. The four analysts, on average, attributed 82 percent of Allstate's EPS miss for the second quarter of 2015 to the increased auto claims frequency and severity. I applied the 82 percent attribution percentage to my price impact analysis for the August 4, 2015 Disclosure Date. Therefore, it is my opinion that the increase in auto claims frequency was responsible for 82 percent of the abnormal return on Allstate's stock, or -8.22 percent (= -10.02% × 82%), on Tuesday, August 4, 2015.

124. Furthermore, as with my price impact analysis for the February 5, 2015 and May 6, 2015 Disclosure Dates, because the corrective disclosure on August 4, 2015 involves the Company's misrepresentations regarding the increase in auto claims frequency that was caused by its aggressive auto insurance growth strategies, I measure the price impact of corrective information concerning Allstate's aggressive auto insurance growth strategies, exclusive of the impact of any external factors, in performing my loss causation and damages analyses.

125. In measuring the impact of Allstate's aggressive growth strategies that were implemented in 2013 on its auto claims frequency, I relied on the Leverty Report. As noted above, the Leverty

Report opines that, for the second quarter of 2015, no more than 10.07 percent of the increase in auto claims frequency was attributable to external factors, such as precipitation and miles driven.[141] Thus, I applied a 89.93 percent (= 100% - 10.07%) adjustment factor to the abnormal return on Allstate's common stock on August 4, 2015 because it represents the portion of the growth rate in Allstate's auto claims frequency that resulted from Allstate's aggressive growth strategies whose impact Allstate allegedly misrepresented at the beginning of the Class Period. I calculated the portion of the abnormal return on Allstate's common stock on August 4, 2015 that was caused by the corrective information regarding the impact of its aggressive growth strategies in its auto insurance business and found it to be -7.39 percent (= -8.22% × 89.93%).

## VII.    Calculation of Damages per Share

126. It is necessary to remove the effects of market-wide factors, industry-wide factors, and any confounding news related to Allstate on each corrective Disclosure Date when performing the damages-per-share calculation. Confounding news consists of economically significant Allstate-specific information that is unrelated to the alleged fraud. The residual abnormal return, which is net of all market-wide, industry-wide, and Allstate-specific effects unrelated to the alleged fraud, on each corrective Disclosure Date represents the amount of damages per share attributable to the disclosure of the alleged fraud on the Disclosure Date.

127. I calculated the amount of damages per share for each day of the Class Period based on the residual abnormal returns for the corrective Disclosure Dates of February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015. My damages calculations for the three corrective

---

[141] Leverty Report, ¶188, Table 3 and ¶198, Table 6. Being conservative, I treated the negative impact of precipitation on frequency values as zero.

Disclosure Dates are based on the loss causation analysis presented in Section VI of this expert report.

128. Damages per share on each of the Disclosure Dates are calculated by multiplying the percentage abnormal return attributable to the fraud (that is, the residual after adjusting for any company-specific information unrelated to the alleged fraud) on the day the corrective disclosure is reflected in Allstate's share price by the closing share price on the trading day immediately prior to the corrective Disclosure Date.

### A.  February 5-6, 2015

129. For the Disclosure Date of Thursday, February 5, 2015, the corrective disclosure occurred immediately after the market closed on February 4, 2015.  The corrective information was contained in Allstate's earnings release for the fourth quarter of 2014.  Allstate reported positive earnings results for the fourth quarter of 2014.  I would expect a positive stock price reaction in response to Allstate's positive earnings results.  However, the corrective disclosure revealing the increase in auto claims frequency had a negative impact on Allstate's stock price on February 5, 2015.

130. But for Allstate's positive earnings results for the fourth quarter, I would expect that Allstate's stock price would have declined more than it actually did.  Therefore, to be conservative in favor of Defendants, I did not parse out the *positive* impact of the confounding information (*i.e.*, the positive earnings results) from the negative price impact of the corrective disclosure on February 5.  I did not find any other economically significant Allstate-specific news unrelated to the alleged fraud on that date.

131. In addition, as discussed in Section VI.A, a few analysts, in their analysts reports released after the market closed on February 5, 2015, continued to raise concerns about Allstate's increased

auto claims frequency and, consequently, downgraded their ratings, lowered their EPS estimates for 2015-2016, and/or lowered their price targets for Allstate's common stock. Therefore, the continued commentary of securities analysts following Allstate's February 4 earnings release provided additional information to investors on February 6, 2015. I did not find any other economically significant Allstate-specific news unrelated to the alleged fraud on that date.

132. As discussed in Section VI.A.iv of this expert report, I further adjusted the abnormal return on Allstate's common stock on February 5 and 6, 2015 to measure the price impact of the increase in auto claims frequency caused by the Company's aggressive growth strategies for its auto insurance business.

133. For the February 5, 2015 Disclosure Date, the residual abnormal return attributable to Allstate's aggressive growth strategy is -1.21 percent. Accordingly, I used the closing price of Allstate's common stock of $72.58 on February 4, 2015 and the residual abnormal return of -1.21 percent on February 5, 2015 for my damages calculation. The amount of inflation dissipation from Allstate's common stock price on February 5, 2015 due to the corrective disclosure is $0.88. (*See* Exhibit 7.)

134. For the February 6, 2015 Disclosure Date, the residual abnormal return attributable to Allstate's aggressive growth strategy is -1.68 percent. Accordingly, I used the closing price of Allstate's common stock of $72.30 on February 5, 2015 and the residual abnormal return of -1.68 percent on February 6, 2015 for my damages calculation. The amount of inflation dissipation from Allstate's common stock price on February 6, 2015 due to the corrective disclosure is $1.21. (*See* Exhibit 7.)

### B. May 6, 2015

135. For the Disclosure Date of Wednesday, May 6, 2015, the corrective disclosure occurred immediately after the market closed on May 5, 2015. The corrective information was contained in Allstate's earnings release for the first quarter of 2015. Allstate reported positive earnings results for the first quarter of 2015. I would expect a positive stock price reaction in response to Allstate's positive earnings results. However, the corrective disclosure revealing the increase in auto claims frequency had a negative impact on Allstate's stock price on May 6, 2015.

136. But for Allstate's positive earnings results for the first quarter, I would expect that Allstate's stock price would have declined more than it actually did. Therefore, to be conservative in favor of Defendants, I did not parse out the *positive* impact of the confounding information (*i.e.*, the positive earnings results) from the negative price impact of the corrective disclosure on May 6, 2015. I did not find any other economically significant Allstate-specific news unrelated to the alleged fraud on that date.

137. As discussed in Section VI.B.iv of this expert report, I further adjusted the abnormal return on Allstate's common stock on May 6, 2015 to measure the price impact of the increase in auto claims frequency caused by the Company's aggressive growth strategies for its auto insurance business. For the May 6, 2015 Disclosure Date, the residual abnormal return attributable to Allstate's aggressive growth strategy is -3.09 percent.

138. Accordingly, I used the closing price of Allstate's common stock of $70.00 on May 5, 2015 and the residual abnormal return of -3.09 percent on May 6, 2015 for my damages calculation. The amount of inflation dissipation from Allstate's common stock price on May 6, 2015 due to the corrective disclosure is $2.16. (*See* Exhibit 7.)

52

### C.   August 4, 2015

139.   For the Disclosure Date of Tuesday, August 4, 2015, the corrective disclosure occurred immediately after the market closed on August 3, 2015.  The corrective information was contained in Allstate's earnings release for the second quarter of 2015.  Allstate's second quarter earnings results fell substantially below securities analysts' forecasts and weakened their overall assessments of Allstate's outlook, which was primarily attributable to the higher auto claims frequency trends that were evident for the third quarter in a row.  I parsed out any confounding information that may have adversely affected Allstate's stock price on August 4, 2015.  After adjusting for the Allstate-specific negative information, the residual abnormal return for Allstate's common stock on August 4, 2015 was -8.22 percent.

140.   As discussed in Section VI.C.iv of this expert report, I further adjusted the abnormal return on Allstate's common stock on August 4, 2015 to measure the price impact of the increase in auto claims frequency caused by the Company's aggressive growth strategies for its auto insurance business.  For the August 4, 2015 Disclosure Date, the residual abnormal return attributable to Allstate's aggressive growth strategy is -7.39 percent.

141.   Accordingly, I used the closing price of Allstate's common stock of $69.38 on August 3, 2015 and the abnormal return of -7.39 percent on August 4, 2015 for my damages calculation.  The amount of inflation dissipation from Allstate's common stock price on August 4, 2015 due to the corrective disclosure is $5.13.  (*See* Exhibit 7.)

### VIII.   Calculation of Inflation per Share during the Class Period

142.   The daily inflation per share amounts for each day during a damage period are referred to as

the inflation ribbon.[142]  The amount of fraud-related inflation in Allstate's stock price on a particular day during the Class Period equals the difference between the actual share price and the price of the stock but-for the fraud.  The but-for price is the price with all the effects of the fraud removed.  The but-for share price calculation is usually based on the "backwardation" method, which starts with the share price immediately following the final disclosure of the fraud, which marks the end of the damage period.  It is assumed that there is zero inflation after the fraud has been fully disclosed to the market.

143. After conducting the loss causation analysis described earlier in this expert report, it is my opinion that the alleged misrepresentations first introduced inflation into Allstate's common stock price beginning October 29, 2014, when Allstate released its earnings for the third quarter of 2014.  Plaintiffs allege that Allstate failed to disclose the Company's claims frequency increase was caused by its aggressive growth strategy.[143]  Specifically, Plaintiffs allege that "to implement the aggressive growth strategy, Defendants caused Allstate to underwrite risker and less profitable business that resulted in an increase in claims frequency."[144]  As discussed in Section IV.C of this expert report, Allstate's stock price would not be expected to increase due to a misrepresentation of economically significant information that maintained or confirmed investors' expectations.

144. Exhibit 8 provides the amount of inflation in Allstate's common stock price for each day during the Class Period.  These daily damage amounts per share are based on the corrective Disclosure Date damages per share presented in Section VII of this expert report and summarized in Exhibit 7.  The amount of damages per share suffered by purchasers of the

---

[142] The terms 'inflation per share' and 'damages per share' are used interchangeably to refer to the impact of the alleged fraud on Allstate's stock price during the Class Period.

[143] Complaint, ¶58.

[144] Complaint, ¶58.

shares of Allstate's common stock during the Class Period due to the alleged fraud and the subsequent disclosures of the truth about the true cause of the increase in auto claims frequency on the Disclosure Dates is, in total, up to $9.47 per share. Each class member's damages will depend on when the class member bought and sold the shares that were affected by the alleged fraud during the Class Period.

145. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental report in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this report. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this expert report.

Executed: February 27, 2020

John D. Finnerty, Ph.D.