**Exhibit B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE THE ALLSTATE CORPORATION SECURITIES LITIGATION | Case No. 16-cv-10510 |

**REPLY EXPERT REPORT OF JOHN D. FINNERTY, Ph.D.**

**IN SUPPORT OF LOSS CAUSATION AND DAMAGES**

Table of Contents

**I.      Qualifications** ....................................................................................................**1**

**II.     Assignment** ........................................................................................................**1**

**III.    Summary of Opinions** ......................................................................................**2**

**IV.    Dr. Gompers' Criticism of My Characterization of the Plaintiffs'
         Allegations Is Unfounded and Lacks Merit** ..................................................**5**

**V.     Dr. Gompers' Criticism of My Loss Causation Analysis Is Flawed and
         Unsupported** ....................................................................................................**7**

    A.   Dr. Gompers Incorrectly Claims That I Did Not Show What Portions of
              the Increases in Auto Claims Frequency Were Attributable to Allstate's
              Greatly Reduced Underwriting Standards ............................................... 8

    B.   Dr. Gompers Incorrectly Claims That I Did Not Properly Account for
              Negative Confounding Information Unrelated to Claims Frequency .................... 16

        i.    February 4-6, 2015 ................................................................... 16

        ii.   May 5-6, 2015 .......................................................................... 25

        iii.  August 3-4, 2015 ...................................................................... 29

    C.   Dr. Gompers Incorrectly Claims That I Did Not Show that the Alleged
              Corrective Disclosures Were Corrective of the Alleged Misrepresentations
              and Omissions .......................................................................................... 37

        i.    The Information That Dr. Gompers Claims Was Released to the Market Prior
                    to the Class Period Is Irrelevant to the Alleged Corrective Disclosures at Issue
                    ............................................................................................... 38

        ii.   Dr. Gompers' Assertion Concerning the Lack of a "Link" Between the
                    Alleged Misrepresentations/Omissions and the Corrective Disclosures Is
                    Unfounded .............................................................................. 42

    D.   Dr. Gompers Mischaracterizes My Analysis by Claiming that My Use of a
              Two-Day Return Is Inconsistent with Market Efficiency ...................................... 48

**VI.    Dr. Gompers' Criticism of My Damages Analysis Is Unsupported** ........................**50**

**VII.   Nothing in the Gompers Report Has Changed My Opinions Expressed in
         the Finnerty Damages Report** .................................................................**52**

## I.  Qualifications

1.  I am an Academic Affiliate at AlixPartners, LLP, a financial and operational consulting firm, where I was previously a Managing Director.  I previously submitted an expert report in connection with this matter on February 27, 2020 (the "Finnerty Damages Report").[1] The scope of my assignment, my qualifications, and other details related to my work in this matter are set forth in the Finnerty Damages Report. Attached as Appendix A is an updated copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within at least the past four years.

2.  I am being compensated at a rate of $1,150 per hour for my work on this matter.  I have been assisted in the preparation of this expert report by AlixPartners's staff working under my direction and supervision.  I will also receive compensation based on the professional fees earned by AlixPartners in conjunction with their support of my work in writing this report. Neither my compensation nor AlixPartners's compensation is contingent on my findings or on the outcome of this matter.

3.  The materials that I considered in coming to my opinions in this matter are referenced in this expert report and accompanying exhibits or are listed in Appendix B to this expert report.

## II.  Assignment

4.  Labaton Sucharow LLP ("Counsel"), counsel for the Plaintiffs in this matter, has asked me to review and respond to the opinions proffered in the Expert Report of Paul A. Gompers,

---

[1] I continue to use the same terms that were defined in the Finnerty Damages Report in this reply report without defining these terms again in the text of this report. I also previously submitted an expert report in support of lead plaintiffs' motion for class certification on June 22, 2018 (the "Finnerty Class Certification Report") and a reply expert report on November 19, 2018 (the "Finnerty Class Certification Reply Report").

Ph.D., dated July 9, 2020 (the "Gompers Report").

## III.    Summary of Opinions

5.    Based on my education, knowledge, and training in economics; my experience in performing

loss causation and damages analysis in connection with securities class action matters; and

my review of the case documents, company filings, and other information relevant to this

matter, I have reached the following opinions to a reasonable degree of certainty in the

financial economics profession after conducting appropriate studies, the results of which are

described in this expert report:

a.    Dr. Gompers (1) does not contest that the event study used in the Finnerty
Damages Report is a reliable, well-accepted method of assessing loss causation
and damages; (2) does not contest that the Fama-French Three-Factor Model I
applied for the event study is reliable and well-accepted in the finance literature;
(3) does not contest that the abnormal returns on shares of Allstate's common
stock based on the Fama-French Three-Factor Model were properly calculated;
and (4) does not contest that Allstate's common stock exhibited a statistically
significant negative abnormal return on each Disclosure Date at the 5% level or
better;

b.    Dr. Gompers' criticisms of my loss causation and damages analysis are
unsupported and flawed:

i.    Dr. Gompers' claim that I did not show that "what portions, if any, of
the increases in Allstate's claims frequency were attributable to
Allstate's allegedly greatly reduced underwriting standards," is
unsupported.  In particular, Dr. Gompers misinterprets and
mischaracterizes Dr. Leverty's analysis.  My reliance on Dr. Leverty's
analysis to measure the impact of the corrective disclosures regarding
Allstate's aggressive growth strategies and the resulting increase in
claims frequency is appropriate because it enables me to adjust the
impact of the increase in claims frequency for the portion of the
impact attributable to miles driven and precipitation, which Allstate
had claimed were responsible for 100% of the claims frequency
increase.

ii.    Dr. Gompers' claim that I did not "properly account for negative

confounding information unrelated to clams frequency" on corrective Disclosure Dates is unsupported. I properly accounted for any negative confounding information in analysing the impact of the corrective disclosures on the Disclosure Dates.

iii. Dr. Gompers' claim that I did not show that "the alleged corrective disclosures were corrective of the alleged misrepresentations and omissions" is baseless.

Dr. Gompers claims that the Plaintiffs' alleged misrepresentations and omissions did not have any price impact because Allstate's growth strategy and its reduced underwriting standards were publicly disclosed before the Class Period. However, he conflates the Plaintiffs' allegation that Allstate failed to disclose that its aggressive growth strategies were the proximate cause of the increase in its auto claims frequency with the fact that the Company had previously announced its growth strategy and noted that its reduced underwriting standards might increase claims frequency. These two statements conveyed fundamentally different information to investors in terms of the significance and the magnitude of the market impact.

Dr. Gompers' claim that I did not provide the link between the alleged misrepresentations/omissions and corrective disclosures is unfounded because his criticism is based on his mischaracterization of the Plaintiffs' allegations, *i.e.*, based on his arbitrary four categories. Instead of properly considering the subject matter concealed by the alleged misrepresentations and omissions, Dr. Gompers improperly and misleadingly attempts to rewrite Plaintiffs' allegations by classifying them into four separate alleged misstatements and omissions. However, the four misstatements and omissions he specifies – and indeed the eleven misstatements and omissions Plaintiffs allege in the Complaint - all conceal the same underlying factor: Allstate's implementation of new aggressive growth strategies to increase the number of auto insurance policies in force was the proximate cause of the increase in Allstate's auto claims frequency during the Class Period. These alleged misrepresentations and omissions that Allstate made were corrected on the four Disclosure Dates when the truth about Allstate's poor financial performance resulting from the significant increases in its auto claims frequency, which was caused by its aggressive growth strategies, was revealed to the market.

Contrary to Dr. Gompers' assertion, in the Finnerty Damages Report, I did demonstrate loss causation by showing that Allstate's stock price declines on the corrective Disclosure Dates were all substantially the result of disclosures of the risks concealed by the Allstate's alleged misrepresentations and omissions.

iv.  Dr. Gompers' claim that the use of "a two-day residual stock price return following the February 4-5, 2015 corrective disclosures" is inconsistent with the market efficiency is unsupported.  I identified *new* information for my loss causation analysis for the February 6 Disclosure Date, *i.e.*, securities analysts' commentary.  I also note that a two-day event window is common in academic event studies and that courts have accepted the two-day event window and certified the class;

c.  Dr. Gompers' criticisms of my damages analysis are unsupported:

i.  Dr. Gompers' claim that my analysis cannot be used to measure damages, because my damages methodology is based on the same assumptions that he claims undermine my loss causation analysis, is unsupported for the same reasons I discussed above.

ii.  Dr. Gompers' claim that my damages methodology "overstates damages by assuming that the entirety of any price inflation was present at the beginning of the Class Period" is unfounded because Dr. Gompers mischaracterizes Plaintiffs' allegations.  Contrary to Dr. Gompers' mischaracterization, the allegation in this matter is that, even though Defendants were aware of the auto claims frequency increase at least as of the beginning of the Class Period on October 29, 2014, Defendants failed to disclose this increase to the public until February 4, 2015 and also failed to disclose that Allstate's aggressive new growth strategy was the proximate cause of the significant increase in its auto claims frequency;

d.  I stand by my opinions proffered in the Finnerty Damages Report that:

i.  The abnormal return on Allstate's common stock on each of the Disclosure Dates (February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015), after adjusting for market-wide and industry-wide factors in an appropriately designed event study, is statistically significant at the 5 percent level or better.

4

    ii.    The residual abnormal returns, after further adjusting for non-fraud-related Allstate news, on February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015 were -1.21 percent, -1.68 percent, -3.09 percent, and -7.39 percent, respectively. The residual returns were substantially caused by a series of disclosures concerning the increase in auto claims frequency due to Allstate's aggressive growth strategies that the Company had misrepresented prior to the Disclosure Dates.

    iii.    The amount of damages suffered by purchasers of the shares of Allstate's common stock as a result of the disclosures of the truth about the increase in auto claims frequency on the Disclosure Dates is, in total, up to $9.38 per share, depending on when the shares were bought and sold during the Class Period;[2] and

    e.    Nothing in the Gompers Report has changed my opinions expressed in the Finnerty Damages Report.

## IV. Dr. Gompers' Criticism of My Characterization of the Plaintiffs' Allegations Is Unfounded and Lacks Merit

6.    Dr. Gompers claims that I characterized Plaintiffs' allegations differently from the allegations stated in the Complaint. In particular, Dr. Gompers argues that:[3]

> Now, rather than claiming that the fraud was that defendants failed to disclose Allstate's allegedly "*greatly reduced underwriting standards*" were the proximate cause of Allstate's frequency increase, Dr. Finnerty claims that the fraud was that "[d]efendants allegedly failed to disclose that Allstate's *new growth strategy* was the proximate cause of the significant increase in its auto claims frequency." (Emphasis added.)

7.    Dr. Gompers' assertion is baseless because my description of Plaintiffs' allegations in the Finnerty Damages Report is consistent with the Plaintiffs' allegations. As I discussed in the

---

[2] I understand that, in order to incorporate Defendants expert's criticism, Dr. Leverty tested alternative regression models that estimate the proportion of Allstate's increase in claims frequency due to miles driven and precipitation. The percentage attributions based on the alternative regressions are 3.92%, 18.34%, and 11.68%, for Q4 2014, Q1 2015, and Q2 2015, respectively. (*See* Leverty Reply Report, ¶¶ 156-158.) Accordingly, based on the alternative regressions, percentage attributions to Allstate's aggressive growth strategies for its increased claims frequency are 96.08%, 81.66%, and 88.32%, for Q4 2014, Q1 2015, and Q2 2015, respectively. Based on the alternative attributions, the amount of damages is, in total, up to $9.32.

[3] Gompers Report, ¶61, citing the Finnerty Damages Report, ¶20.

Finnerty Damages Report, the Complaint states that "[i]n 2013, Defendants launched a new strategy to aggressively grow the number of Allstate insurance policies in force ("PIF") by greatly relaxing its underwriting standards."[4] Plaintiffs allege that, even though Allstate experienced a steep increase in auto claims frequency and Defendants were aware of the auto claims frequency increase at least as of October 2014, Defendants failed to disclose this increase to the public until February 4, 2015.[5] Plaintiffs also allege in the Complaint that Defendants failed to disclose that the "Company's aggressive growth, which was based on Defendants greatly reducing its underwriting standards," was the proximate cause of the significant increase in its auto claims frequency.[6] Allstate instead allegedly misrepresented to investors that the increasing auto claims frequency trend was consistent with its normal auto claims frequency trend in 2014, attributing the spike in its auto claims frequency to temporary external factors, including the economy (increase in the number of miles driven) and the weather (greater precipitation in certain geographic regions).[7]

8. As indicated, the Complaint clearly alleges that Allstate's "aggressive growth strategy" was the proximate cause of the increase in its claims frequency. Thus, contrary to Dr. Gompers' mischaracterization, my description of Plaintiffs' allegations in the Finnerty Damages Report is not inconsistent with the Plaintiffs' allegations.

9. Dr. Gompers also fails to consider the development of this matter since the filing of the Complaint. As I noted in the Finnerty Damages Report, I understand that discovery in this matter has revealed that, as part of Allstate's growth strategy, the Company also implemented various other initiatives (*e.g.*, BTT, CGR, and Drivewise), in addition to

---

[4] Complaint, ¶¶39-40.
[5] Complaint, ¶¶49-54, 71.
[6] Complaint, ¶¶7, 16.
[7] Complaint, ¶¶10, 12, 15.

reducing its underwriting standards.[8] I understand from Counsel that the Company's overall growth strategies, which are not limited to the Company's greatly reduced underwriting standards, are what is at issue in this matter.

10. Therefore, Dr. Gompers' claim that my description of "aggressive growth strategy" is different from the Complaint's allegation of "greatly reduced underwriting standards" for the proximate cause of Allstate's auto claims frequency increase is unfounded and lacks merit.

## V. Dr. Gompers' Criticism of My Loss Causation Analysis Is Flawed and Unsupported

11. Dr. Gompers claims that in order to "establish losses, if any, caused by the correction of alleged misrepresentations and/or omissions," a financial economist must:[9]

1) identify all alleged misrepresentations and/or omissions made by the defendants;

2) determine the information that could have and should have been disclosed instead, as well as when that information should have been disclosed to make the alleged misrepresentations and/or omissions not misleading;

3) analyze the alleged misrepresentations and/or omissions and determine whether they were a proximate cause of the stock price decline; and

4) estimate the stock price impact, if any, from the alleged misrepresentations and/or omissions—and only from the alleged misrepresentations and/or omissions.

12. Then, Dr. Gompers criticizes me for supposedly not showing that "any decline in Allstate's stock price was proximately caused by correction of the alleged misrepresentations and omissions,"[10] because 1) I did not show that "what portions, if any, of the increases in Allstate's claim frequency were attributable to Allstate's allegedly greatly reduced underwriting standards,"[11] 2) I did not "properly account for negative confounding

---

[8] Pls.' Responses and Objections to Defs' Second Set of Interrogatories No. 4.
[9] Gompers Report, ¶67.
[10] Gompers Report, Section V.
[11] Gompers Report, Section V.B.

information unrelated to claim frequency" on the corrective Disclosure Dates,[12] 3) I did not

show that "the alleged corrective disclosures were corrective of the alleged

misrepresentations and omissions,"[13] and 4) the use of "a two-day residual stock price return

following the February 4-5, 2015 alleged corrective disclosures" is inconsistent with market

efficiency.[14]

13. As an initial matter, Dr. Gompers does not contest that the event study used in the Finnerty

Damages Report is a reliable, well-accepted method of assessing loss causation and

damages; does not contest that the Fama-French Three-Factor Model I applied for the event

study is reliable and well-accepted in the finance literature; does not contest that the

abnormal returns on shares of Allstate's common stock based on the Fama-French Three-

Factor Model were properly calculated; and does not contest that Allstate's common stock

exhibited a statistically significant negative abnormal return on each Disclosure Date at the

5% level or better.

14. As discussed in detail below, each of Dr. Gompers' claims lacks merit. Thus, his opinions

are unsupported.

   **A.   Dr. Gompers Incorrectly Claims That I Did Not Show What Portions of the
         Increases in Auto Claims Frequency Were Attributable to Allstate's Greatly
         Reduced Underwriting Standards**

15. Dr. Gompers claims that I did not show what portions of the increases in Allstate's auto

claims frequency were attributable to Allstate's greatly reduced underwriting standards

because my "application of Dr. Leverty's calculations" is flawed and I did not "demonstrate

that the market attributed to the allegations the same portions of claims frequency

---

[12] Gompers Report, Section V.C.
[13] Gompers Report, Section V.D.
[14] Gompers Report, Section V.E.

increases."[15]  Specifically, Dr. Gompers criticizes me for supposedly assuming that "any increase in claim frequency not explained by Dr. Leverty's analyses of miles driven or precipitation must be attributable to plaintiffs' allegations, excluding even the potential for any other non-allegation-related factors to affect claim frequency."[16]  Dr. Gompers argues that, by doing so, I ignored "other factors that affect claims frequency but are not related to the allegations," such as "local conditions, including traffic congestion, road speed limits, road conditions, and driver composition."[17]

16.  However, Dr. Gompers misinterprets Dr. Leverty's analysis.  Dr. Leverty reiterates in the Reply Report of Tyler Leverty, PhD, dated July 30, 2020 (the "Leverty Reply Report") that miles driven and precipitation are the two primary external factors that were responsible for part of the increase in Allstate's auto claims frequency during the Class Period.[18]  Dr. Leverty also opines that "it is reasonable to attribute the increase in frequency not accounted for in the external measures to internal factors."[19]

17.  Dr. Gompers also fails to consider the implications of Allstate's internal analysis, in which the Company identified only two external factors – miles driven and precipitation, – which accounted for 75% and 25% of its increase in auto claims frequency, respectively.  For example, Allstate's internal information package that was prepared for its Q4 2014 earnings call demonstrates that the auto claims frequency trends were "primarily influenced by two factors: miles driven (primary) and precipitation (secondary)."[20]  The internal document also indicates Allstate's analysis that the impact of miles driven and precipitation accounted for

---

[15] Gompers Report, ¶70.
[16] Gompers Report, ¶77.
[17] Gompers Report, ¶¶78-79.
[18] Leverty Reply Report, ¶¶132-133.
[19] Leverty Reply Report, ¶134.
[20] Allstate, "Q4 Earnings Call Prep Additional Analysis," dated January 20, 2015. (ALLSEC_0023805)

75% and 25% of its claims frequency trend, respectively. It further broke down the miles driven factor, which it stated was impacted primarily by changes in the economy (70%) and lower gas prices (30%).

18. Based on the internal analysis, Mr. Winter, during Allstate's earnings call for the Q4 2014 held on February 5, 2015, stated that:[21]

> Let me start with what's not driving it. Number one, we saw nothing to indicate that it's a quality of business issue or that it's being driven by growth, which is a natural question that you would have since I hope sometime during the call we talk about the growth we're achieving in the auto business, and so with all that growth, you question is this somehow related? Well, we looked at new-to-renewal ratios, we looked at state-mix ratio, we looked at rating plan relativities, and we saw nothing in there that would indicate that it was a quality or growth-related issue. So what is it likely related to? Well, we went back and looked historically over the last 7 to 8 years, and a couple of things emerged. First, **2 factors traditionally drive PD frequency, miles driven and precipitation, especially precipitation during peak driving times. Between those 2, miles driven has about roughly 3x the impact of precipitation.** (Emphasis added.)

19. During Allstate's earnings call held on May 5, 2015, again, Mr. Winter stated that:[22]

> As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather. And I believe I said, last quarter, **we thought that miles driven was about 3x as influential as the weather, that pattern seems to [be] pulled up again, this quarter**. But we want to validate that and verify it and as Pat referred to in his opening remarks, we did a very intense deep dive into our business to ensure that the increases in the frequency we're seeing are proportional and consistent across multiple segments of the business, no matter how you cut it. To make sure, in effect, that these aren't our problems, but are, in fact, external. (Emphasis added.)

20. I understand that Defendants have not identified any other external factors that actually caused the Company's increased auto claims frequency.

21. Furthermore, Dr. Gompers asserts that Dr. Leverty's analysis cannot be used "to accurately

---

[21] Allstate, "The Allstate Corporation Q4 2014 Earnings Conference Call," dated February 5, 2015.
[22] Allstate, "The Allstate Corporation Q1 2015 Earnings Conference Call," dated May 5, 2015.

estimate the portions of claim frequency increases caused by miles driven and precipitation," because Dr. Leverty's analysis does not establish a causal relationship between Allstate's auto claim frequency and an increase in miles driven or precipitation and his regression analysis relied on several unsupported assumptions.[23]

22. However, Dr. Gompers mischaracterizes Dr. Leverty's analysis. Dr. Leverty determined the maximum impact that miles driven and precipitation could have had on Allstate's auto claims frequency in the fourth quarter of 2014, the first quarter of 2015, and the second quarter of 2015.[24] Consequently, there is no need for Dr. Leverty's analysis to establish precisely how much of the increase in Allstate's auto claims frequency in each of those three quarters was caused by miles driven and precipitation.

23. Finally, Dr. Gompers criticizes me for supposedly not considering what portions of the increases in Allstate's auto claims frequency the market attributed to Allstate's aggressive growth strategies.[25] Specifically, Dr. Gompers claims that he finds that the market's attribution of the increases in Allstate's claims frequency to Allstate's aggressive growth strategies contradicts my attribution of 90.36%, 86.35%, and 89.93% of the increases in Q4 2014, Q1 2015, and Q2 2015, respectively.[26] Dr. Gompers cites securities analysts' commentary in arguing that securities analysts attributed Allstate's increased claims frequency to external factors, thus similarly affecting other auto insurers, and did not

---

[23] Gompers Report, ¶¶83-88.

[24] Leverty Reply Report, ¶¶154-158.

[25] Gompers Report, ¶89.

[26] Gompers Report, ¶¶89-96. I understand that, in order to incorporate Defendants expert's criticism, Dr. Leverty tested alternative regression models that estimate the proportion of Allstate's increase in claims frequency due to miles driven and precipitation. The percentage attributions based on the alternative regressions are 3.92%, 18.34%, and 11.68%, for Q4 2014, Q1 2015, and Q2 2015, respectively. (*See* Leverty Reply Report, ¶¶ 156-158.) Accordingly, based on the alternative regressions, percentage attributions to Allstate's aggressive growth strategies for its increased claims frequency are 96.08%, 81.66%, and 88.32%, for Q4 2014, Q1 2015, and Q2 2015, respectively.

11

attribute 86% to 90% of the increases in claims frequency during Q1 2014 – Q2 2015 to Allstate's greatly reduced underwriting standards or aggressive growth strategies.[27]

24. However, Dr. Gompers fails to consider that the stock analysts he cites in the Gompers Report merely conveyed what Allstate had stated publicly during Allstate's earnings calls:

RBC, May 6, 2015[28]

> Auto claims frequency was up 6.8% for bodily injury and 2.1% for property damage, which is an uptick compared to the typical run rate seen over the past few years and is even higher relative to Q4's elevated levels. **Management cited improving macro conditions (higher miles driven) as well as adverse weather conditions in the Northeastern U.S. as primary reasons for the rise in auto frequency claims.** We believe there is merit to [Allstate's] assertion as miles driven across the country have risen sharply since the end of 2014 (lower gas prices may have helped too). We don't believe this phenomenon is specific to just Allstate… (Emphasis added.)

Compass Point, May 7, 2015[29]

> **Allstate says** the market has a "We" problem and not []"Us" problem that will cause the company to push through market wide rate increase in its auto business **to address rising frequency as more miles are being driven**. The market reacted unfavorably to the news that rate increases will be coming through in addition to the 1Q15 underlying combined ratio coming in at the top of the company's annual guidance. […] Allstate is not alone, as GEICO reported year over year increase in property damage and bodily injury frequency and severity. (Emphasis added.)

Credit Suisse, May 6, 2015[30]

> [O]thers have also seen some deteriorating underwriting results. We would point to [GEICO] as one example, as they were also hit by a spike up in frequency…

> **ALL previously stated they do not know what is causing the increase in loss cost trends in auto** but are planning to move up scheduled rate increases throughout the year.

---

[27] Gompers Report, ¶¶90, 91, 94, 96.

[28] RBC Capital Markets, "Rising auto claims frequency overshadows solid Q1," May 6, 2015, at 3.

[29] Compass Point Research & Trading, "Allstate EPS is Higher, But So is Loss Ratio; Maintain Neutral," May 7, 2015, at 1.

[30] Credit Suisse Securities, "Lowering TP Following Continuation of Soft (Though Somewhat Expected) Auto," May 6, 2015, at 2-3.

Bank of America Merrill Lynch May 5, 2015[31]

> Similar to the 4Q14, and consistent with commentary from several other industry participants (Mercury General and [GEICO]), Allstate's auto margins were pressured in the 1Q15. In its release, **management attributed the uptick in loss costs to 'seasonal winter weather and higher non-weather levels of frequency and severity'**. (Emphasis added.)

MKM, August 4,2015[32]

> **Allstate noted the increase in auto accidents was across many states and risk classes. Therefore, the company believes the problem is being driven by external factors, primarily an increase in miles driven**. […]
>
> We believe the problems facing Allstate are also affecting others and we are seeing similar responses by other insurers. (Emphasis added.)

UBS, August 9, 2015[33]

> **The company said the frequency increase was related to macroeconomic trends (i.e., higher miles driven)**. Other personal auto insurers have either not seen the increase in claims frequency or it has been a more muted increase. […] (Emphasis added.)

25. Dr. Gompers also fails to consider that certain analysts he cites actually commented on Allstate's new growth strategies, rather than the external factors, but speculated about the cause of its increased auto claims frequency, given that the Company did not fully disclose that its aggressive growth strategy was the primary cause of its claims frequency increase:

RBC, August 4, 2015[34]

> We have no doubt that an improving economy and increased miles driven (low gas prices possibly as well) are playing a role in this [increased frequency] trend. While we don't think this is specific to Allstate (GEICO, Farmers & others have recently commented that they are seeing this [increase in frequency] too), we don't see this elevated level of claims abating before the end of the 2015. **While we think that the**

---

[31] Bank of America Merrill Lynch & Co., "Loss cost remains elevated; expect action; Growth solid," May 5, 2015, at 3.

[32] MKM Partners, Auto Frequency Increase Causes Miss; Company Addressing the Problem," August 4, 2015, at 2.

[33] UBS Securities, "Auto claims frequency is up and margins are down, but for how long?," August 9, 2015, at 1, 3.

[34] RBC Capital Markets, "Margins disappoint, lowering to Sector Perform," August 4, 2015, at 3.

**company may implement stricter underwriting standards and raise rates**, it will take some time for these measures to show up in results. (Emphasis added.)

UBS, August 9, 2015[35]

The company said the frequency increase was related to macroeconomic trends (i.e. higher miles driven). **Other personal auto insurers have either not seen the increase in claims frequency or it has been a more muted increase.** […]

While the share price decline makes ALL's shares look more interesting, given the expected near-term pressure on margins, we do not see a reason to jump into the shares at this point. With respect to other personal lines insurer, including PGR (rated Buy), while we would expect some rise in claims frequency with the increase in miles driven, our analysis suggest that ALL's claims frequency is more sensitive to changes in miles driven. We would therefore not expect similar margin compression at PGR, HIG, and TRV in their personal auto business. […]

ALL appears to be much more sensitive to the change [in miles driven] than PGR and the industry as a whole. **While we have to speculate as to the reason for this difference**, we suspect that demographic and geographic mix are playing a role. (Emphasis added.)

26.  As indicated, these securities analysts issued their analysts' reports in response to Allstate's earnings announcements, particularly commenting on the Company's unexpected increase in claims frequency.  The cited analysts commentary indicates that they primarily relied on Allstate's statements that were made during its earnings calls, during which the Company stated that it "believed the increases were caused by macroeconomic trends and weather."[36]

---

[35] UBS Securities, "Auto claims frequency is up and margins are down, but for how long?" August 9, 2015, at 1, 3.

[36] Gompers Report, ¶¶90, 93. (Allstate's statements during the Q4 2014 earnings call, February 5, 2015, "This increase was [the] result of higher levels of accident frequency experienced in the first two months of the quarter, which was driven by a combination of increased economic activity and non-catastrophe weather. […] Number one, we saw nothing to indicate that it's a quality of business issue or that it's being driven by growth, […] So with all that growth, you question: is this somehow related? Well, we look at new to renewal ratios; we looked at state mix ratio; we looked at rating plan relativities; and we saw nothing in there that would indicate that it was a quality of business or a growth-related issue. So what is it likely related to? Well, we went back and looked historically over the last seven to eight years, and a couple of things emerged. First, two factors traditionally drive PD frequency: miles driven and precipitation – especially precipitation during peak driving times. Between those two, miles driven has about roughly 3 times the impact of precipitation."; Allstate's statements during the Q1 2015 earnings call, May 6, 2015, "This analysis also reinforces our conclusion that recent frequency fluctuations are due primarily to macroeconomic trends [and] weather. […] As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather; Allstate's statements during the Q2 2015

14

27.   When Allstate did not properly disclose the fact that its new growth strategy (including its greatly reduced underwriting standards) was the proximate cause of the significant increase in its auto claims frequency, it is unreasonable to expect the securities analysts to be able to figure out the true cause and to understand the truth on their own.

28.   Furthermore, Dr. Gompers ignores certain securities analysts' reports, in which stock analysts expressed their concerns about Allstate's increased claims frequency.  For example, Evercore, in its analyst report published on February 4, 2015, suspected that the higher auto claims frequency for Allstate could have been driven by the significant growth in policies in force of the Company, given that its competitors had not cited similar issues for the same quarter.[37]

29.   Deutsche Bank in its analyst report published on August 4, 2015, noted regarding Allstate's auto claims frequency that: [38]

> Strangely, Allstate's woes did not appear in competitor accident-year loss ratios for 2Q15… Allstate will argue that, as it has become an increasingly data-heavy business with more market share than any publicly traded company, its ability to detect trends has improved relative to peers. We believe these Allstate results are likely to seep into investor concerns over the auto line in general, but, until others confirm Allstate's experience, it will generally be viewed as an Allstate-specific problem.

30.   Sandler O'Neill, in an analyst report released on August 4, 2015, also noted that:[39]

> The increase in auto accidents is broad-based by state, risk class, rating plans and the maturity of the business. This has now occurred for a number of quarters in a row. Importantly, other insurers such as Progressive and Travelers have not reported a

---

earnings call, August 4, 2015, "As you know, new business normally runs at a higher frequency level than renewal customers. We often refer to this as a new business penalty. With that in mind, we wanted to quantify this impact in our auto book, particularly in light of the positive growth trends we've experienced over the past couple years. So we analyzed how the volume of new auto business we've written in the past two years has impacted our results. Our analysis indicated that the new business growth rate is having between 0.5 and 1 point impact on the auto loss ratio. This impact was expected and manageable. It is, however, a contributing factor to the higher frequency we are seeing.")

[37] Evercore ISI, "ALL Brand PIF Growth Accelerated But AYCR Ex Cats Misses," February 4, 2015, at 1.

[38] Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for [2]Q15 Miss," August 4, 2015, at 2-3.

[39] Sandler O'Neill + Partners, "2Q15 First Look: Reports $0.63 vs. $0.66 SOP," August 4, 2015, at 1.

similar issue in the second quarter. Increasingly, Allstate looks like it has a company specific issue with its auto insurance underwriting that relates to both auto claim frequency and catastrophe loss exposure.

31. Therefore, a few contemporaneous securities analysts' commentaries contradict Dr. Gompers assertion that securities analysts attributed Allstate's increased claims frequency to external factors and did not attribute a significant portion of the increases in claims frequency during Q1 2014 – Q2 2015 to Allstate's greatly reduced underwriting standards or aggressive growth strategies. Although some securities analysts attributed Allstate's increased claims frequency to external factors, Dr. Gompers fails to consider that they merely conveyed what Allstate had stated, given that Allstate did not properly disclose the fact that its new growth strategy (including its greatly reduced underwriting standards) was the proximate cause of the significant increase in its auto claims frequency.

**B.    Dr. Gompers Incorrectly Claims That I Did Not Properly Account for Negative Confounding Information Unrelated to Claims Frequency**

32. Dr. Gompers claims that I did not properly account for confounding news unrelated to claims frequency on any of the corrective Disclosure Dates.[40]  However, Dr. Gompers' claims are baseless and not supported.

**i.    February 4-6, 2015**

33. Dr. Gompers claims that, in analyzing the alleged corrective disclosures on February 4-6, 2015, I did not account for "two types of negative confounding news unrelated to claim frequency: (i) news related to an increase in claim severity and (ii) news related to lower-than-expected net investment income."[41]  However, as discussed below, Dr. Gompers'

---

[40] Gompers Report, ¶97.
[41] Gompers Report, ¶98.

16

criticism of the two types of confounding information is baseless.

34.    First, Dr. Gompers criticizes my loss causation analysis for not disaggregating the impact of claims severity from the impact of claims frequency on Allstate's stock price declines on the February 5-6, 2015 Disclosure Dates, given that he argues the claims severity is confounding information not related to Plaintiffs' allegations.[42]

35.    Dr. Leverty analyzes Allstate's claim severity during the Class Period in the Leverty Reply Report and concludes that Allstate's increase in auto claim severity was not statistically significantly greater than the increase in the claim severity for the auto insurance industry during his sample period, which includes the Class Period.[43]  In fact, Dr. Leverty finds that, during his sample period, Allstate's BI paid auto claim severity increased about 85% as fast as the auto insurance industry's BI paid auto claim severity; the sensitivity of Allstate's BI paid claim severity relative to the auto insurance industry's BI paid claim severity decreased after 2013; and the sensitivity of Allstate's BI paid claim severity to the auto insurance industry's BI paid claim severity also decreased after the implementation of BTT.[44]  Dr. Leverty also finds that, during his sample period, which includes the Class Period, Allstate's PD paid auto claim severity increased in line with the auto insurance industry's PD paid auto claim severity; the sensitivity of Allstate's PD paid claim severity relative to the auto insurance industry's PD paid claim severity decreased after 2013; and the sensitivity of Allstate's PD paid claim severity relative to the auto insurance industry's PD paid claim severity also decreased after the implementation of BTT.[45]

---

[42] Gompers Report, ¶¶99-100.
[43] Leverty Reply Report, ¶¶192-199.
[44] Leverty Reply Report, ¶¶192-195 and Exhibit 16.
[45] Leverty Reply Report, ¶¶196-198 and Exhibit 17.  I note that in Exhibit 17 to the Leverty Reply Report, the coefficient of the variable in the first regression equation measuring the sensitivity of Allstate's PD paid auto claim severity to the auto insurance industry's is exactly 1.0. In the other two regression equations, the coefficient of each independent variable measuring an analogous sensitivity is slightly greater than 1.0 but none of these four

17

36.     Thus, Dr. Leverty's analysis undermines Dr. Gompers' criticism that the increase in

Allstate's auto claim severity is negative confounding information, because Dr. Leverty's

regression results indicate that Allstate's increases in auto claim severity during the Class

Period were in line with, or even lower than, the increases in claim severity for the auto

insurance industry.  My event study model adjusts for industry factors, such as trends in auto

claim severity.  Since Allstate's increase in auto claim severity was at or below the auto

insurance industry average, my loss causation and damages analysis has fully accounted for

the impact of Allstate's auto claim severity during the Class Period.

37.     Therefore, auto claim severity during the Class Period was an industry-wide factor, rather

than an Allstate-specific issue.[46]  Indeed, during the Class Period, Allstate repeatedly stated

that its increase in auto claim severity was "in line with" Consumer Price Index trends,

which would affect all auto insurers similarly and thus confirms that it was an industry-wide

factor:

Allstate, Form 10-K, dated February 19, 2015[47]

> Bodily injury and property damage coverage paid claim severities increased 2.7%
> and 4.1%, respectively, in 2014 compared to 2013. **Severity results in 2014
> increased in line with historical Consumer Price Index trends.** Claim frequencies
> in the bodily injury and property damage coverages decreased 1.1% and increased
> 0.3%, respectively, in 2013 compared to 2012. Bodily injury and property damage
> coverage paid claim severities increased 3.8% and 1.8%, respectively, in 2013
> compared to 2012. (Emphasis added.)

Allstate, Form 10-Q, dated May 5, 2015[48]

---

coefficients is significantly different from 1.0. Thus, all three regression equations in Dr. Leverty's Exhibit 17
indicate that Allstate's PD paid claim severity increased in line with the auto insurance industry's PD paid claim
severity during the Class Period.

[46] Dr. Gompers makes the same claim regarding the claims severity for the subsequent Disclosure Dates (May 6,
2015 and August 4, 2015), thus I provide my responses to all his criticisms regarding the claim severity issue here
collectively.

[47] Allstate, Form 10-K for the fiscal year ending December 31, 2014, dated February 19, 2015.

[48] Allstate, Form 10-Q for the quarterly period ended March 31, 2015, dated May 5, 2015.

Bodily injury and property damage coverage paid claim severities (average cost per claim) increased 3.9% and 4.8%, respectively, in the first quarter of 2015 compared to first quarter of 2014. **Bodily injury severity results in the first quarter of 2015 increased in line with historical Consumer Price Index trends.** We regularly monitor profitability trends and take appropriate underwriting and pricing actions to ensure adequate returns are maintained. (Emphasis added.)

Allstate, Form 10-Q, dated August 3, 2015[49]

Bodily injury and property damage coverage paid claim severities (average cost per claim) increased 0.6% and 3.7%, respectively, in the second quarter of 2015 compared to second quarter of 2014, and increased 2.2% and 4.2%, respectively, in the first six months of 2015 compared to the first six months of 2014. **Bodily injury severity results in the first six months of 2015 increased in line with historical medical Consumer Price Index trends.** (Emphasis added.)

38.     In addition, the fact that other property and casualty insurance companies like Allstate also reported increases in claims severity during the Class Period indicates that the increase in claim severity reflects an industry-wide trend during the period:

Berkshire Hathaway, Form 10-Q, dated May 1, 2015[50]

Average claims severities were also higher in the first quarter of 2015 for physical damage and collision coverages (four to five percent range), bodily injury coverage (four to six percent range) and PIP coverage (two to four percent range).

Progressive, Form 10-Q, dated May 11, 2015[51]

Total personal auto incurred severity (i.e., average cost per claim, including both paid losses and the change in reserves) increased about 3% for the first quarter 2015, compared to the first quarter 2014. Following are the changes we experienced in severity in our auto coverages on a year-over-year basis:

- Bodily injury decreased about 1%.
- Property coverages increased with property damage and collision up about 5% to 6%.
- Personal injury protection (PIP) increased about 1%.

---

[49] Allstate, Form 10-Q for the quarterly period ended June 30, 2015, dated August 3, 2015.
[50] Berkshire Hathaway Inc., Form 10-Q for the quarterly period ended March 31, 2015, dated May 5, 2015.
[51] The Progressive Corporation, Form 10-Q for the quarterly period ended March 31, 2015, dated May 11, 2015.

Progressive, Form 10-Q, dated August 5, 2015[52]

> Total personal auto incurred severity (i.e., average cost per claim, including both paid losses and the change in case reserves) increased about 3% for the three and six months ended June 30, 2015, compared to the same prior year period. Following are the changes we experienced in severity in our auto coverages on a year-over-year basis:
>
> - Bodily injury was flat for both the second quarter and first six months of 2015.
> - Property coverages increased with property damage up 2% to 4% and collision up 6% to 7% for both periods.
> - Personal injury protection (PIP) increased about 5% for the second quarter and 3% year to date.

Berkshire Hathaway, Form 10-Q, dated August 7, 2015[53]

> Average claims severities were also higher in the first six months of 2015 for property damage and collision coverages (four to five percent range), bodily injury coverage (six to seven percent range) and PIP coverage (two to four percent range).

39.     Therefore, Dr. Gompers' criticism of my loss causation analysis for not disaggregating the impact of claims severity is without merit because 1) the impact of the increase in claim severity was not statistically significant and 2) the impact of industry-wide factors on claim severity during the Class Period is controlled for by the insurance industry index variable in my event study model.

40.     Second, Dr. Gompers claims that I did not disaggregate the negative impact of the information related to Allstate's net investment income from the impact of its increased claims frequency on Allstate's stock price decline on the February 5-6, 2015 Disclosure Dates.[54]   Dr. Gompers argues that my treatment of Allstate's net investment income in analyzing the February 4-6 corrective disclosures is different from my analysis for the

---

[52] The Progressive Corporation, Form 10-Q for the quarterly period ended June 30, 2015, dated August 5, 2015.
[53] Berkshire Hathaway Inc., Form 10-Q for the quarterly period ended June 30, 2015, dated August 7, 2015.
[54] Gompers Report, ¶102.

August 3-4, 2015 corrective disclosures.[55]  However, Dr. Gompers mischaracterizes my analysis.

41.    Contrary to Dr. Gompers' assertion, I did account for the negative impact of Allstate's unexpected shortfall in net investment income in analyzing the February 4-6 corrective disclosures.  As I described in the Finnerty Damages Report, in analyzing the February 4-6 corrective disclosures, I did consider both 1) positive factors, including lower-than-expected catastrophe losses, more favorable reserve development, and higher life insurance operating income, and 2) negative factors, including the increase in auto claims frequency, higher underwriting expenses, and lower investment income.[56]  I also presented contemporaneous securities analysts commentary on the factors that affected Allstate's Q4 2014 earnings results. Overall, Allstate's Q4 2014 earnings results were broadly above or in-line with analysts' forecasts, *i.e.*, the overall Q4 2014 earnings impact was net positive.[57]  Thus, the impact of Allstate's negative earnings factors was fully offset by its positive earnings factors.

42.    For example, certain securities analysts stated that the negative net investment income was more than offset by the Company's positive earnings factors:

<u>Wells Fargo, February 4, 2015</u>[58]

> Allstate reported Q4 operating EPS of $1.72 exceeding both our estimate of $1.60 and consensus of $1.67. The upside reflects better-than-expected underwriting results, reflecting a lower level of cat losses and higher reserve releases. This more than offset lower-than-expected investment income. Catastrophe losses came in at only $95 million, lower than our $300 million estimate. ALL had not previewed catastrophe losses for any month this quarter. This more than offset worse-than-modeled underlying results.

---

[55] Gompers Report, ¶¶102-105.
[56] Finnerty Damages Report, ¶¶41-59.
[57] Finnerty Damages Report, Exhibit 4.
[58] Wells Fargo Securities, "ALL: Q4 First Look—Frequency Blip Overshadows Earnings Beat," February 4, 2015, at 1.

Sandler O'Neill, February 4, 2015[59]

> Allstate reported fourth quarter 2014 operating earnings per share of $1.72, vs. our estimate of $1.67, as compared to consensus looking for $1.69. The earnings beat relative to our estimate was driven by underwriting outperformance (reported a combined ratio of 90.0% vs. our estimate of 91.6%) along with higher than expected earned premiums (reported $7,354 million vs our estimate of $7,308 million) that served to more than offset lower than anticipated life insurance operating income (reported $128 million vs. our estimate of $142 million) and net investment income (reported $779 million vs. our estimate of $822 million).

Janney, February 6, 2015[60]

> For 2015, we model 2015 premium growth of 5%, reported underwriting of 94.1% (vs. 93.9%) and cat losses of 7 points and no points from reserves/ amortization. Life earnings are expected to decline 14% (primarily reduce contributions from limited partnerships in the first half). Net investment income is expected to decline 10% reflecting lower yields (both underlying and more moderate partnership income).

Morgan Stanley, February 5, 2015[61]

> Op EPS of $1.72 was above $1.68 consensus but below our $1.77 estimate. Core underwriting margin of 89.6% (deteriorated 190bps YoY) vs. 86.8% MS est. Cat losses were $95m vs. $300m MS [est]. P&C premiums grew +4.9% YoY as Policies-In-Force (PIF) growth improved in both Allstate auto (+2.9% vs. +2.6% in 3Q) and homeowners (+0.5% vs. +0.1% in 3Q). P&C net investment income decreased -23% YoY to $294m due to lower partnership income. ALL repurchased ~$250m of shares in (~1% of outstanding). BV decreased -0.1% sequentially to $48.24 (+6.5% YoY). Operating ROE was 14.3%.

43.    Based on my review of securities analysts' reports, I found that the overall impact of those positive and negative factors, including the negative impact of net investment income, was net positive for Allstate's Q4 2014 earnings result.  In an efficient market like the one for Allstate's common stock during the Class Period, Allstate's net positive earnings results for the fourth quarter of 2014, which beat the market's EPS consensus, would normally be

---

[59] Sandler O'Neill + Partners, "4Q14 First Look: Reports $1.72 vs. $1.67 SOP," February 4, 2015, at 1.
[60] Janney Capital Markets, "ALL: Updated Model," February 6, 2015, at 1.
[61] Morgan Stanley & Co., "2015 Guidance Points to Limited EPS Growth," February 5, 2015, at 1.

expected to elicit a positive stock price reaction. However, in assessing Allstate's outlook, investors and securities analysts raised concerns about an increase in Allstate's auto claims frequency, and certain securities analysts lowered their EPS estimates for 2015-2016 and/or their price targets for Allstate's common stock.[62] Consequently, I opined that the corrective information contained in Allstate's earnings release regarding the increase in its auto claims frequency was the cause of the significant price declines of Allstate's stock on February 5-6, 2015.

44. I noted in the Finnerty Damages Report that but-for Allstate's positive earnings results for the fourth quarter of 2014, Allstate's stock price would have declined further. Thus, being conservative in favor of Defendants, I did not parse out the *net positive* impact of confounding information (*i.e.*, the net positive earnings results) from the negative price impact of the corrective disclosure.

45. Therefore, contrary to Dr. Gompers claims that I did not consider Allstate's unexpected shortfall in net investment income in my analysis of the February 4-6 corrective disclosures, the impact of the negative net investment income was already taken into account and incorporated into Allstate's overall earnings results.

46. Moreover, contrary to Dr. Gompers' assertion, even when the impact of Allstate's net investment income for Q4 2014 is considered as a separate factor, the residual impact of the net investment income would be insignificant. Regarding its net investment income, Allstate reported in its earnings press release on February 4, 2015 that:

> Net investment income of $3.5 billion for 2014 was 12.3% lower than 2013 due to the LBL divestiture, the continued planned reduction in deferred annuities, and the

---

[62] *See*, *e.g.*, Evercore ISI, "More Comfortable with Frequency Uptick in Oct/Nov Post Conference Call, Improving Encompass Results," February 5, 2015, at 1; and Sterne, Agee & Leach, "4Q14 Core Miss on Increased Auto Loss Trend, NII and Life Income; Reducing Ests [Estimates] and Price Target," February 5, 2015, at 1.

ongoing impact of low interest rates on the portfolio's results. Limited partnership income was strong in 2014, partially offsetting the impact of low interest rates.

47. Based on my review of securities analysts' commentaries on Allstate's Q4 2014 investment income, I find that they attributed the Company's negative net investment income generally 1) to a lower asset balance, primarily due to the sale of Lincoln Benefit Life Company, and 2) to a lower average investment yield. (*See* Exhibit 1.)

48. Concerning the sale of Lincoln Benefit Life Company, the transaction was first announced by Allstate on July 17, 2013 and completed on April 1, 2014.[63] Thus, by the time when Allstate announced its Q4 2014 earnings on February 4, 2015, the decline in it net investment income due to the sale of Lincoln Benefit Life Company was foreseeable because analysts and investors knew that the company had been sold.

49. Concerning Allstate's decline in investment yields, the decline was caused by lower fixed income yields and lower partnership income. The declines in Allstate's partnership income were observed in both private equity/debt funds and real estate income.[64]

50. I note that the effect of the decline in fixed income and limited partnership (many of which trade on yield much like fixed income instruments) yields would affect all members of the property and casualty industry, who invest in those investment vehicles. An insurer's net investment income depends on the composition of its investment portfolio and the rates of return on the securities in the investment portfolio. Property and casualty insurance companies like Allstate generally have similar investment portfolio composition.[65] Likewise

---

[63] Allstate press release, "Allstate Announces the Sale of Lincoln Benefit Life Company," July 17, 2013; Allstate press release, "Allstate Closes Sale of Lincoln Benefit Life," April 1, 2014.
[64] RBC Capital Markets, "Staying on board; Dialing up capital management," February 5, 2015.
[65] Giulio Girardi, Kathleen Weiss Hanley, Stanislava Nikolova, Loriana Pelizzon, and Mila Getmansky Sherman, "Portfolio Similarity and Asset Liquidation in the Insurance Industry," SAFE Working Paper, No. 224. Available at https://ssrn.com/abstract=3239362.

life insurance companies generally have similar investment portfolio composition.[66] Consequently, the industry index variable in my event study model controls for the effect of this property and casualty insurance industry-wide factor. Progressive, for example, also reported in its Form 10-K in March 2015 that its investment income declined in 2014 due to various factors, including changes in yield.[67] Second, the rates of return on the securities are correlated with returns on the market portfolio. Consequently, the excess return on the market portfolio variable in my event study partially controls for the market-wide component of this factor. What remains after these two adjustments is any idiosyncratic variation in net investment income specific to Allstate, which is outweighed by the positive earnings factors on the corrective Disclosure Date.

### ii. May 5-6, 2015

51. Dr. Gompers claims that, in analyzing the alleged corrective disclosures on May 5-6, 2015, I did not account for "two types of negative confounding news unrelated to claim frequency" that were included in Allstate's disclosures on those dates: "(i) news related to an increase in claim severity and (ii) news related to adverse reserve reestimates."[68]

52. First, like the February 4-6 corrective disclosures, Dr. Gompers criticizes me for not disaggregating the impact of claim severity from the impact of claims frequency on Allstate's stock price decline on the May 6, 2015 Disclosure Date.[69] However, Dr. Gompers's argument is baseless, for the same reasons I discussed in the previous section for the February 4-6, 2015 corrective disclosures.

---

[66] *Id.*
[67] The Progressive Corporation, Form 10-K for the fiscal year ended December 31, 2014, dated March 2, 2015, p. 10.
[68] Gompers Report, ¶98.
[69] Gompers Report, ¶¶99-100.

53.    Second, Dr. Gompers asserts that I did not show that "negative information related to Allstate's reserve reestimates (also known as reserve developments) did not at least partially cause the decline in Allstate's stock price on May 6, 2015."[70] Dr. Gompers cites a few securities analysts' commentaries concerning Allstate's worse-than-expected reserve reestimates.

54.    Contrary to Dr. Gompers' assertion, I did account for the negative impact of Allstate's reserve developments in analyzing the May 5-6 corrective disclosures. As I described in the Finnerty Damages Report, in analyzing the May 5-6 corrective disclosures, I did consider both 1) positive factors, including better-than-expected life insurance results, a lower corporate loss, lower-than-expected catastrophe losses, and higher investment income, and 2) negative factors, including the increase in auto claims frequency, lower-than-expected core underwriting margin, and adverse reserve development.[71] I also presented contemporaneous securities analysts' commentaries on the factors that affected Allstate's Q1 2015 earnings results. Overall, Allstate's Q1 2015 earnings results were largely in-line with or above stock analysts' forecasts., *i.e.*, the overall Q1 2015 earnings impact was net positive.[72]

55.    For example:

Wells Fargo, May 5, 2015[73]

> ALL reported Q1 operating EPS of $1.46, exceeding our $1.45 est and $1.44 consensus. The modest upside reflects better-than-expected life results and a lower corporate loss. Non-life results came in as expected as stronger investment income offset weaker underwriting results. Lower-than-expected catastrophe losses were more than offset by adverse reserve development. Auto results were impacted by elevated frequency trends for the second consecutive quarter, something that we had looking to lessen. While ALL saw continued policy growth, a strong level of capital

---

[70] Gompers Report, ¶109.
[71] Finnerty Damages Report, ¶¶68-85.
[72] Finnerty Damages Report, Exhibit 4.
[73] Wells Fargo Securities, "ALL: First Look at Q1 Results—Frequency Concerns Remain," May 5, 2015, at 1.

return, and maintained its full-year outlook, we think this will be more than overshadowed by the loss trend. We expect ALL shares to trade down (5/6) on the continued higher frequency trends.

Morgan Stanley, May 5, 2015[74]

ALL reported Op EPS of $1.46, above $1.44 consensus and in-line with our $1.46 estimate. Combined ratio of 93.7% includes $294m (4.0pts) of catastrophes (vs. $400m MS est.) and ~$44m (0.6pts) of reserve charges (vs. $44m MS est. reserve releases). Core underwriting margin (ex. cats and reserve releases) deteriorated 40bps YoY to 89.1% (vs. 88.6% MS est.) and at the higher-end of 87-89% full-year 2015 guidance range. Premiums grew +4.8% YoY, primarily due to +3.2% PIF growth in auto and +0.8% in homeowners. Net investment income increased +15% YoY due to higher partnership returns (driven by real estate valuation gains).

UBS, May 5, 2015[75]

Operating EPS of $1.46 vs. UBS est. $1.27 [(positive variance of $0.19)] and $1.43 consensus.  Compared to our estimates, the EPS upside mainly involved
1)  the Company's lower-than-expected catastrophe losses ($0.23 p/sh),
2)  higher limited partnership income ($0.10 p/sh), and
3)  a lower expense ratio ($0.05 p/sh),
[which were] partly offset by a higher underlying loss ratio ($0.11 p/sh) and adverse reserve development ($0.12 p/sh).

BVPS increased 2.0% sequentially to $49.19 (vs. UBSe $49.61). Share buyback was better than expected at $915mm, including a $500m ASR in March. $2.4bn remains on the share repurchase program.

Credit Suisse, May 6, 2015[76]

ALL reported operating earnings of $1.46, light of our $1.50 estimate but ahead of consensus at $1.44.  In thinking about the quality items that impacted the quarter's result relative to our estimate we would point out: 1) 7c of lighter than expected catastrophes,
2) 10c of favorable limited partnership income relative to our 11% yield runrate,
3) 1c for the better than modeled results in corporate,

---

[74] Morgan Stanley & Co., "Allstate Corporation, 1Q15: Solid Results but Auto Frequency Ticked up (Again)," May 5, 2015, at 1.
[75] UBS Securities, "Allstate Corp., Beat on Lower Cat Losses, but Auto Frequency Ticks Up Again," May 5, 2015, at 1.
[76] Credit Suisse Securities, "Lowering TP Following Continuation of Soft (Though Somewhat Expected) Auto," May 6, 2015, at 1.

all partially offset by 14c less of favorable PYD [Prior Year Development].

56. Based on my review of securities analysts' reports, I found that the overall impact of those positive and negative factors, including the negative impact of reserve development, was net positive for Allstate's Q1 2015 earnings result. In an efficient market like the one for Allstate's stock during the Class Period, Allstate's positive earnings results for the first quarter of 2015 would normally be expected to elicit a positive stock price reaction. However, in formulating their assessments of Allstate's outlook, investors and the majority of securities analysts who followed Allstate were again concerned about the higher auto claims frequency trends that were evident for the second consecutive quarter. In response, a number of securities analysts lowered their EPS estimates for 2015/2016 and/or their price targets for Allstate's common stock.[77] Consequently, I opined that the corrective information contained in Allstate's earnings release regarding the increase in its auto claims frequency was the cause of the significant price decline of Allstate's stock on May 6, 2015.

57. I noted in the Finnerty Damages Report that but-for Allstate's positive earnings results for the first quarter of 2015, Allstate's stock price would have declined further. Thus, being conservative in favor of Defendants, I did not parse out the *net positive* impact of confounding information (*i.e.*, the net positive earnings results) from the negative price impact of the corrective disclosure.

58. Therefore, contrary to Dr. Gompers' claim that I did not consider Allstate's negative reserve development for my analysis of the stock price impact of Allstate's May 5-6 corrective disclosure, the impact of the negative reserve development was already taken into account

---

[77] *See*, *e.g.*, Sandler O'Neill + Partners, "1Q15 Earnings Review: Maintaining HOLD rating," May 6, 2015, at 1-2; Credit Suisse Securities, "Lowering TP Following Continuation of Soft (Though Somewhat Expected) Auto," May 6, 2015, at 1; and RBC Capital Markets, "Rising Auto Claims Frequency Overshadows Solid Q1," May 6, 2015, at 1.

and incorporated into Allstate's overall earnings results.

### iii.    August 3-4, 2015

59.  Dr. Gompers asserts that, in analyzing the alleged corrective disclosures on August 3-4,

2015, 1) I did not account for news related to an increase in claim severity and 2) my

methodology to control for the impact of other confounding factors is inconsistent with basic

economic principles.[78]

60.  First, as with my discussions in previous sections for the February 4-6 and May 5-6

corrective disclosures, Dr. Gompers' criticism of the claim severity is baseless.

61.  Second, Dr. Gompers' criticism of my methodology for disaggregating the impact of

confounding information is unsupported.  In the Finnerty Damages Report, I parsed out the

impact of any confounding information that may have adversely affected Allstate's stock

price on August 4, 2015, based on contemporaneous stock analyst reports from securities

analysts at four major broker-dealers (UBS, Credit Suisse, JMP Securities, and William

Blair) who quantified the impact of each item of new information contained in Allstate's

earnings announcement for the second quarter of 2015 that contributed to the deviation of

Allstate's reported EPS from the $0.63 EPS Street estimate that had been expected for the

second quarter 2015.[79]

62.  Dr. Gompers criticizes me for assuming that "a negative confounding factor's impact on

Allstate's stock price decline is directly proportional to that factor's impact on Allstate's Q2

2015 EPS difference and does not depend on how that confounding factor may influence

---

[78] Gompers Report, ¶114.
[79] Credit Suisse Securities, "Magnitude of EPS Miss Distracting but Rate Action Plan on Schedule," August 4, 2015, at 1; UBS Securities, "Allstate Corp., 2Q15: Auto Frequency Ticks Up Again in a Tough Quarter," August 3, 2015, at 1; JMP Securities, "2Q15 Results: Large EPS Miss Driven by Elevated Auto Loss Trends; Likely Not a Quick Fix," August 4, 2015, at 1; and William Blair, "Higher Losses Suggest Earnings Have Likely Peaked," August 4, 2015. (*See* Finnerty Damages Report, Exhibit 6.)

future profitability."[80]  Thus, he argues that my methodology supposedly contradicts "a well-known principle of finance that the value of an asset is equal to the present value of the asset's expected future cash flows."[81]  However, Dr. Gompers' assertion is meritless for the following reasons.

63. First, stock analysts in their reports typically express the price of a company's common stock as the product of (i) the price-earnings multiple for the stock and (ii) the company's earnings per share.[82]  The price-earnings multiple does take into account stock analysts' assessment of a company's future profitability, the cash flows that its operations can be expected to generate in the future, and the dividends the company can be expected to distribute to its shareholders.  Many stock analysts also perform a discounted cash flow analysis to estimate the value of a share of stock, for example, expressing the share price as the expected present value of future cash dividends.[83]  Both techniques are widely used in the securities industry and the investment management industry.[84]

64. Dr. Gompers is arguing that I should have relied on the discounted cash flow approach in my loss causation analysis.  However, he has not demonstrated that it is more reliable than the technique I employed for the purpose of estimating the effect on a company's share price of a deviation of the actual EPS from the Street consensus EPS.  My adjustment for confounding news in my loss causation analysis focuses on the impact of the confounding news on the stock's abnormal return and its price when the confounding news relates to a

---

[80] Gompers Report, ¶119.
[81] Gompers Report, ¶120.
[82]  Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., 2011, Wohl Publishing, Morristown, NJ, p. 140.
[83] Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, 3rd ed., John Wiley & Sons, Inc., Hoboken, NJ, 2012, pp. 21-25.
[84] Id.  See also, Emery, Douglas R., John D. Finnerty, and John D. Stowe, Corporate Financial Management, 4th ed., Wohl Publishing, Morristown, NJ, 2011, pp. 133-142.

deviation in the company's EPS from the Street consensus EPS. Dr. Gompers' criticism fails to recognize that I am measuring changes in share price in response to deviations from consensus expected earnings and that I am *not* trying to calculate the company's share price based on the discounted value of the stream of expected future cash flows to a share of the company's stock.

65. Second, when a company reports actual EPS that deviate from the Street consensus EPS (which is referred to as an "earnings surprise"), this deviation typically leads to an immediate stock price reaction that is directionally consistent with direction of the earnings surprise. If an earnings surprise were significant enough for securities analysts to change their views on the company's expected future earnings, they would revise their earnings estimates accordingly. Although the factors that affect the current period earnings of a company are not necessarily exactly directly proportional to the factors that affect the company's future earnings, an earnings surprise provides the basis for stock analysts to revise their EPS estimates for the company's stock. Thus, the information embedded in stock analysts' detailed calculations of the EPS deviations attributable to the various factors that they believe are responsible for the overall deviation of reported EPS from the Street consensus EPS are useful in estimating the impact of each item of confounding news on the company's share price. Consequently, the stock analysts' EPS deviation analyses for the current period should serve as a reliable basis for calculating the amount by which the company's share price has changed, and multiplying the deviation in EPS attributable to an item of confounding news times the stock's pre-announcement price-earnings multiple should provide, to a reasonable degree of certainty, an estimate of the impact of the confounding news on the company's share price on the announcement date.

31

66. Third, each individual analyst's earnings estimates (and his/her target price) for a company's stock could vary, depending on each particular security analyst's view of the company's future prospects. Thus, one should consider stock analysts' assessments collectively, rather than relying on any single individual stock analyst's assessment separately. Therefore, Dr. Gompers' criticism of my analysis for not accounting for three individual analyst's expectations – by RBC, William Blair, and Compass Point – for Allstate's net investment income is meritless.[85]

67. Nevertheless, I note that these three securities analysts' expectations for Allstate's net investment income are effectively accounted for in my loss causation analysis. As shown in the table on pages 47-48 of the Finnerty Damages Report, I accounted for the confounding news based on the four securities analysts who quantified the impact of each element of information, including the negative impact of Allstate's net investment income, *i.e.*, the EPS deviations of -$0.04 for UBS, -$0.13 for Credit Suisse, and -$0.05 for William Blair.[86] Although this EPS variance analysis is for the Company's Q2 2015, this analysis by the stock analysts, including William Blair, provides to a reasonable degree of certainty an estimate of the stock price impact of the unexpected shortfall in net investment income.

68. In addition, the other two securities analysts that Dr. Gompers cites as an example – RBC and Compass Point – noted the "low interest rate environment" and the potential "rising interest rates" as reasons for their lower expectations for Allstate's net investment income going forward. The yields on fixed income instruments are determined by market-wide factors, and the impact of low fixed income investment yields affects all property and

---

[85] Gompers Report, ¶121.
[86] I note that in measuring the impact of confounding news based on William Blair's variance analysis, I was being conservative in favor of Defendants because I ignored the net positive impact as illustrated in the table.

casualty insurance companies.  The lower interest rate environment is partly a market-wide factor and partly an industry-wide factor, rather than an Allstate-specific factor.  Thus, this factor is already controlled for by the market-index and the industry-index variables in my event study model, except to the extent of any residual impact that might be due to Allstate's specific portfolio strategies.  Consequently, it is my opinion that my adjustment for effect of Allstate's unexpected net investment income shortfall in Q2 2015 is conservative in favor of Defendants.

69. Therefore, the three examples that Dr. Gompers presents in the Gompers Report undermine his argument that I did not consider the impact of the negative net investment income in measuring the impact of confounding information, which renders his claim unsupported.

70. Furthermore, Dr. Gompers fails to consider that, in response to Allstate's Q2 2015 earnings results, securities analysts unanimously highlighted Allstate's increased auto claims frequency/severity as a primary negative factor for the Q2 2015 earnings miss and for their 2015/2016 earnings revisions.  Accordingly, a number of securities analysts lowered their EPS estimates for Allstate for 2015/2016 and/or their price targets for Allstate's common stock highlighting the economic significance of Allstate's increase in auto claims frequency:

Wells Fargo, August 4, 2015[87]

> Allstate hosted its Q2 earnings conference call on 8/4. The discussion primarily focused on the uptick in its loss trends, particularly frequency. **We are lowering our 2015 and 2016 EPS estimates to $4.80 and $6.00 from $5.03 and $6.25, respectively, to reflect weaker underlying margins**. Our valuation range is now $70-74 (down from $76-80).  (Emphasis added.)

---

[87] Wells Fargo Securities, "ALL: Conference Call Round-Up--Allstate Runs Out of Gas in Q2," August 4, 2015, at 1.

<u>MKM, August 4, 2015</u>[88]

>    While we believe Allstate will be able to get in front of this problem, it could take a
>    few quarters before the company can deliver better auto results.
>    • We are reducing our 2015 estimate to $5.00 from $5.60.
>    • We are reducing our 2016 estimate to $6.00 from $6.50.
>    • **Our estimate reductions are driven by a higher underlying combined ratio
>    estimate in Allstate's auto business.** (Emphasis added.)

<u>Sandler O'Neill, August 5, 2015</u>[89]

>    We value the stock at a price-to-book value multiple of approximately 130%, which
>    is at a modest discount with the peer group (136%) and deserved in our opinion **given
>    the company's frequency and severity issues in recent quarters**, applied to our
>    estimated book value one year from now (3Q16) of $50.93 to reach our $66 price
>    target. (Emphasis added.)

<u>RBC, August 4, 2015</u>[90]

>    Our reasoning is primarily due to reduced earnings visibility and expectation of
>    slower book value growth. Since 4Q14 the company has seen consistent margin
>    pressure from higher loss frequency and severity. While pricing action has been
>    taken, it will take a few more quarters before the benefits of these actions will be
>    visible in results. Equally, given Allstate's portfolio duration, we expect further
>    pressure on book value growth as interest rates begin to rise.

<u>RBC, August 4, 2015</u>[91]

>    We heard nothing on the call that leads us to believe that loss frequency and severity
>    trends will improve over the near term.

<u>JMP, August 4, 2015</u>[92]

>    The miss versus our estimate was largely driven by a higher than forecast accident
>    year loss ratio (65% vs. 62% est.; $0.35 miss), due to increased frequency and

---

[88] MKM Partners, "Auto Frequency Increase Causes Miss; Company Addressing the Problem," August 4, 2015, at 1.

[89] Sandler O'Neill + Partners, "2Q15 Earnings Review: Maintaining HOLD Rating," August 5, 2015, at 1.

[90] RBC Capital Markets, "Margins Disappoint, Lowering to Sector Perform," August 4, 2015, at 1. I acknowledge that RBC highlighted both Allstate's increase in claims frequency/severity and its slower book value growth.

[91] RBC Capital Markets, "Allstate (ALL) Q2 Conference Call Highlights," August 4, 2015.

[92] JMP Securities, "2Q15 Results: Large EPS Miss Driven by Elevated Auto Loss Trends; Likely Not a Quick Fix," August 4, 2015, at 1.

severity driving a deterioration in auto results. […]

We decrease our 2015/2016 estimates to $4.85/$6.10 from $5.45/$6.20 to **reflect the miss in the quarter and inflated auto loss cost projections**. (Emphasis added.)

Compass Point, August 4, 2015[93]

We maintain our Neutral rating and are lowering our price target to $66 from $70. **The company announced that frequency and severity losses exceeded expected trends, and even after adjusting for CAT losses, the combined ratio underperformed expectations**. […] In the meantime, ALL is countering the surprising rise in the loss ratio through expense savings initiatives (reduced advertising, technology, and personnel). While this may have a positive impact on initial earnings results, there is a risk that the company could diminish some of the franchise value created as the second largest publicly traded auto insurer in the U.S. (Emphasis added.)

Janney, August 4, 2015[94]

We revised our 2015 estimate to $4.55 from $5.45 (Consensus: $5.36) and revised our 2016 estimate to $5.60 from $6.40 (Consensus: $6.08).

Our 2015 reduction incorporates **the q2 shortfall ($.37) and more pessimistic underlying loss ratios assumptions**. Our 2016 estimate incorporates **higher underlying loss ratio assumptions**. (Emphasis added.)

William Blair, August 4, 2015[95]

Earnings Revisions: We are lowering our 2015 operating EPS estimate to $4.80, from $5.24, **mainly due to the earnings miss and a decrease in our premium growth assumptions**. We are lowering our 2016 operating EPS estimate to $5.15, from $5.46, due to a 90-basis-point increase in our **auto loss ratio assumptions** and a decrease in premium growth. (Emphasis added.)

Morgan Stanley, August 5, 2015[96]

Lowering 2015-16e estimates to $4.72/$5.47 from $5.38/$5.51 due to **higher auto claims frequency and severity** pressuring margins offset partially by price increases.

---

[93] Compass Point Research & Trading, "What's the Frequency Allstate?; Maintain Neutral," August 4, 2015, at 1.
[94] Janney Capital Markets, "Updated Model," August 4, 2015, at 1.
[95] William Blair, "Higher Losses Suggest Earnings Have Likely Peaked," August 4, 2015, at 1.
[96] Morgan Stanley & Co., "Frequency and Severity Push Losses Higher for Third Straight Quarter," August 5, 2015, at 1.

(Emphasis added.)

71. Dr. Gompers also ignores that certain securities analysts expected Allstate's stock price to decline on August 4, 2015 due to its increased auto claims frequency, or attributed Allstate's stock price decline on August 4 to its increased auto claims frequency. For example, before the market closed on August 4, 2015, Deutsche Bank expected that Allstate's stock price would decline sharply on August 4 in response to Allstate's disappointing second quarter earnings results, which were driven by the spike in auto claims frequency.[97] Sandler O'Neill stated that "[g]iven the $0.34 per share earnings miss relative to consensus, we anticipate shares will be materially weak as a result."[98]

72. After the market closed on August 4, 2015, J.P. Morgan commented that Allstate shares were "selling off substantially" on August 4, in response to the earnings miss "reflecting deterioration in loss frequency trends."[99] Deutsche Bank noted regarding Allstate's stock price reaction on August 4 that "the miss on earnings and fundamentals caused shares to fall precipitously."[100] Macquarie stated that the earnings "miss was attributable to worsening auto loss cost trends due to external factors, such as higher miles driven. Subsequently, the stock fell 10.2% vs. S&P -0.22%."[101] UBS commented that "Allstate's shares declined 9.3% last week due to disappointing earnings driven by a higher than expected increase in auto insurance claims frequency."[102]

73. Therefore, Dr. Gompers' criticism of my analysis for not appropriately disaggregating confounding information is without merit and contradicts contemporaneous securities

---

[97] Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for 4Q15 Miss," August 4, 2015, at 1.
[98] Sandler O'Neill + Partners, "2Q15 First Look: Reports $0.63 vs. $0.66 SOP," August 4, 2015, at 1.
[99] J.P. Morgan Securities, "ALL Confident It Can Improve Auto Margins, But Turnaround Could Take Several Quarters," August 4, 2015, at 1.
[100] Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for 4Q15 Miss," August 4, 2015, at 1.
[101] Macquarie Capital, "Upgrading to Neutral from UP. It's not me, it's you.," August 4, 2015, at 1.
[102] UBS Securities, "Auto claims frequency is up and margins are down, but for how long?" August 9, 2015, at 1.

36

analysts' commentaries, because these analysts highlighted Allstate's increased auto claims frequency/severity as their major concern, and some specifically attributed Allstate's stock price decline on August 4, 2015 to Allstate's increased auto claims frequency.

**C.    Dr. Gompers Incorrectly Claims That I Did Not Show that the Alleged Corrective Disclosures Were Corrective of the Alleged Misrepresentations and Omissions**

74.    Dr. Gompers claims that I did not establish the "link" between the alleged misrepresentations/omissions and corrective disclosures.[103]  He further argues that "even assuming that some part of Allstate's stock price declines following the alleged corrective disclosures was caused by claim frequency increases attributable to Allstate's allegedly 'greatly reduced underwriting standards,'… it does not necessarily follow that disclosures concerning these claim frequency increases were corrective of the alleged misrepresentations and omissions."[104]  Dr. Gompers also claims that "before the Class Period, it was publicly known that Allstate was broadening its underwriting criteria as part of a strategy to 'grow insurance policies in force' and that its growth strategy would likely increase claim frequency."[105]  He further claims that I did not consider "what incremental information could have been disclosed earlier and whether any correction of the specific alleged misrepresentations and omissions was the proximate cause of Allstate's stock price declines."[106]  However, Dr. Gompers criticisms are baseless and not supported as discussed below.

---

[103] Gompers Report, ¶124.
[104] Gompers Report, ¶125.
[105] Gompers Report, ¶126.
[106] Gompers Report, ¶126.

> **i.  The Information That Dr. Gompers Claims Was Released to the Market Prior to the Class Period Is Irrelevant to the Alleged Corrective Disclosures at Issue**

75.  Dr. Gompers asserts that "before the Class Period, it was publicly known through defendants' own disclosures that Allstate was pursuing a growth strategy that included broadening its underwriting criteria and that a 'somewhat inevitable' result of such growth would be an increase in claim frequency."[107]  In particular, Dr. Gompers notes that "it was publicly known that Allstate was implementing a growth strategy that included broadening its underwriting criteria."[108]  Dr. Gompers also notes that it was "publicly known before the Class Period that Allstate's growth strategy would likely increase claim frequency and could potentially reduce profitability."[109]  For example, Dr. Gompers quotes Allstate's statements during earnings conference calls as follows:

May 2, 2013 Conference Call[110]

> I talked about at probably the last two earnings calls about two initiatives that we had underway with the auto business that we have termed price optimization and **broadening the target**. Essentially what the intent of both of those initiatives was to do was to slightly expand our target market. [...]  So, overall it is a **slight broadening, not a dramatically different market**, but a disciplined move to expand our target market to include a greater percentage of people who shop with us. (Emphasis added.)

February 6, 2014 Conference Call[111]

> We looked at the new to renewal ratios because as we are growing, we would expect some pressure on our frequency there but actually it hasn't emerged yet. The faster we grow that becomes **somewhat inevitable** but we are monitoring it closely and we will stay out in front of it. (Emphasis added.)

---

[107] Gompers Report, ¶127.
[108] Gompers Report, ¶128.
[109] Gompers Report, ¶130.
[110] Gompers Report, ¶128, citing Allstate, "The Allstate Corporation Q1 2013 Earnings Conference Call," dated May 2, 2013.
[111] Gompers Report, ¶130, citing Allstate, "The Allstate Corporation Q4 2013 Earnings Conference Call," dated February 6, 2014.

76. Dr. Gompers quotes other Allstate's statements, in which he claims the Company made similar statements concerning its focus on its growth strategy and broadening underwriting standards, including its earnings press releases and financial statements issued on February 7, 2013, May 1, 2013, July 31, 2013, February 20, 2014, and May 7, 2014.[112]

77. Dr. Gompers also cites a few securities analysts' commentaries that reiterated Allstate's growth strategy, its broadening of its auto insurance underwriting criteria, and the potential negative impact of a possible increase in claims frequency on the Company's profitability.[113]

78. However, these statements made by Allstate prior to the Class Period, *i.e.*, that it had focused on growth or it had "broadened" its auto underwriting standards, did not reveal the specific information disclosed on the corrective Disclosure Dates. Allstate describes its strategy as a "slight broadening, not in a dramatically different market," thus trying to downplay the economic significance of the change in underwriting standards and other aspects of its aggressive growth strategy.[114] Allstate's announcements concerning its overall growth strategies and its "broadening" of its underwriting standards prior to the Class Period are irrelevant to the allegations at issue in this matter. Again, the Plaintiffs' allegation is that Allstate failed to disclose that its aggressive growth strategies beginning in 2013 had a significant negative impact on its increased auto claims frequency in late 2014 and early 2015.

79. Allstate never disclosed before the corrective Disclosure Dates that its aggressive growth strategies, including its lowered underwriting standards, would cause a substantial increase in its auto claims frequency and that a significant increase in auto claims frequency had already

---

[112] Gompers Report, Exhibits 5A-5C.
[113] Gompers Report, ¶130 and Exhibits 5A-5C.
[114] Allstate, "The Allstate Corporation Q1 2013 Earnings Conference Call," dated May 2, 2013.

occurred by the beginning of the Class Period. This undisclosed information is economically different information from what the Company had announced when it said that it had merely "broadened" its underwriting standards. In fact, Allstate continued to downplay the potential impact of its "broadening" of its underwriting standards on its business before the Class Period.

80. For example, during the earnings conference call held on May 2, 2013, Allstate's CEO stated concerning its growth strategies that:

> And essentially, what the intent of both of those initiatives was to do was to **slightly expand our target market**…. And so we have broadened that target market a little bit, still well **within what we believe is the preferred type of risk** that we want as a company... It's a pretty broad-based improvement, and what's interesting is that the new business trends that are up and the retention trends that are up, are up in those states where we have implemented those 2 initiatives, the price optimization and broadening the target…. So overall, it's a **slight broadening, not in a dramatically different market, but a disciplined move to expand our target market** to include a greater percentage of people who shop with us. (Emphasis added.)

81. During a conference call held on February 6, 2014, Allstate's CEO, again, played down the impact of the slightly increased auto loss ratio in the fourth quarter of 2013 by stating that:[115]

> [T]he tick-up [in the standard auto loss ratio]…, **we just consider some normal volatility**. There is some embedded pressure on the severity side. I think **frequency is relatively stable and it's performing well within the historical ranges**. So there was a little PD uptick. But remember that 2012 was actually below the historical range. So we look at that, and **there's nothing to be worried about**. We looked at the new to renewal ratios, because as we're growing, **we would expect some pressure on our frequency there. But actually, it hasn't emerged yet.** The faster we grow, that becomes somewhat inevitable, **but we're monitoring it closely and we'll stay out in front of it.** And again, on the severity side, it's slightly elevated. You look at the 2-year average growth, though, on like PD paid severity, and it's fairly moderate. (Emphasis added.)

---

[115] Allstate, "The Allstate Corporation FQ4 2013 Earnings Conference Call," dated February 6, 2014.

82. Dr. Gompers conflates the Plaintiffs' allegation that Allstate failed to disclose the substantial impact of its aggressive growth strategies, including its reduced underwriting standards, on the increase in its auto claims frequency during the Class Period with the fact that the Company announced its new growth strategy and its slight broadening of its auto insurance underwriting standards before the Class Period and thereafter continued to mislead investors into believing that the impact of its aggressive growth strategy was much less severe than it actually was. These two statements conveyed fundamentally different information to investors in terms of the significance and the magnitude of the impact of the change in strategy and the related change in Allstate's auto underwriting standards.

83. In addition, Allstate's statement concerning the "somewhat inevitable" impact of its growth strategy on its auto claims frequency downplays the likelihood that its new business growth strategy would cause an increase in its auto claims frequency. In other words, the economic significance of the information that was publicly known to the market prior to the Class Period - *i.e.*, that the growth strategy was potentially expected to cause higher claims frequencies - is fundamentally different from the information disclosed on the Disclosure Dates – *i.e.*, the fact that Allstate had actually experienced a spike in auto claims frequency by the beginning of the Class Period and that the Company's aggressive growth strategy would cause a significant increase in its auto claims frequency.

84. Concerning the securities analysts' commentary that Dr. Gompers cites, as discussed above, many of the stock analysts merely reiterated what Allstate had publicly stated during its earnings calls and in its financial statements. Like Allstate's statements, these securities analysts' commentaries do not support Dr. Gompers' argument that securities analysts' reports prior to the corrective Disclosure Dates discussed the specific information disclosed

41

on the corrective Disclosure Dates.[116]

> ii. **Dr. Gompers' Assertion Concerning the Lack of a "Link" Between the Alleged Misrepresentations/Omissions and the Corrective Disclosures Is Unfounded**

85. Dr. Gompers asserts that I did not link alleged misrepresentations and omissions made between the start of the Class Period and the first Disclosure Date of February 4, 2015 to a later correction on the corrective Disclosure Dates.[117] Dr. Gompers also asserts that I did not establish "how the May 5-6, 2015 alleged corrective disclosures corrected any alleged misrepresentations and omissions made by defendants in February 2015," nor did I establish "how the August 3-4, 2015 alleged corrective disclosures corrected any alleged misrepresentations and omissions made by defendants in February 2015 or May 2015."[118]

86. In order to support his claim, Dr. Gompers attempts to summarize Plaintiffs' alleged misrepresentations and omissions into four categories: "(i) Allstate's 0.2% year-over-year increase in bodily injury *paid* claim frequency in Q3 2014, (ii) Allstate's "comprehensive plan to generate profitable growth," (iii) Allstate's *gross* claim frequency increases in October and November 2014, and (iv) the cause of Allstate's year-over-year increases in *gross* claim frequency in Q4 2014 and Q1 2015."[119]

87. Then, Dr. Gompers claims that I did not "link" the alleged misrepresentations and omissions he defines in his strawman classification scheme to all later corrected information disclosed on the corrective Disclosure Dates.[120] Specifically, Dr. Gompers claims that I did not show that "any information in the alleged corrective disclosures contradicted or corrected anything

---

[116] Gompers Report, ¶130 and Exhibits 5A-5C.
[117] Gompers Report, ¶132.
[118] Gompers Report, ¶¶141, 143.
[119] Gompers Report, ¶123 and Exhibit 1.
[120] Gompers Report, ¶132.

defendants said (or allegedly omitted but should have said) before February 4–5, 2015" and that I did not discuss "the alleged false and misleading statements made in October and December 2014," "why those disclosures were corrective," or my "estimation of the effect of the alleged corrective disclosures on the price on Allstate common stock."[121]  Dr. Gompers has ignored what I wrote in my report.

88.    First of all, Dr. Gompers' categorization of Plaintiffs' allegations is a nullity.  Dr. Gompers mischaracterizes Plaintiffs' allegations by attempting to rewrite the alleged misrepresentations and omissions in a nonsensical fashion that is designed to serve his own purpose.[122]  The arbitrary classification scheme bears no discernible relation to the eleven alleged misrepresentations and omissions stated in the Complaint.[123]  Indeed, Exhibit 1 of the Gompers Report, and especially the language he highlighted, emphasizes that all alleged eleven misrepresentations and omissions – not just the four Dr. Gompers conjures up – involve Defendants' concealment of the Company's increase in auto claims frequency and that Allstate's aggressive new auto insurance policy growth strategy, including greatly reduced underwriting standards and other elements, was responsible for the significant increase in its auto claims frequency during the Class Period.[124]  Exhibit 1 of the Gompers Report also demonstrates that Allstate instead allegedly misrepresented to investors that the increasing claims frequency trend was consistent with its normal claims frequency trend in 2014 and that the spike in the claims frequency was due to temporary external factors, such as the growing economy (*i.e.*, number of miles driven) and the bad weather (*i.e.*,

---

[121] Gompers Report, ¶133.
[122] Gompers Report, ¶123.
[123] Complaint, ¶¶57-91.
[124] Complaint, ¶2,7; *see also In re The Allstate Corporation Sec. Litig.*, 2020 WL 4013360, at *2 (7th Cir. July 16, 2020) (summarizing Plaintiffs' allegations).

precipitation) in certain parts of the country.[125]  Therefore, Dr. Gompers' attempt to

recharacterize Plaintiffs' allegations by whimsically classifying them into four arbitrary

categories creates a strawman that is inconsistent with the Plaintiffs' allegations.

89.    Thus, Dr. Gompers' assertion that I did not provide the link between the alleged

misrepresentations/omissions and the corrective disclosures based on his mischaracterization

of the Plaintiffs' allegations, *i.e.*, based on his four arbitrary categories, is meritless because

it rests on a classification scheme that is not faithful to the Plaintiffs' allegations.

90.    In the Finnerty Damages Report, I considered what I understand from Counsel to be the legal

definition of loss causation.  Specifically, the Finnerty Damages Report's discussion of loss

causation—and the link between price declines and misrepresentations—is consistent with

the discussion of loss causation in *Vivendi*:[126]

> [T]o establish loss causation, a plaintiff must show that "the loss [was a]
> foreseeable" result of the defendant's conduct (i.e., the fraud), "*and* that the
> loss [was] caused by the materialization of the . . . risk" concealed by the
> defendant's alleged fraud.

> Put more simply, proof of loss causation requires demonstrating that "the
> *subject* of the fraudulent statement or omission was the cause of the actual
> loss suffered."[127]

91.    In addition, the Finnerty Damages Report's discussion of partial corrections and/or

materializations of the risk concealed by Defendants' misrepresentations and omissions is

consistent with the discussions in *Vivendi*:

> Whether the truth comes out by way of a corrective disclosure describing the
> precise fraud inherent in the alleged misstatement or *through events
> constructively disclosing the fraud,* does not alter the basic loss-causation
> calculus.

> That *"corrective disclosure" and "materialization of risk" are not wholly*

---

[125] Complaint, ¶¶10, 12, 15.

[126] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, at 261-262 (2d Cir. 2016).

[127] *Id.*, quoting *Suez Equity Inv'rs, L.P. v. Toronto Dominion Bank,*, 250 F.3d 87, at 95 (2d Cir. 2001).

*distinct theories of loss causation* highlights the flaws of Vivendi's position. (Emphasis added.)[128]

92.   Furthermore, it is my understanding that a disclosure event need not mirror a misrepresentation, or be based upon a confession by Defendants, to establish loss causation. Instead, I understand that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions."[129]  In *Lehman Bros.*, the court provided the following analysis:

> In other words, if a company misrepresents fact *A* (we have plenty of free cash flow), which conceals risk *X* ([lack of] liquidity), the risk can still materialize by revelation of fact *B* (a ratings downgrade), an indication of risk X ([inadequate] liquidity).  As discussed above, to prove the causal connection between misrepresenting fact *A* and the revelation of fact *B*, plaintiffs must establish only that the revelation of fact *B* was foreseeable, *i.e.*, within the zone of risk *X*, and that fact *B* reveals information about risk *X*. When fact *B* is revealed, the market need not be aware of fact *A* or that fact *A* had been previously misrepresented.[130]

93.   Consistent with my understanding, I note that in *Vivendi* the court and jury found that the stock price declines following nine events were caused by the subject matter of Vivendi's misstatements—the concealment of liquidity risk—even though none of the events expressly stated that Vivendi had lied to investors about liquidity risks:

> (1) January 7, 2002 news that Vivendi sold 55 million of its treasury shares; (2) May 3, 2002 news that Moody's downgraded Vivendi's long-term senior debt to a notch above junk status; (3) June 21, 2002 news that Vivendi sold a stake in its subsidiary Vivendi Environnement, despite earlier statements that it would wait to sell; (4) June 24, 2002 news just three days later that Vivendi sold an even larger stake in Vivendi Environnement; (5) July 2, 2002 news that Moody's downgraded Vivendi's long-term senior debt to junk status, followed by S&P's downgrade of Vivendi's short-term senior debt; (6) July 3, 2002 news that Vivendi acknowledged its short-term

---

[128] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, at 262 (2d Cir. 2016).

[129] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, at 173 (2d Cir. 2005).

[130] *In re Lehman Bros. Se and ERISA Litig*, 131 F. Supp. 3d 241, at 264 (S.D.N.Y. 2015) (quoting *In re Vivendi Universal, S.A. Securities Litigation*, 634 F. Supp. 2d 352, at 367 (S.D.N.Y. 2009)).

liquidity problems and its €1.8 billion in obligations that were due that very month; (7) July 10, 2002 news that rating agencies cautioned that further downgrades were possible, and that French authorities had raided Vivendi's Paris headquarters to investigate possible securities fraud; (8) July 15, 2002 news that a member of Vivendi's board of directors was urging Vivendi quickly to sell Canal+, which was not generating earnings as expected; and (9) August 14, 2002 news that Vivendi planned to sell €10 billion in assets over the following two years, €5 billion of which it hoped to sell within just nine months.[131]

94. Consistent with *Vivendi*, in the Finnerty Damages Report, I analyzed whether the *subject* of the alleged misrepresentations and omissions—the concealment of Allstate's increase in claims frequency and its approximate cause, *i.e.*, the Company's aggressive growth strategies—was the cause of Allstate's stock price declines on the corrective Disclosure Dates. Thus, my analysis was entirely consistent with Plaintiffs' allegations that by fraudulently concealing these risks, Defendants were able to artificially maintain the price of Allstate's stock during the Class Period, and I reliably calculated the losses caused by the dissipation of that artificial price maintenance.

95. Contrary to Dr. Gompers' assertion based on his mischaracterization of the Plaintiffs' allegations, in the Finnerty Damages Report, I did provide the link between the alleged misrepresentations/omissions and the corrective disclosures. I did establish in the Finnerty Damages Report that Allstate's stock price declines on each of the corrective Disclosure Dates were all the result of disclosures of the risks concealed by Allstate's alleged misrepresentations and omissions:

---

[131] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, at 262-263 (2d Cir. 2016).

| Disclosure Date | The Link between the Alleged Misrepresentations/Omission and the Corrective Disclosures that I Proffered in the Finnerty Damages Report |
|---|---|
| February 5-6, 2015 | "[I]n assessing Allstate's outlook, investors and securities analysts raised concerns about Allstate's reduced auto combined ratio, which was primarily driven by an increase in Allstate's auto claims frequency."<br><br>"Allstate's earnings announcement for the fourth quarter of 2014 provided new information that led to concerns regarding the increase in auto claims frequency, which was, from an economic perspective, corrective of alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the concerning outlook."[132] |
| May 6, 2015 | "[I]n formulating their assessments of Allstate's outlook, investors and securities analysts were again concerned about the higher auto claims frequency trends that were evident for the second consecutive quarter."<br><br>"Allstate's earnings announcement for the first quarter of 2015 provided new information that led to concerns regarding the Company's increased auto claims frequency, which was, from an economic perspective, corrective of (and a materialization of the risks concealed by) alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the concerning outlook."[133] |
| August 4, 2015 | "Allstate's earnings announcement for the second quarter of 2015 provided new information regarding the Company's increased auto claims frequency, which was, from an economic perspective, corrective of alleged misrepresentations and omissions concerning the performance of Allstate's auto insurance business and what factors were responsible for the increase in auto claims frequency. This was the first time that Allstate acknowledged that the recent growth in Allstate brand auto policies in force had contributed to the recent increases in its auto claims frequency."[134] |

96.   Furthermore, Dr. Gompers entirely ignores the stock analysts' commentary that I presented

in the Finnerty Damages Report that attributed Allstate's stock price decline on each of the

corrective Disclosure Dates to the increase in its auto claims frequency or expected Allstate's

---

[132] Finnerty Damages Report, ¶¶60-61.
[133] Finnerty Damages Report, ¶¶86-87.
[134] Finnerty Damages Report, ¶115.

stock price to decline due to the increase in Allstate's auto claims frequency.[135]

### D. Dr. Gompers Mischaracterizes My Analysis by Claiming that My Use of a Two-Day Return Is Inconsistent with Market Efficiency

97.    Dr. Gompers claims that my "use of a two-day residual stock price return" following the February 4-5, 2015 alleged corrective disclosures "is inconsistent with [my] assumption that Allstate's stock traded in an efficient market," because "in an efficient market, prices begin adjusting to the arrival of new information almost immediately, converging to efficient levels that reflect the market's assessment of the value implications of new information within minutes or hours."[136]  He further claims that I did not identify any alleged corrective disclosure for the February 6 Disclosure Date but simply observed securities analysts continued comments on Allstate's Q4 2014 earnings results after the market closed on February 5.[137]

98.    However, Dr. Gompers mischaracterizes my analysis.  As described in the Finnerty Damages Report and as Dr. Gompers actually acknowledges, I identified *new* information for my loss causation analysis for the February 6 Disclosure Date, *i.e.*, securities analysts' commentary.

99.    I understand that the courts have determined that even in an efficient market, complex economic data may not be immediately digestible by investors but can be made understandable through expert analysis, including securities analysts' commentaries:

> In *Amedisys*, the court found that an analysis contained in a WSJ article, which was based on publicly available Medicare records, was plausibly "not merely

---

[135] *See, e.g.*, Wells Fargo Securities, "ALL: First Look at Q1 Results—Frequency Concerns Remain," May 5, 2015; Deutsche Bank Securities, "Modest 1Q15 Beat on Solid P&C Alt Investment Income," May 5, 2015; Janney Capital Markets, "Initial Thoughts on 1Q15 Results," May 5, 2015; J.P. Morgan Securities, "ALL Confident It Can Improve Auto Margins, But Turnaround Could Take Several Quarters," August 4, 2015, at 1; Deutsche Bank Securities, "Frequency Trend and Seasonal Trend Bode for 4Q15 Miss," August 4, 2015, at 1; Macquarie Capital, "Upgrading to Neutral from UP. It's not me, it's you.," August 4, 2015, at 1; UBS Securities, "Auto claims frequency is up and margins are down, but for how long?" August 9, 2015, at 1.
[136] Gompers Report, ¶¶148-149.
[137] Gompers Report, ¶¶150-151.

confirmatory" but constituted a corrective disclosure.[138]

In *Signet,* the court noted that "[d]efendants are incorrect that it simply published already-known information. […] [The analyst's report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why Signet's underlying business was weaker than most people realized. It thus qualifies as corrective."[139]

In *Xerox*, the court rejected defendants' argument that plaintiffs' expert could not show that "the alleged corrective disclosures contained new information" where, in part, the expert "conducted an extremely limited and insufficient review of the public information…"[140]

In *Vivendi*, the court did "not find that no reasonable juror could conclude that the ratings downgrades disclosed no new information."[141]

100. Nevertheless, I note that a two-day window is common in academic event studies and that many courts have accepted a two-day event window and granted class certification.[142]

101. Therefore, my loss causation analysis for the February 4-6, 2015 corrective disclosures is not inconsistent with the market efficiency of Allstate's common stock during the Class Period, which I have previously demonstrated in the Finnerty Class Certification Report.

---

[138] *Pub. Emps. Ret. Sys. Of Miss. v. Amedisys, Inc.,* 769 F.3d 313, 323 (5th Cir. 2014).

[139] *In re Signet Jewelers Ltd. Secs. Litig.*, 2019 WL 3001084, at *17.

[140] *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 412 (D. Conn. 2010).

[141] *In re Vivendi Universal, S.A., Sec. Litig.*, 634 F. Supp. 2d 352, 371-72 (S.D.N.Y. 2009).

[142] *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 n. 183 (S.D.N.Y. 2015) (holding that "[a] two-to-three-day window is common in event studies because it is standard for experts to utilize an event window including the day of the event and the day following an event…"); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011), abrogated on other grounds by *Amgen Inc. v. Conn Ret. Plans & Tr. Funds*, 568 U.S. 455, 133 S. Ct. 1184 (2013) (holding "[t]hat some information took two days to affect the price does not undermine a finding of efficiency."); *Monroe Cty. Emp. Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 391-92 (N.D. Ga. 2019) ("Fourth, academic literature supports the use of two-day (or more) event windows. For example, MacKinlay explains that two-day event windows are appropriate when analyzing earnings announcements. Professor Feinstein cited multiple other legal and academic papers endorsing the use of multi-day event windows and explaining that price reactions to news sometimes occur over two or more trading days, including a paper by David I. Tabak, who explains that "[i]n securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement." And although Defendants and Professor Gompers cite academic literature for the proposition that stock price reactions generally begin quickly, this does not necessarily mean that stock price reactions always end quickly. Rather, as Professor Feinstein explained, "[i]t is not settled science that an efficient market price reaction is over within a matter of minutes," and "the articles [Professor Gompers cites] do not conclude that the stock price reaction in an efficient market necessarily ends quickly and cannot continue on the day after an earnings announcement." [Doc. 113-2, ¶¶60, 65].")

**VI.    Dr. Gompers' Criticism of My Damages Analysis Is Unsupported**

102.  First, Dr. Gompers claims that my analysis cannot be used to measure damages, because my damages methodology is based on the same assumptions that he claims undermine my loss causation analysis.[143]  Then, Dr. Gompers repeats the same opinions he proffered in the previous section of his report.[144]  However, as discussed herein in Section V of this report, Dr. Gompers' opinions are unsupported.

103.  Second, Dr. Gompers claims that my damages methodology "overstates damages by assuming that the entirety of any price inflation was present at the beginning of the Class Period."[145]  Specifically, Dr. Gompers criticizes my damage methodology for supposedly assuming that "Allstate could have made a disclosure at the beginning of the Class Period that would have led the market to know, with reasonable certainty, the Company's claim frequency increases supposedly attributable to the allegations for the next three quarters."[146]  Then Dr. Gompers asserts that I have not provided "any evidence to show that Allstate would have had this information at earlier times," nor have I "articulated what that but-for-disclosure(s) could have been."[147]

104.  Again, Dr. Gompers mischaracterizes Plaintiffs' allegations.  Plaintiffs have not alleged, nor have I assumed, that "Allstate could have made a disclosure at the beginning of the Class Period that would have led the market to know, with reasonable certainty, the Company's claim frequency increases supposedly attributable to the allegations for the next three quarters."[148]  The allegation in this matter is that, even though Defendants were aware of the

---

[143] Gompers Report, ¶156.
[144] Gompers Report, ¶¶157-159, referencing Gompers Report, Section V.B-V.E.
[145] Gompers Report, ¶¶157-159, referencing Gompers Report, Section V.B-V.E.
[146] Gompers Report, ¶162.
[147] Gompers Report, ¶162.
[148] Gompers Report, ¶162.

auto claims frequency increase at least as of the beginning of the Class Period on October 29, 2014, Defendants failed to disclose this increase to the public until February 4, 2015 and also failed to disclose that Allstate's new growth strategy was the proximate cause of the significant increase in its auto claims frequency.[149]  Thus, Plaintiffs' allegation is that Defendants should have disclosed the truth about its increase in claims frequency and its aggressive growth strategy for being the cause of the increase, instead of attributing the spike in its auto claims frequency to temporary external factors, such as miles driven and precipitation.

105. Furthermore, Dr. Gompers' assertion that I did not provide "any evidence to show that Allstate would have had this information at earlier times" or "what that but-for-disclosure(s) could have been" is unfounded because, as Plaintiffs' expert economist providing opinions regarding loss causation and damages, I am not required to specify the words that Defendants could have used had they decided to be truthful about the cause of Allstate's auto claims frequency increase during the Class Period.

106. For the purpose of the loss causation and damages analysis in the Finnerty Damages Report, I have accepted the Plaintiffs' allegations as true.  Based on the Plaintiffs' allegations, in the Finnerty Damages Report, I analyzed what Allstate allegedly failed to properly disclose and what the resulting impact of the alleged corrective disclosures was on the Company's stock price on the corrective Disclosure Dates.

---

[149] Complaint, ¶¶7, 16, 49-54, 71.

**VII.  Nothing in the Gompers Report Has Changed My Opinions Expressed in the Finnerty Damages Report**

107.  Nothing in the Gompers Report has changed my opinions expressed in the Finnerty Damages Report.  I stand by my opinions proffered in the Finnerty Damages Report that:

    i.    The abnormal return on Allstate's common stock on each of the corrective Disclosure Dates (February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015), after adjusting for market-wide and industry-wide factors in an appropriately designed event study, is statistically significant at the 5 percent level or better.

    ii.    The residual abnormal returns, after further adjusting for non-fraud-related Allstate news, on February 5, 2015, February 6, 2015, May 6, 2015, and August 4, 2015 were -1.21 percent, -1.68 percent, -3.09 percent, and -7.39 percent, respectively.  The residual returns were substantially caused by a series of corrective disclosures concerning the increase in auto claims frequency due to Allstate's aggressive growth strategies that the Company had misrepresented prior to the corrective Disclosure Dates.

    iii.    The amount of damages suffered by purchasers of the shares of Allstate's common stock as a result of the disclosures of the truth about the increase in auto claims frequency on the Disclosure Dates is, in total, up to $9.38 per share, depending on when the shares were bought and sold during the Class Period.[150]

---

[150] I understand that, in order to incorporate Defendants expert's criticism, Dr. Leverty tested alternative regression models that estimate the proportion of Allstate's increase in claims frequency due to miles driven and precipitation. The percentage attributions based on the alternative regressions are 3.92%, 18.34%, and 11.68%, for Q4 2014, Q1 2015, and Q2 2015, respectively. (*See* Leverty Reply Report, ¶¶ 156-158.)  Accordingly, based on the alternative regressions, percentage attributions to Allstate's aggressive growth strategies for its increased claims frequency are 96.08%, 81.66%, and 88.32%, for Q4 2014, Q1 2015, and Q2 2015, respectively.  Based on the alternative attributions, the amount of damages is, in total, up to $9.32.

108. My analysis is based on the materials I have reviewed to date.  I reserve the right to amend my opinions and file a supplemental report in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this report.  To the extent this matter is adjourned for any reason, I further reserve the right to supplement this expert report.

Executed: July 30, 2020

_____
John D. Finnerty, Ph.D.

**Appendix A**



# JOHN D. FINNERTY, Ph.D.

## Academic Affiliate, AlixPartners, LLP

### Professor of Finance, Gabelli School of Business, Fordham University

Phone: (212) 845-4090                                                        909 Third Avenue
Fax: (646) 746-2490                                                        New York, NY 10022
Cell: (347) 882-8756                                            Email: jfinnerty@alixpartners.com

Dr. Finnerty is an Academic Affiliate in the Financial Advisory Services Group at AlixPartners, LLP, where he had previously served as a Managing Director for four years. He specializes in matters involving securities fraud class actions; market manipulation cases; securities disputes; corporate finance, investment banking, and fixed income; convertible securities; cases involving business, securities, and derivatives valuation; and matters requiring solvency analysis, calculation of damages, or statistical analysis. He provides litigation support for matters involving securities fraud, valuation disputes, solvency, portfolio mismanagement, fairness, breach of contract, breach of fiduciary duty, broker raiding, commercial disputes, and employment disputes. He has testified as an expert in matters involving securities fraud class action market efficiency, loss causation, and damages; securities appraisal; mortgage-backed securities damages; business valuation; solvency; private placement and other corporate finance issues; broker raiding; and other financial matters in federal and state court, arbitrations, and mediations. He has also testified as an expert in bankruptcy court concerning the valuation of businesses and securities, debt-for-debt exchange offers, and the fairness of proposed plans of reorganization.

Dr. Finnerty is also a Professor of Finance at Fordham University's Gabelli School of Business where he was the founding Director of the Master of Science in Quantitative Finance Program. He has taught for 32 years, including courses in investment banking, corporate finance, private equity, fixed income analysis, fixed income securities, fixed income portfolio management, principles of finance, securities innovation, and bankruptcy and reorganization. His teaching and research interests include initial public offerings, the valuation of securities and derivative instruments, project financing, and private equity fund and hedge fund management, structure, and

performance. He has developed innovative models for pricing gold IPOs and valuing convertible securities, employee stock options, restricted common stock, inflation-indexed bonds, venture capital preferred stock, emerging-growth firm common stock, and private equity carried interests.

Dr. Finnerty has published 16 books, including *Corporate Financial Management*, 5th ed., *Project Financing: Asset-Based Financial Engineering*, 3rd ed., P*rinciples of Financial Management*, and *Debt Management*, and more than 120 articles and professional papers in corporate finance, business and securities valuation, and other areas of finance. His writings and teaching have focused on the analysis and valuation of securities, especially fixed income instruments and complex derivative products, and mortgage-backed and other asset-backed securities. Dr. Finnerty is a former editor of *Financial Management*, one of the leading academic finance journals, and a former editor of *FMA Online*. He is a former member of the editorial boards of several finance and portfolio management journals.

Dr. Finnerty worked for more than 20 years as an investment banker. He worked on more than 50 public and private financings, served as financial advisor in connection with over a dozen mergers, and served as financial advisor and arranged financing for several project financings.

Dr. Finnerty is a Trustee and a former Chair of the Trustees and a former President and Director of the Eastern Finance Association, a former Director of the Financial Management Association, and a former President and Director of the Fixed Income Analysts Society. He served as a member of FASB's Option Valuation Group in connection with the revision of FAS 123. He was inducted into the *Fixed Income Analysts Society Hall of Fame* in 2011.

**EDUCATION**

1977          Ph.D. in Operations Research, Naval Postgraduate School

1973          B.A. and M.A. in Economics, Cambridge University; Marshall Scholar

1971          A.B. in Mathematics, Williams College; magna cum laude with highest honors in Mathematics; Rice Prize in Mathematics; Phi Beta Kappa

**BUSINESS EXPERIENCE**

| | |
|---|---|
| 2013 – Present | **AlixPartners, LLP, New York, NY** |
| 2017 – Present | Academic Affiliate, Financial Advisory Services Group |
| 2013 – 2017 | Managing Director, Financial Advisory Services Group |

**Appendix A**

| 2003 – 2013 | **Finnerty Economic Consulting, LLC, New York, NY**<br>Managing Principal |
|---|---|

2003 – 2013          **Finnerty Economic Consulting, LLC, New York, NY**
                                Managing Principal

2001 - 2003          **Analysis Group, Inc., New York, NY**
                                Managing Principal

2001 - 2003          **PricewaterhouseCoopers, LLP, New York, NY**
                                Partner, Financial Advisory Services Group

| 2003 – 2013 | **Finnerty Economic Consulting, LLC, New York, NY**<br>Managing Principal |
| 2001 - 2003 | **Analysis Group, Inc., New York, NY**<br>Managing Principal |
| 1997 - 2001 | **PricewaterhouseCoopers, LLP, New York, NY**<br>Partner, Financial Advisory Services Group<br>Dispute Analysis & Investigations securities litigation practice |
| 1995 - 1997 | **Houlihan Lokey Howard & Zukin, New York, NY**<br>Director |
| 1989 - 1995 | **McFarland Dewey & Co., New York, NY**<br>General Partner |
| 1986 - 1989 | **College Savings Bank, Princeton, NJ**<br>Executive Vice President, Chief Financial Officer, Treasurer, Secretary, and Director |
| 1982 - 1986 | **Lazard Frères & Company, New York, NY**<br>Vice President, Corporate Finance Department |
| 1977 - 1982 | **Morgan Stanley & Co. Inc., New York, NY**<br>Associate, Corporate Finance Department |

**ACADEMIC EXPERIENCE**

| 1987 - Present | **Fordham University Gabelli School of Business, New York, NY**<br>Professor of Finance and founding Director of the Master of Science in Quantitative Finance Program.<br>Received tenure in September 1991.<br>Gladys and Henry Crown Award for Faculty Excellence, 1997. |
| 1976 - 1977 | **Naval Postgraduate School, Monterey, CA**<br>Adjunct Professor, Department of Administrative Sciences |
| 1973 - 1976 | **United States Naval Reserve**<br>Instructor, Naval Postgraduate School. Promoted to Lieutenant, USNR. |

**Appendix A**

## PROFESSIONAL ASSOCIATIONS

Chair of the Trustees, Eastern Finance Association (2009-2010), Trustee (2008-Present), President (2007-2008), and Director (2005-2008)

President, Fixed Income Analysts Society (2006-2007), and Director (2001-2009)

Director, Financial Management Association (1991-1999, 2005-2007, 2011-2013)

Editor, *Financial Management* (1993-1999)

Editor, *FMA Online* (2001-2010)

Associate Editor, *Journal of Derivatives Accounting* (2003-2005)

Associate Editor, *Journal of Applied Finance* (2000-2007, 2012-2016)

Associate Editor, *Journal of Financial Engineering* (1992-1999)

Member, Editorial Advisory Boards, *The Financier* (1995-2003), *Journal of Portfolio Management* (1995-2018), and *International Journal of Portfolio Analysis & Management* (2011-2018)

Globe Business Publishing Ltd., London, U.K., Globe Law and Business Reader Panel (2015-Present)

## DIRECTORSHIP

Member, Board of Directors, Ashley, Inc. (2016-Present); Vice Chairman (2019-Present), Chair of the Audit Committee (2016-Present); Member of the Finance Committee (2016-Present); Member of the Strategic Alliance Committee (2018-Present)

## OTHER ACTIVITIES

Leadership Giving Co-Chair, Williams College Class of 1971

Co-chairman, New Jersey Special Gifts Program, Williams College Third Century Campaign

Member, Special Gifts Committee, New York City Area for Williams College Third Century Campaign

Vice Chairman, Williams College Class of 1971 25th Reunion Gift Committee

Treasurer and Trustee, Spring Lake Bath and Tennis Club, and Co-Chair, Finance Committee

## AWARDS

Marshall Scholar, 1971

Gladys and Henry Crown Award for Faculty Excellence, Fordham Business School, 1997

Best Investments Paper, Southern Finance Association, 2001

Best Corporate Finance Paper, Southern Finance Association, 2006

Bene Merenti Medal, Fordham University, 2007

Fixed Income Analysts Society Hall of Fame, 2011

Achievements in Excellence Team Award, AlixPartners, LLP, 2014

Ashley Greater New York Community Service Award, 2018

**Appendix A**

## EXPERT TESTIMONY IN LAST FOUR YEARS

| Clients | Case | Description of Testimony |
|---|---|---|
| Kramer Levin Naftalis & Frankel<br>Residential Capital<br>Official Committee of Unsecured Creditors | In re: Residential Capital, LLC, et al., Debtors<br>Residential Capital, LLC, et al. v. UMB Bank<br>Official Committee of Unsecured Creditors v. UMB Bank<br>U.S. Bankruptcy Court for the Southern District of New York<br>Case No. 12-12020 (MG) | Prepared an expert report and a rebuttal expert report describing OID (original issue discount) bonds, explaining the discount as interest, calculating the amount of OID, describing incentives firms can give bondholders to exchange their bonds for new bonds when OID is created, and analyzing a debt-for-debt exchange offer Residential Capital conducted in 2008. Testified at deposition and at trial in bankruptcy court. |
| Internal Revenue Service | Sugarloaf Fund, LLC v. Commissioner of Internal Revenue<br>United States Tax Court<br>Chicago, IL<br>Docket No. 671-10 | Prepared an expert report concerning the market for distressed consumer receivables in Brazil and valuing three portfolios of distressed Brazilian consumer electronics receivables. Testified at trial in tax court. |
| Olshan Frome Wolosky | Iroquois Master Fund, Ltd. v. Quantum Fuel Systems Technologies Worldwide, Inc.<br>U.S. District Court for the Southern District of New York<br>Case No. 13 Civ. 3860 | Prepared an expert report concerning the fair market value of an exchange right embedded in a corporate common stock warrant issued in a public offering and the impact of the warrant issue on the effective common stock price in a previously issued common stock warrant. Testified at deposition and at trial. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel<br>Korein Tillery | CMFG Life Insurance Company, et al. v. RBS Securities<br>U.S. District Court for the Western District of Wisconsin<br>Case No. 12-cv-00037 WMC | Prepared an expert report concerning the amount due to CMFG Life Insurance Company, CUMIS Insurance Society, and MEMBERS Life Insurance Company on their equitable rescission claim as a result of their purchase of residential mortgage-backed securities from RBS Securities. Testified at deposition. |
| Faegre Baker Daniels<br>Sherman & Howard | The Pioneer Centres Holding Company Employee Stock Ownership Plan and Trust, et al. v. Alerus Financial and Berenbaum Weinshienk<br>U.S. District Court for the District of Colorado<br>Civil Action No. 1:12-cv-02547-RM-BNB | Prepared an expert report analyzing and comparing a proposed ESOP stock purchase and redemption transaction and a consummated asset purchase transaction, analyzing an independent transaction trustee's negotiating position with respect to the seller's representations and warranties, and assessing the plaintiffs' damages claims. Testified at deposition. |
| Quinn Emanuel Urquhart & Sullivan | In re Lehman Brothers Holdings, et al., v. JPMorgan Chase Bank<br>U.S. Bankruptcy Court for the Southern District of New York<br>Index No. 10-ap-03266 | Prepared an expert report and a rebuttal expert report concerning the incremental value Lehman Brothers could have been realized from the sale of its investment management division if the bankruptcy of Lehman Brothers could have been delayed at least five business days. Testified at deposition. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---------|------|--------------------------|
| Ashurst<br>Markit Group Limited | European Commission Statement of Objections of 1 July 2013 Case COMP/39.745 – CDS Information Market | Prepared an expert report and a supplemental expert report explaining why the CDS market was not ready for exchange trading by 2009, CDS dealers were unlikely to have had sufficient incentives to become the initial market makers, and a CDS CLOB exchange was unlikely to achieve lower trading costs and wider new investor demand. |
| Internal Revenue Service | AD Investment 2000 Fund LLC AD Global 2000 Fund LLC v. Commissioner of Internal Revenue United States Tax Court New York, NY Docket Nos. 9177-08 and 9178-08 | Prepared an expert report concerning the reasonableness of profit expectation for a strategy involving a spread call option strategy. Testified at trial in tax court. |
| Luboja & Thau | Charles Schwab v. Morgan Stanley Smith Barney FINRA-DR Arbitration Arbitration No. 12-02325 | Prepared an expert report concerning the damages resulting from the alleged raid of two California offices of Charles Schwab. Testified at arbitration. |
| Satterlee Stephens Burke & Burke | Oppenheimer & Co. Inc. v. Deutsche Bank Securities Inc. FINRA Arbitration FINRA Case No. 10-04093 | Prepared an expert report and testified at arbitration concerning auction rate credit-linked notes, their intended market, the fair market of the AR CLNs at issuance, and Deutsche Bank's unjust enrichment. |
| Wollmuth Maher & Deutsch | Lehman Brothers Special Financing, Inc. v. Bank of America, et al. U.S. Bankruptcy Court for the Southern District of New York Case No. 10-03547 (SCC) | Prepared an expert report concerning the economic commonality of certain payment preference provisions across 48 CDO transactions in which Lehman Brothers Special Financing was involved as a credit default swap counterparty. Testified at deposition. |
| Robbins Geller Rudman & Dowd | Carpenters Pension Trust Fund of St. Louis, et al. v. Barclays plc, et al. U.S. District Court for the Southern District of New York Civil Action No. 1:12-cv-05329-SAS | Prepared an expert report on the efficiency of the market for the American depositary shares (ADS) on the Company's common stock in connection with a securities class action. Testified at deposition and at trial. |
| Fox Rothschild | In re: IH 1, Inc., et al., Debtors George L. Miller, Chapter 7 Trustee v. Kirkland & Ellis U.S. Bankruptcy Court for the District of Delaware Case No. 09-10982 (LSS) | Prepared an expert solvency report concerning an aluminum extrusion company. Testified at deposition. |
| Labaton Sucharow Robbins Geller Rudman & Dowd | In re Goldman Sachs Group, Inc. Securities Litigation U.S. District Court for the Southern District of New York Case No. 1:10-cv-03461-PAC | Prepared an expert report on the efficiency of the market for the Company's common stock in connection with a securities class action and a report on loss causation and damages. Testified at deposition and at trial. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---|---|---|
| Internal Revenue Service | Endeavor Partners Fund, LLC, Delta Currency Trading, LLC, Tax Matters Partner, et al. v. Commissioner of Internal Revenue United States Tax Court New York, NY Docket Nos. 8698-12, 8710-12, 8721-12, 8846-12, 9975-12, 11290-12, and 12591-12 | Prepared an expert rebuttal report responding to an expert report prepared by the taxpayer's expert, which provided an economic rationale underlying the taxpayer's business strategy. Testified at trial in tax court. |
| Boies, Schiller & Flexner Korein Tillery | Bruce S. Sherman v. Bear Stearns Companies Inc., et al. U.S. District Court for the Southern District of New York Index No. 09 Civ. 8161 (RWS) | Prepared an expert report in connection with a 10b-5 securities fraud matter concerning the efficiency of the market for the common stock of the Bear Stearns Companies, Inc., furnishing a loss causation analysis, and calculating the amount of damages sustained by Bruce Sherman due to the alleged fraud. Testified at deposition. |
| Arnold & Porter | AmTrust North America, Inc. v. SquareTrade, Inc. JAMS Arbitration No. 1100079447 | Prepared an expert report concerning the improper sampling of consumer electronics claims submitted under the defendant's extended service plans and the incorrect calculation of damages by the plaintiff's experts. Testified at arbitration. |
| Humphrey, Farrington & McClain Klamann Law Firm White Graham Buckley & Carr | Dennis Demetre and Lori Lewis v. HMS Holdings Corp. Supreme Court of the State of New York, County of New York Index No. 652381/2012 | Prepared an expert report identifying the expected synergies from a corporate merger; explaining due diligence, role of investment bankers, post-merger integration, and purpose of earn-outs in change-of-control transactions; analyzing the earn-out provision of a stock purchase agreement; and calculating the amount of damages sustained by the plaintiffs due to non-payment of the earn-out. Testified at deposition and at trial. |
| Schuyler, Roche & Crisham | UBS Financial Services Inc. v. David Kinnear, et al. FINRA Arbitration FINRA Case No. 12-00554 | Prepared an expert report concerning the damages allegedly resulting from the improper solicitation of former clients by a broker in violation of his employment agreement. Testified at arbitration. |
| Securities and Exchange Commission | U.S. Securities and Exchange Commission v. Stifel, Nicolaus & Co., Inc. and David W. Noack U.S. District Court for the Eastern District of Wisconsin Case No. 2:11-cv-755 | Prepared an expert report concerning collateralized debt obligations (CDOs) and analyzed three leveraged synthetic CDO transactions five Wisconsin school districts entered into in 2006, assessed the various risks, and opined on the accuracy of certain statements made to the school districts about those investment risks. Testified at deposition. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. Credit Suisse Securities (USA), et al. U.S. District Court for the Southern District of New York Case No. 13-cv-6736 (DLC) | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from Credit Suisse. Testified at deposition. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---------|------|--------------------------|
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. Goldman Sachs, et al. U.S. District Court for the Southern District of New York Case No. 13-cv-6721 (DLC) | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from Goldman Sachs. Testified at deposition. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. Goldman Sachs, et al. U.S. District Court for the Central District of California – Western Division Case No. 11-cv-6521 GW (JEMx) | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from Goldman Sachs. Testified at deposition. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. UBS Securities U.S. District Court for the Southern District of New York Case No. 13-cv-6731 (DLC) | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from UBS. Testified at deposition. |
| Goodmans | Ontario Superior Court of Justice (Commercial List) In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended And in the Matter of a Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc. Court File No. CV-14-10695-00CL | Prepared an expert report concerning the distinguishing characteristics of debt and equity and evaluating from a financial point of view whether the principal terms of the U.S. Steel Canada Term Loan and Revolving Credit Loan were more equity-like than debt-like as of the date of issuance. Testified at trial in Toronto. |
| Labaton Sucharow | In re Amgen Inc., Securities Litigation U.S. District Court for the Central District of California Western Division Case No. CV 07-2536 PSG (PLAx) | Prepared expert report concerning loss causation and damages and prepared rebuttal and reply reports responding to defendants' expert reports concerning loss causation and damages issues. Testified at deposition. |
| Orrick, Herrington & Sutcliffe | Hemlock Semiconductor Corporation v. Deutsche Solar GmbH U.S. District Court for the Eastern District of Michigan Northern Division Case No. 1:13-CV-11037 | Prepared an expert report explaining the economic characteristics of take-or-pay agreements, describing the benefits Deutsche Solar received under four supply agreements, identifying the harm to Hemlock resulting from the contract breaches, and quantifying the nominal value of Deutsche Solar's unfilled purchased obligations. Testified at deposition. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---------|------|------------------------|
| Lowenstein Sandler | In re Petrobras Securities Litigation Case No. 14-cv-9662 (JSR) Discovery Global Citizens Master Fund, Ltd., et al. v. Petroleo Brasileiro S.A., et al. U.S. District Court for the Southern District of New York Case No. 15-cv-9126 (JSR) | Prepared an expert report concerning the efficiency of the market for the common ADS and preferred ADS of Petrobras and also concerning loss causation and damages to purchasers of the common ADS, preferred ADS, and an issue of Petrobras Global Finance notes in a 10b-5 and Section 11 securities fraud matter. Also prepared a reply report. Testified at deposition. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. Credit Suisse Securities (USA), et al. U.S. District Court for the District of Kansas Case No. 12-2648 JWL/JPO | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from Credit Suisse. Testified at deposition. |
| Kellogg, Huber, Hansen, Todd, Evans & Figel Korein Tillery | National Credit Union Administration Board v. UBS Securities, et al. U.S. District Court for the District of Kansas Case No. 12-cv-2591 JWL | Prepared an expert report and a rebuttal expert report that provide relevant background information concerning residential mortgage-backed securities (RMBS) and the market for RMBS and calculates the amounts of NCUA's claims for damages as a result of their purchase of RMBS from UBS. Testified at deposition. |
| Susman Godfrey | GE Funding Capital Market Services, Inc. and Trinity Funding Company, LLC v. Nebraska Investment Finance Authority U.S. District Court for the Southern District of New York 15 Civ.1069 (LGS) | Prepared an expert report explaining how the defendant's unilateral extension of seven GIC contracts after the associated municipal bonds were redeemed reflected a valuable option, for which plaintiffs would have charged in the GIC contract prices if they had intended the contracts to incorporate such an extension option. Testified at deposition. |
| Lewis Roca Rothgerber Christie | James J. Cotter, Jr. v. Margaret Cotter, et al. District Court, Clark County, Nevada Case No. A-15-719860-B, Dept. No. XI | Prepared a rebuttal expert report opining on the event study and other statistical analyses and the conclusions in an expert report submitted by the defendants' expert. Testified at deposition. |
| Sullivan & Cromwell | In re: Term Commodities Cotton Futures Litigation U.S. District Court for the Southern District of New York Master Docket No. 12-cv-5126 (ALC) (KNF) | Prepared a responsive expert report and a rebuttal expert report opining on the event studies, supply of storage models, and other statistical analyses and the conclusions in several expert reports submitted by the plaintiffs' expert. Testified at deposition. |
| Coss and Momjian | Stephen Todd Walker v. Morgan Stanley Smith Barney, LLC, et al. FINRA Arbitration FINRA Case Nos. 10-04094, 10-04888, and 11-01780 | Prepared an expert report and an expert rebuttal report concerning the damages allegedly suffered by a registered representative due to tortious interference, defamation, unfair competition, and conversion by a broker dealer. Testified at arbitration. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---------|------|-------------------------|
| Bernstein Litowitz Berger & Grossmann Labaton Sucharow | In re Facebook, Inc., IPO Securities and Derivative Litigation U.S. District Court for the Southern District of New York MDL No. 12-2389 (RWS) | Prepared an expert report and a rebuttal expert report concerning the damages allegedly suffered by plaintiffs due to material misstatements and omissions in an IPO prospectus under Sections 11 and 12 of the Securities Act of 1933 and responding to conclusions in expert reports submitted by the defendants' experts. Testified at deposition. |
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Credit Suisse First Boston Mortgage Securities Corp., et al. Circuit Court of Montgomery County, Alabama Civil Action No. 03-CV-2012-901035.00 | Prepared an expert report that calculates the amounts of damages Colonial Bank allegedly suffered as a result of its purchase of RMBS from the defendants. Damages are calculated under Sections 11 and 12 of the Securities Act of 1933 and under the blue sky laws of the states of Alabama and Nevada. Testified at deposition. |
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Morgan Stanley & Co., et al. Circuit Court of Montgomery County, Alabama Civil Action No. 03-CV-2012-901036.00 | Prepared an expert report that calculates the amounts of damages Colonial Bank allegedly suffered as a result of its purchase of RMBS from the defendants. Damages are calculated under Sections 11 and 12 of the Securities Act of 1933 and under the blue sky laws of the states of Alabama and Nevada. Testified at deposition. |
| Kellogg, Hansen, Todd, Figel & Frederick Korein Tillery | CMFG Life Insurance Company, et al. v. Morgan Stanley & Co. U.S. District Court for the Western District of Wisconsin Case No. 13-cv-577 (JDP) | Prepared an expert report that calculates the amounts of damages the plaintiffs allegedly suffered as a result of their purchase of RMBS from the defendant. Damages are calculated under equitable common law. Testified at deposition. |
| Lowenstein Sandler | Broadway Gate Master Fund, Ltd., et al. v. Ocwen Financial Corporation, et al. U.S. District Court for the Southern District of Florida Case No. 9:16-CV-80056-WPD | Prepared an expert report concerning the efficiency of the market for the common stock of Ocwen Financial and also concerning loss causation and damages to purchasers of the common stock in a 10b-5 securities fraud opt-out matter. Testified at deposition. |
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for United Western Bank v. RBS Acceptance Inc., et al. U.S. District Court for the District of Colorado Civil Action No. 1:14-cv-00418-PAB-MJW | Prepared an expert report that calculates the amount of damages United Western Bank allegedly suffered as a result of its purchase of RMBS from the defendants. Damages are calculated under the blue sky laws of the state of Colorado. Testified at deposition. |
| Shumaker, Loop & Kendrick | Ameriprise Financial Services v. Cheryle Anne Brady FINRA Arbitration FINRA Case No. 16-03368 | Prepared an expert report concerning the damages allegedly suffered by a registered representative who claimed to have been wrongfully terminated by a broker dealer. Testified at arbitration. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---|---|---|
| Mandel Bhandari | Scantibodies Laboratory, Inc. v. Church & Dwight Co., Inc. U.S. District Court for the Southern District of New York 14 Civ. 2275 (JGK) | Prepared an expert report opining as to the amount of lost-profits damages suffered by Scantibodies Laboratory resulting from the alleged breaches of two manufacture and supply agreements. Testified at deposition. |
| Pryor Cashman | Carbures Europe, S.A., et al. v. Emerging Markets Intrinsic Cayman Ltd., et al. Supreme Court of the State of New York, County of New York Index No. 653892/15 | Prepared an expert report explaining what hedging common stock price risk exposure involves, distinguishing such hedging from simply selling shares of common stock without regard for the risk being offset, describing alternative mechanisms for settling liabilities through the payment of cash or the delivery of securities, and explaining why settling a liability through payment in shares of common stock is not costless. Testified at deposition and at trial. |
| Orrick, Herrington & Sutcliffe | Hemlock Semiconductor Group v. Kyocera Corporation U.S. District Court for the Eastern District of Michigan Northern Division Case No. 1:15-CV-11236 | Prepared a presentation explaining why the long-term solar-grade polysilicon purchase agreements at issue in the matter were similar to projecting financing arrangements and were consequently sound based on economic principles. |
| Hunton & Williams | AMCO Insurance Company, et al. v. CoBank, ACB U.S. District Court for the Southern District of New York Case No. 16-cv-4422 (LTS) | Prepared an expert report and a rebuttal report explaining how institutional investors could reasonably be expected to invest the cash proceeds from an allegedly premature bond redemption and calculated damages. Testified at deposition. |
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. Goldman, Sachs, et al. U.S. District Court for the Western District of Texas Austin Division Civil Action No.14-cv-129-SS | Prepared an expert report that calculates the amount of damages Guaranty Bank allegedly suffered as a result of its purchase of RMBS from the defendants. Damages are calculated under the blue sky laws of the state of Texas. Testified at deposition. |
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. RBS Securities U.S. District Court for the Western District of Texas Austin Division Civil Action No. 14-cv-126-SS | Prepared an expert report that calculates the amount of damages Guaranty Bank allegedly suffered as a result of its purchase of RMBS from the defendant. Damages are calculated under the blue sky laws of the state of Texas. Testified at deposition. |
| Robbins Geller Rudman & Dowd | China Development Industrial Bank v. Morgan Stanley, et al. Supreme Court of the State of New York, County of New York Index No. 650957/2010 | Prepared an expert report and a reply expert report calculating the plaintiff's damages under a credit default swap mark-to-market theory and also under a rescission theory. Testified at deposition. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---------|------|-------------------------|
| Orrick, Herrington & Sutcliffe | Hemlock Semiconductor Corporation v. Green Energy Technology and Tatung Co. of America State of Michigan in the Circuit Court for the County of Saginaw Case No. 13-020593-CK-1 | Prepared an expert report and an expert rebuttal report opining as to the reliability of the spot market prices PVinsights reports for solar-grade polycrystalline silicon and calculating damages resulting from the repudiation of a long-term purchase agreement for solar-grade polycrystalline silicon.  Testified at deposition. |
| Hughes Hubbard & Reed | Credit Suisse Securities (USA) LLC v. UBS Financial Services, Inc. FINRA Arbitration FINRA Case No. 15-03186 | Prepared an expert report and an expert rebuttal report opining as to the damages allegedly resulting from the improper hiring of registered representatives by a former competitor when a broker-dealer closed its U.S. high-net-worth wealth management business.  Testified at arbitration. |
| Coss & Momjian Gregory, Doyle, Calhoun & Rogers | HA&W Capital Partners, LLC, et al. v. Niraj Nicholas Bhandari, et al. v. HA&W Holdings, LLC Superior Court of Cobb County, State of Georgia Civil Action No. 14-1-2408-53 | Prepared an expert report calculating damages resulting from alleged breaches of employment contracts when four brokers left their employer without giving proper notice and joined a competing broker-dealer.  Testified at deposition. |
| Foley & Lardner | Cortlandt Street Recovery Corp. and Wilmington Trust Company, as Trustee, v. David Bonderman, et al. Supreme Court of the State of New York, County of New York Index No. 653357/2011 | Prepared an expert report and an expert rebuttal report opining that the terms of the Convertible Preferred Equity Certificates (CPECs) issued by affiliates of the Defendants and the manner in which they were administered are more typical of equity than debt and that the offering memorandum for a subsequent issue of PIKs is confusing in their characterization of the CPECs. |
| Orrick, Herrington & Sutcliffe | Hemlock Semiconductor Operations LLC v. Wealthy Rise International Limited State of Michigan in the Circuit Court for the County of Saginaw Business Court Case No. 18-036218-CB | Prepared an expert report opining as to the reliability of the spot market prices PVinsights reports for solar-grade polycrystalline silicon and calculating damages resulting from the termination of a long-term purchase agreement for solar-grade polycrystalline silicon.  Testified at deposition. |
| Kahn Swick & Foti Pomerantz | In Re Chicago Bridge & Iron Company N.V. Securities Litigation U.S. District Court for the Southern District of New York Case No. 1:17-CV-1580 | Prepared an expert report and a reply report on the efficiency of the market for the affected common stock during the class period and opining on whether the amount of damages per share when the fraud-related inflation was removed from the stock can be calculated on a class-wide basis.  Also prepared an expert report and a reply expert report on loss causation and damages.  Testified at a hearing before a special master concerning issues related to class certification.  Also testified at two depositions regarding loss causation and damages. |

**Appendix A**

| Clients | Case | Description of Testimony |
|---|---|---|
| Grais & Ellsworth | Federal Deposit Insurance Corporation as Receiver for Guaranty Bank v. Deutsche Bank Securities<br>U.S. District Court for the Western District of Texas Austin Division Civil Action No. 14-cv-129-SS | Prepared an expert report and a supplemental report that calculate the amount of damages Guaranty Bank allegedly suffered as a result of its purchase of RMBS from the defendant. Damages are calculated under the blue sky laws of the state of Texas. Testified at deposition. |
| Bernstein Litowitz Berger & Grossmann | In re: Vale S.A. Securities Litigation<br>U.S. District Court for the Southern District of New York Case No. 1:16-cv-00658-GHW | Prepared an expert report opining as to loss causation and the ability to calculate damages on a class-wide basis and calculating per-share damages for holders of Vale common ADRs and Vale preferred ADRs in connection with a securities fraud class action. Testified at deposition. |
| Pomerantz | Rex and Roberta Ling Living Trust, et al. v. B Communications Ltd., et al.<br>U.S. District Court for the Southern District of New York Dkt. No. 1:17-cv-04937 (JPO) | Prepared an expert report opining on the impact of the alleged misrepresentations and corrective disclosures on the price of the common stock of B Communications Ltd. and the ability to calculate damages on a class-wide basis in connection with a securities fraud class action. Testified at deposition. |

**Appendix A**

## PUBLICATIONS

<u>**Books**</u>

1. John D. Finnerty, <u>An Illustrated Guide to Bond Refunding Analysis.</u>  The Financial Analysts Research Foundation, Charlottesville, VA, 1984.

2. John D. Finnerty, <u>Corporate Financial Analysis: A Comprehensive Guide to Real-World Approaches for Financial Managers.</u>  McGraw-Hill Book Company, New York, 1986.
   a) Main Selection:  Macmillan's <u>The Executive Program</u>
   b) Alternate Selection:  Prentice-Hall's <u>Books for Accountants</u>

3. John D. Finnerty, Andrew J. Kalotay, and Francis X. Farrell, Jr., <u>The Financial Manager's Guide to Evaluating Bond Refunding Opportunities.</u>  Ballinger Publishing Company, Cambridge, MA, 1988.

4. Douglas R. Emery and John D. Finnerty, <u>Principles of Finance with Corporate Applications.</u> West, St. Paul, MN, 1991.

5. John D. Finnerty and Martin S. Fridson, eds., <u>The Yearbook of Fixed Income Investing 1995.</u> Irwin Professional Publishing, Chicago, 1996.

6. John D. Finnerty, <u>Project Financing:  Asset-Based Financial Engineering.</u> John Wiley & Sons, New York, 1996.

7. Douglas R. Emery and John D. Finnerty, <u>Corporate Financial Management.</u>  Prentice Hall, Upper Saddle River, NJ, 1997.

8. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Principles of Financial Management</u>. Prentice Hall, Upper Saddle River, NJ, 1998.

9. John D. Finnerty and Douglas R. Emery, <u>Debt Management</u>.  Harvard Business School Press, Boston, 2001.

10. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 2nd ed. Prentice Hall, Upper Saddle River, NJ, 2004.

11. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 3rd ed. Prentice Hall, Upper Saddle River, NJ, 2007.

12. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, Int. ed. Prentice Hall, Upper Saddle River, NJ, 2007.

13. John D. Finnerty, <u>Project Financing:  Asset-Based Financial Engineering</u>, 2nd ed.  John Wiley & Sons, New York, 2007.

14. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 4th ed. Wohl Publishing, Morristown, NJ, 2011.

**Appendix A**

15. John D. Finnerty, <u>Project Financing:  Asset-Based Financial Engineering</u>, 3rd ed.  John Wiley & Sons, New York, 2013.

16. Douglas R. Emery, John D. Finnerty, and John D. Stowe, <u>Corporate Financial Management</u>, 5th ed. Wohl Publishing, Morristown, NJ, 2018.

## <u>Monographs</u>

1. John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer," PricewaterhouseCoopers LLP, New York, 1998.

2. John D. Finnerty, "Structuring Derivative Instruments to Adjust Risk Exposure: The Arithmetic of Financial Instruments," PricewaterhouseCoopers LLP, New York, 1999.

3. John D. Finnerty, "A Comparison of Alternative Models for Valuing Employee Stock Options," Financial Executives Research Foundation, Florham Park, NJ, January 2003.

## <u>Papers Published in Refereed Journals</u>

1. John D. Finnerty, "How Often Will the Firemen Get Their Sleep?," <u>Management Science</u> (July 1977), pp. 1169-1173.

2. John D. Finnerty, "Real Money Balances and the Firm's Production Function," <u>Journal of Money, Credit and Banking</u> (November 1980), pp. 666-671.

3. John D. Finnerty, "The Behavior of Electric Utility Common Stock Prices Near the Ex-Dividend Date," <u>Financial Management</u> (Winter 1981), pp. 59-69.

4. John D. Finnerty, "The Stock Market's Reaction to the Switch from Flow-Through to Normalization," <u>Financial Management</u> (Winter 1982), pp. 36-47.

5. John D. Finnerty, "Evaluating the Economics of Refunding High-Coupon Sinking-Fund Debt," <u>Financial Management</u> (Spring 1983), pp. 5-10.

6. John D. Finnerty, "Bank Discount, Coupon Equivalent, and Compound Yields: Comment," <u>Financial Management</u> (Summer 1983), pp. 40-44.

7. John D. Finnerty, "Preferred Stock Refunding Analysis: Synthesis and Extension," <u>Financial Management</u> (Autumn 1984), pp. 22-28.

8. John D. Finnerty, "Stock-for-Debt Swaps and Shareholder Returns," <u>Financial Management</u> (Autumn 1985), pp. 5-17.

9. John D. Finnerty, "Zero Coupon Bond Arbitrage: An Illustration of the Regulatory Dialectic at Work," <u>Financial Management</u> (Winter 1985), pp. 13-17.

10. John D. Finnerty, "Refunding Discounted Debt: A Clarifying Analysis," <u>Journal of Financial and Quantitative Analysis</u> (March 1986), pp. 95-106.

**Appendix A**

11. John D. Finnerty, "A Visit with Alice in Moneyland," Journal of Corporate Finance (Spring 1987), pp. 46-47.

12. John D. Finnerty, "An Analytical Framework for Evaluating Securities Innovations," Journal of Corporate Finance (Winter 1987), pp. 3-18.

13. John D. Finnerty, "Capital Budgeting and CAPM: Choosing the Market Risk Premium," Journal of Corporate Finance (Winter 1988), pp. 11-14.

14. John D. Finnerty, "Financial Engineering in Corporate Finance: An Overview," Financial Management (Winter 1988), pp. 14-33. (Lead Article) Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., The Handbook of Financial Engineering. Harper & Row, New York, 1990, ch. 3, and in Robert W. Kolb, ed., The Financial Derivatives Reader. Kolb, Miami, 1992, ch. 2.

15. John D. Finnerty, "New Issue Dividend Reinvestment Plans and the Cost of Equity Capital," Journal of Business Research (March 1989), pp. 127-139.

16. John D. Finnerty, "Measuring the Duration of a Floating-Rate Bond," Journal of Portfolio Management (Summer 1989), pp. 67-72. Reprinted in Sanjay K. Nawalkha and Donald R. Chambers, eds., Interest Rate Risk Measurement and Management. Institutional Investor Books, New York, 1999, ch. 32.

17. John D. Finnerty and Victor M. Borun, "An Analysis of Unbundled Stock Units," Global Finance Journal (Fall 1989), pp. 47-69.

18. John D. Finnerty and Michael Rose, "Arbitrage-Free Spread: A Consistent Measure of Relative Value," Journal of Portfolio Management (Spring 1991), pp. 65-77.

19. John D. Finnerty, "The Time Warner Rights Offerings: A Case Study in Financial Engineering," Journal of Financial Engineering (June 1992), pp. 38-61.

20. John D. Finnerty, "The Advance Refunding of Nonredeemable High-Coupon Corporate Debt Through In-Substance Defeasance," Journal of Financial Engineering (September 1992), pp. 150-173.

21. Douglas R. Emery and John D. Finnerty, "A Review of Recent Research Concerning Corporate Debt Provisions," Financial Markets, Institutions & Instruments (December 1992), pp. 23-39.

22. John D. Finnerty and Dean Leistikow, "College Tuition Prepayment Programs: Description, Investment Portfolio Composition, and Contract Pricing," Journal of the Midwest Finance Association (1992), pp. 165-174.

23. John D. Finnerty, "Comment: The Need to Enhance the Effectiveness of Discussants and Some Suggested Guidelines for Session Organizers and Discussants," Financial Practice and Education (Spring/Summer 1993), pp. 15-18.

**Appendix A**

24. John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums," Journal of Portfolio Management (Summer 1993), pp. 73-84.

25. John D. Finnerty, "Interpreting SIGNs," Financial Management (Summer 1993), pp. 34-47.

26. John D. Finnerty, "Indexed Sinking Fund Debentures: Valuation and Analysis," Financial Management (Summer 1993), pp. 76-93.

27. John D. Finnerty and Robert J. Kunze, "Arranging Financing for Biotechnology Ventures," Financier (May 1994), pp. 20-34.

28. John D. Finnerty, "Valuing Corporate Equity When Value Additivity May Not Hold:  The Case of the Newhouse Estate Valuation," Financial Practice and Education (Spring/Summer 1994), pp. 107-115.

29. John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums": Reply to Comment, Journal of Portfolio Management (Summer 1994), pp. 101-102.

30. John D. Finnerty, "Range Floaters: Pricing a Bet on the Future Course of Short-Term Interest Rates," Financier (November 1994), pp. 20-27.  Reprinted in John D. Finnerty and Martin S. Fridson, eds., The Yearbook of Fixed Income Investing 1995.  Irwin Professional Publishing, Chicago, 1996, ch. 8.

31. John D. Finnerty, "Some Suggested Guidelines for Reviewers," Financial Practice and Education (Fall/Winter 1994), pp. 22-24.

32. John D. Finnerty, Iftekhar Hasan, and Yusif Simaan, "Designing an Efficient Investment Strategy for Hedging the Future Cost of a College Education," Journal of Investing (Spring 1996), pp. 47-58.

33. John D. Finnerty, "Credit Derivatives, Infrastructure Finance, and Emerging Market Risk," Financier (February 1996), pp. 64-75.

34. John D. Finnerty, "Adjusting the Binomial Model for Default Risk," Journal of Portfolio Management (Winter 1999), pp. 93-103.

35. John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer:  Total Return Swaps," Financier (vol. 7, 2000), pp. 66-77.

36. John D. Finnerty, "Premium Debt Swaps, Tax-Timing Arbitrage, and Debt Service Parity," Journal of Applied Finance (vol. 11, 2001), pp. 17-22.

37. John D. Finnerty and Mark S. Brown, "An Overview of Derivatives Litigation, 1994 to 2000," Fordham Journal of Corporate & Financial Law (vol.7, 2001), pp. 131-158.

38. John D. Finnerty and Dwight Grant, "Alternative Approaches to Testing Hedge Effectiveness under SFAS No. 133," Accounting Horizons (June 2002), pp. 95-108.

**Appendix A**

39. John D. Finnerty and Douglas R. Emery, "Corporate Securities Innovation: An Update," Journal of Applied Finance (Spring/Summer 2002), pp. 21-47.

40. John D. Finnerty, "Adjusting the Comparable-Company Method for Tax Differences when Valuing Privately Held "S" Corporations and LLCs," Journal of Applied Finance (Fall/Winter 2002), pp.15-30.

41. John D. Finnerty and Murray Grenville, "An Introduction to Credit Swaps," Financier (vol. 9, 2002), pp. 51-63.

42. John D. Finnerty and Murray Grenville, "An Introduction to Credit Spread Options," Financier (vol. 9, 2002), pp. 64-75.

43. John D. Finnerty and Dwight Grant, "Testing Hedge Effectiveness under SFAS 133," The CPA Journal (April 2003), pp. 40-47.

44. John D. Finnerty and George M. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," Stanford Journal of Law, Business & Finance (Spring 2003), pp. 213-263.

45. John D. Finnerty and Douglas R. Emery, "The Value of Corporate Control and the Comparable Company Method of Valuation," Financial Management (Spring 2004), pp. 91-99.

46. John D. Finnerty, "Exact Formulas for Pricing Bonds and Options When Interest Rate Diffusions Contain Jumps," Journal of Financial Research (Fall 2005), pp. 319-341.

47. John D. Finnerty, "Extending the Black-Scholes-Merton Model to Value Employee Stock Options," Journal of Applied Finance (Fall/Winter 2005), pp. 25-54.

48. John D. Finnerty, Michael J. McAllister, and Maureen M. Chakraborty, "Calculating Damages in Broker Raiding Cases," Stanford Journal of Law, Business & Finance (Spring 2006), pp. 261-297.

49. John D. Finnerty, "Using Contingent-Claims Analysis to Value Opportunities Lost Due to Moral Hazard Risk," Journal of Risk (Spring 2006), pp. 55-83.

50. John D. Finnerty and Gautam Goswami, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," Hastings Business Law Journal (Summer 2006), pp. 453-486.

51. John D. Finnerty and Mary Kuan, "When the Insurance Regulators Sneeze, the Hybrid Market Can Catch a Cold," Journal of Insurance Regulation (Summer 2007), pp. 87-120.

52. John D. Finnerty, "A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," Journal of Forensic Economics (December 2009), pp. 55-62.

**Appendix A**

53. John D. Finnerty, Jeffrey Turner, Jack Chen, and Rachael Park, "Regulatory Uncertainty and Financial Contagion: Evidence from the Hybrid Capital Securities Market," <u>Financial Review</u> (February 2011), pp. 1-42. (Lead Article)

54. John D. Finnerty and Kishlaya Pathak, "A Review of Recent Derivatives Litigation," <u>Fordham Journal of Corporate & Financial Law</u> (vol. 16, 2011), pp. 73-123.

55. John D. Finnerty, Jie Jiao, and An Yan, "Convertible Securities in Merger Transactions," <u>Journal of Banking and Finance</u> (January 2012), pp. 275-289.

56. John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," <u>Journal of Derivatives</u> (Summer 2012), pp. 53-69.

57. John D. Finnerty, "Pricing of Employee Stock Options: Marketability Does Matter," <u>International Journal of Portfolio Analysis and Management</u> (No. 2, 2012), pp. 179-205.

58. John D. Finnerty, Cameron D. Miller, and Ren-Raw Chen, "The Impact of Credit Rating Announcements on Credit Default Swap Spreads," <u>Journal of Banking and Finance</u> (June 2013), pp. 2011-2030.

59. Martin S. Fridson and John D. Finnerty, "Is There Value in Valuation?" <u>Journal of Portfolio Management</u> (Winter 2013), pp. 87-91. Excerpted in <u>Practical Applications of Institutional Investor Journals</u>, Institutional Investor, New York, August 2013, pp. 6-9.

60. John D. Finnerty, "The Impact of Stock Transfer Restrictions on the Private Placement Discount," <u>Financial Management</u> (Fall 2013), pp. 575-609.

61. John D. Finnerty, "Using Put Option-Based DLOM Models to Estimate Discounts for Lack of Marketability," <u>Business Valuation Review</u> (Fall 2013), pp. 165-170.

62. John D. Finnerty, "Modifying the Black-Scholes-Merton Model to Calculate the Cost of Employee Stock Options," <u>Managerial Finance</u> (No. 1, 2014), pp. 2-32. (Lead Article)

63. John D. Finnerty and Rachael W. Park, "Collars, Prepaid Forwards, and the DLOM: Volatility Is the Missing Link," <u>Business Valuation Review</u> (Spring 2015), pp. 24-30.

64. John D. Finnerty, "Valuing Convertible Bonds and the Option to Exchange Bonds for Stock," <u>Journal of Corporate Finance</u> (April 2015), pp. 91-115.

65. John D. Finnerty, Shantaram P. Hegde, and Christopher B. Malone, "Fraud and Firm Performance: Keeping the Good Times (Apparently) Rolling," <u>Managerial Finance</u> (No. 2, 2016), pp. 151-172.

66. John D. Finnerty, "An Option-Based Model for Valuing the Common Stock of Emerging-Growth Firms," <u>Journal of Derivatives</u> (Summer 2016), pp. 33-53.

67. John D. Finnerty, "What Lessons Can We Learn from Recent Derivatives Litigation and Regulatory Enforcement Actions?" <u>Securities Regulation Law Journal</u> (Winter 2016), pp. 361-427.

**Appendix A**

68.  John D. Finnerty and Mengyi Tu, "Valuing Convertible Bonds: A New Approach," <u>Business Valuation Review</u> (Fall 2017), pp. 85-102.

69.  John D. Finnerty and Rachael W. Park, "Valuing a Private Equity Carried Interest as a Call Option on Fund Performance," <u>Journal of Private Equity</u> (Spring 2018), pp. 14-30.

## <u>Other Papers and Articles</u>

1.  John D. Finnerty, "A Closer Look at Preferred Stock Financing," <u>Public Utilities Fortnightly</u> (November 6, 1980), pp. 41-43.

2.  John D. Finnerty, "Evaluating a Stock-for-Debt Swap: The Proper Framework," <u>Public Utilities Fortnightly</u> (August 5, 1982), pp. 27-32.

3.  John D. Finnerty, "How to Lower the Cost of Floating a New Stock Issue," <u>Public Utilities Fortnightly</u> (March 17, 1983), pp. 25-29.

4.  John D. Finnerty, "The Pluses of Zeros," <u>Euromoney</u> (May 1985), p. 67.

5.  John D. Finnerty, "Refunding High-Coupon Debt," <u>Midland Corporate Finance Journal</u> (Winter 1986), pp. 59-74.

6.  John D. Finnerty, "The Case for Issuing Synthetic Convertible Bonds," <u>Midland Corporate Finance Journal</u> (Fall 1986), pp. 73-82. Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., <u>The Handbook of Financial Engineering</u>. Harper & Row, New York, 1990, ch. 21.

7.  John D. Finnerty, "Where is the Value Added in Securities Innovation," in John Thackray, ed., <u>Chief Financial Officer USA 1987</u>, SPL Associates Limited, London, 1987, pp. 202-205.

8.  John D. Finnerty, "An Analysis of Tuition Prepayment Plans," in <u>Proceedings of the Invitational Conference on College Prepayment and Savings Plans</u>. College Entrance Examination Board, New York, 1988, pp. 25-31.

9.  John D. Finnerty, "A Private Solution to a Public Problem: A Response from the Private Sector to the College Saving Crisis," in <u>Tax Incentives for Education</u>. United States Senate Committee on Finance, Washington, D.C., March 15, 1988, pp. 194-204.

10.  John D. Finnerty, "How to Cope with Rising College Costs," <u>Tax Management Financial Planning Journal</u> (May 31, 1988), pp. 224-228.

11.  John D. Finnerty, "Measuring the Risk Premium on the Market Portfolio," in Frank J. Fabozzi, ed., <u>The Institutional Investor Focus on Investment Management</u>. Ballinger, Cambridge, MA, 1989, pp. 161-167.

12.  John D. Finnerty, "Measuring the Duration of Floating-Rate Debt Instruments," in Frank J. Fabozzi, ed., <u>Advances & Innovations in the Bond and Mortgage Markets</u>. Probus, Chicago, 1989, pp. 77-96.

**Appendix A**

13. John D. Finnerty and Herbert S. Adler, "Make Securities Innovation Work to Your Advantage," Butterworths Journal of International Banking and Financial Law (February 1992), pp. 64-67.

14. John D. Finnerty, "An Overview of Corporate Securities Innovation," Journal of Applied Corporate Finance (Winter 1992), pp. 23-39. Reprinted in Donald H. Chew, Jr., ed., The New Corporate Finance: Where Theory Meets Practice. McGraw-Hill, New York, 1993, pp. 212-228, and in Raymond H. Rupert, ed., The New Era of Investment Banking. Probus, Chicago, 1993, ch. 16.

15. John D. Finnerty, "Financial Engineering," in the New Palgrave Dictionary of Money and Finance, vol. 2. Macmillan, London, 1992, pp. 56-63.

16. John D. Finnerty, "Structures and Contracts which Reallocate Risk," in proceedings of the conference on Structured Finance: Design, Engineering & Production. Euromoney, Brussels, June 4-5, 1992, pp. 75-96.

17. John D. Finnerty, "Sources of Value Added from Structuring Asset-Backed Securities to Reduce or Reallocate Risk," in Charles Stone, Anne Zissu, and Jess Lederman, eds., The Global Asset Backed Securities Market. Probus, Chicago, 1993, ch. 3.

18. John D. Finnerty, Burton L. Raimi, and Neil R. Crowley, "Designing Securities to Qualify as Capital for Bank Regulatory Purposes," in Charles A . Stone and Anne Zissu, eds., Global Risk Based Capital Regulations: Management and Funding Strategies. Irwin Professional Publishing, Burr Ridge, IL, 1994, ch. 8.

19. Douglas R. Emery and John D. Finnerty, "Using a PERCS-for-Common Exchange Offer to Reduce the Costs of a Dividend Cut," Journal of Applied Corporate Finance (Winter 1995), pp. 77-89.

20. John D. Finnerty, "Financial Engineering as a Solution to Interest-Rate Risk Management Challenges," in Anthony G. Cornyn, Robert A. Klein, and Jess Lederman, eds., Controlling & Managing Interest-Rate Risk. New York Institute of Finance, New York, 1997, ch. 17.

21. John D. Finnerty, "Russian Settlements Will Put Credit Derivatives to the Test," American Banker (December 4, 1998), p. 21.

22. John D. Finnerty, "Will Credit Derivatives Survive the Stress Test?" Solutions (Winter 1999), pp. 5, 8.

23. Keith R. Ugone and John D. Finnerty, "Measuring Damages in Securities Fraud Class Action Lawsuits," CD-ROM accompanying Michael R. Young, ed., Accounting Irregularities and Financial Fraud. Harcourt Professional Publishing, New York, 2000.

24. Douglas R. Emery and John D. Finnerty, "Capital Investments," in Burton S. Kaliski, ed., Encyclopedia of Business and Finance, vol. 1. Macmillan, New York, 2001, pp. 81-85.

**Appendix A**

25. John D. Finnerty, "Securitizing Political Risk Investment Insurance: Lessons from Past Securitizations," in Theodore H. Moran, ed., <u>International Political Risk Management: Exploring New Frontiers</u>. World Bank, Washington, DC, 2001, pp. 77-147.

26. John D. Finnerty and Dwight Grant, "How to Test Hedge Effectiveness Under FAS 133," <u>Estratégica</u> (April/June 2001), pp. 8-16.

27. John D. Finnerty, "Debt Innovative," <u>Fordham Business Magazine</u> (Spring/Summer 2001), pp. 24-25.

28. Robert Sidorsky and John D. Finnerty, "Standing to Sue Under Rule 10b-5: A Fresh Look at the New Investment Doctrine," <u>Securities Regulation Law Journal</u> (Summer 2001), pp. 113-198.

29. John M. Althoff and John D. Finnerty, "Testing Hedge Effectiveness," in Henry A. Davis, ed., <u>FAS 133 and the New Derivatives Accounting Landscape</u>. Institutional Investor, New York, Fall 2001, pp. 44-51.

30. John D. Finnerty and George M. Pushner, "Meeting the New Standard for 10b-5 Class Action Damage Calculations," <u>Analysis Group/*Economics* Issue Brief,</u> 2002.

31. John D. Finnerty and Heidi Donoghue, "The Trend in Corporate Financial Disclosure," in Esmeralda O. Lyn and George J. Papaioannou, eds., <u>Financial Services in the Evolving Global Marketplace</u>. Hofstra University Press, New York, 2002, pp. 192-209.

32. John D. Finnerty, "How Companies Account for the Cost of Options," <u>Wall Street Journal</u>, October 10, 2002, p. A15.

33. John D. Finnerty and George M. Pushner, "Rule 10b-5 vs. Section 11 Securities Fraud Class-Action Damages," <u>Analysis Group/*Economics* Issue Brief</u>, 2002.

34. John D. Finnerty, "Damages Estimation After Natural Disasters," in Jack P. Friedman, ed., <u>Litigation Support Report Writing for Accounting, Finance, and Economic Issues</u>. Wiley, New York, 2003.

35. John D. Finnerty, "Valuing Employee Stock Options: A Comparison of Alternative Models," <u>FMA Online</u> (Summer 2003).

36. John D. Finnerty, "Calculating Damages in Broker Raiding Cases," in John Siegal, <u>Protecting Corporate IP Assets: Enforcing Restrictive Covenants in the Employment Context</u>. Practising Law Institute, New York, 2005, pp. 111-145.

37. Douglas R. Emery and John D. Finnerty, "Capital Investments," in Burton S. Kaliski, ed., <u>Encyclopedia of Business and Finance</u>, 2nd ed., vol. 1. Macmillan, Detroit, 2007, pp. 71-74.

38. John D. Finnerty, "The Valuation of Venture Capital Convertible Preferred Stock When Equity Claims Are Nested," <u>Journal of Private Equity</u> (Winter 2008), pp. 1-20.

**Appendix A**

39. John D. Finnerty, "Securities Innovation," in Frank J. Fabozzi, ed., <u>Handbook of Finance</u>, vol. I. Wiley, Hoboken, NJ, 2008, pp. 61-92.

40. John D. Finnerty, "Real Options," in Frank J. Fabozzi, ed., <u>Handbook of Finance</u>, vol. II. Wiley, Hoboken, NJ, 2008, pp. 697-713.

41. John D. Finnerty, "Project Financing," in Hossein Bidgoli, ed., <u>Handbook of Technology Management</u>, vol. I. Wiley, Hoboken, NJ, 2010, pp. 601-612.

42. John D. Finnerty and Peter G. Wollmeringer, "Valuation: Application and Methodologies," in Patricia A. Etzold and Matthew J. Shelhorse, <u>Pocket MBA: Finance for Lawyers July 2010</u>. Practising Law Institute, New York, 2010, pp. 301-358.

43. John D. Finnerty, "Effective Use of Discovery in Cases Involving Wealthy and Sophisticated Investors," PIABA 19th Annual Meeting Proceedings, Ponte Vedra, FL, 2010, pp. 73-79.

44. John D. Finnerty and Rachael Park, "Designing Derivatives Structures," in Jonathan Denton, ed., <u>Practical Derivatives: A Transactional Approach</u>, 2nd ed., Globe Business Publishing, London, 2010, pp. 109-125.

45. John D. Finnerty and Jeffrey S. Turner, "Valuation Examples," in Kirsten S. Aunapu, Eric B. Sloan, Patricia A. Etzold, and Matthew J. Shelhorse, <u>Pocket MBA: Finance for Lawyers Summer 2011</u>, Practising Law Institute, New York, 2011, pp. 491-500.

46. John D. Finnerty and Jeffrey S. Turner, "Valuation: Application and Methodologies (Presentation Slides)," in Kirsten S. Aunapu, Eric B. Sloan, Patricia A. Etzold, and Matthew J. Shelhorse, <u>Pocket MBA: Finance for Lawyers Summer 2011</u>, Practising Law Institute, New York, 2011, pp. 503-573.

47. John D. Finnerty and Rachael W. Park, "Structured Notes and Credit-Linked Notes," in Frank J. Fabozzi, ed., <u>The Handbook of Fixed Income Securities</u>, 8th ed., McGraw-Hill, New York, 2012, pp. 315-336.

48. John D. Finnerty and Rachael W. Park, "Modifying the Black-Scholes-Merton Model to Calculate the Cost of Employee Stock Options," <u>Insight: Financial Advisory Services</u>, AlixPartners, New York, April 2014, pp. 1-8.

49. Douglas R. Emery and John D. Finnerty, "Capital Investments," in Burton S. Kaliski, ed., <u>Encyclopedia of Business and Finance</u>, 3rd ed., vol. 1. Macmillan, Detroit, 2014, pp. 77-80.

50. John D. Finnerty and Rachael W. Park, "Gifting a Grantor Retained Annuity Trust: A Valuable Option," <u>Bloomberg BNA Daily Tax Report</u>, December 11, 2014, pp. 1-6.

51. John D. Finnerty and Yasseen Gailani, "Expert Evidence to Support or Challenge Loss Calculations: How Credible Is It?" <u>Butterworths Journal of International Banking and Financial Law</u>, October 2015, pp. 1-3.

**Appendix A**

52. John D. Finnerty, "Discount for Lack of Marketability for Any Restriction Period: Mastering the Average-Strike Put Option Model," Business Valuation Resources Webinar Handbook, February 15, 2016, pp. 1-58.

53. John D. Finnerty and Rachael W. Park, "Designing Derivatives Structures," in Edmund Parker and Marcin Perzanowski, eds., Practical Derivatives: A Transactional Approach, 3rd ed., Globe Law and Business, Woking, Surrey, United Kingdom, 2017, pp. 155-175.

54. John D. Finnerty and Sherry Chen, "Lessons from Recent Derivatives Litigation and Regulatory Enforcement Actions," Insight: Financial Services, AlixPartners, New York, April 2017, pp. 1-5.

55. John D. Finnerty and Laura Gonzalez, "Why European Banks Are Undercapitalized and What Should Be Done About It," Journal of Applied Corporate Finance, Fall 2017, pp. 65-71.

56. John D. Finnerty, "An Error in How the Unemployment Rate Was Calculated Means We Should be More Worried than We Already Are," Fortune, July 16, 2020, pp. 1-5.

## Patents

1. Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,648,038, March 3, 1987.

2. Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,739,478, April 19, 1988.

3. Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Funding a Future Liability of Uncertain Cost," United States Patent Number 4,752,877, June 21, 1988.

4. Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Insuring the Funding of a Future Liability of Uncertain Cost," United States Patent Number 4,839,804, June 13, 1989.

**Appendix B**
**Materials Considered**

**Legal Documents and Reports**
- Second Corrected Expert Report of Tyler Leverty, PhD, dated March 12, 2020.
- Expert Report of Bruce Deal, dated February 27, 2020.
- Expert Report of Paul A. Gompers, Ph.D., dated July 9, 2020.
- Rebuttal Report of Tyler Leverty, PhD, dated July 9, 2020.
- Reply Report of Tyler Leverty, PhD, dated July 30, 2020.
- *In re The Allstate Corporation Sec. Litig* ., 2020 WL 4013360 (7th Cir. July 16, 2020).
- *In re Vivendi, S.A. Sec. Litig.* , 838 F.3d 223 (2d Cir. 2016).
- *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir. 2005).
- *Starr Intl. USA Invs., LC v. Ernst & Young LLP (In re Lehman Bros. Sec. Litig.)* , 131 F. Supp. 3d 241 (S.D.N.Y. 2015).
- *Pub. Emples. Ret. Sys. Of Miss. v. Amedisys, Inc.,* 769 F.3d 313, 323 (5th Cir. 2014).
- *In re Signet Jewelers Ltd. Secs. Litig.,* 2019 WL 3001084.
- *In re Xerox Corp. Sec. Litig.,* 746 F. Supp. 2d 402, 412 (D. Conn. 2010).
- *In re Vivendi Universal, S.A., Sec. Litig.,* 634 F. Supp. 2d 352, 371-72 (S.D.N.Y. 2009).
- *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 310 F.R.D. 69, 96 n. 183 (S.D.N.Y. 2015).
- *In re DVI, Inc. Sec. Litig.,* 639 F.3d 623, 635 (3d Cir. 2011).
- *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013).
- *Monroe Cty. Emp. Ret. Sys. v. Southern Co.,* 332 F.R.D. 370, 391-92 (N.D. Ga. 2019).

**Bates Numbered Documents**
- ALLSEC_0023805.

**SEC Filings**
- Berkshire Hathaway Inc., Form 10-Q for the quarterly period ended March 31, 2015, dated May 5, 2015.
- Berkshire Hathaway Inc., Form 10-Q for the quarterly period ended June 30, 2015, dated August 7, 2015.
- The Progressive Corporation, Form 10-K for the fiscal year ended December 31, 2014, dated March 2, 2015.
- The Progressive Corporation, Form 10-Q for the quarterly period ended March 31, 2015, dated May 11, 2015.
- The Progressive Corporation, Form 10-Q for the quarterly period ended June 30, 2015, dated August 5, 2015.

**Earnings Releases and Conference Call Transcripts**
- Allstate press release, "Allstate Announces the Sale of Lincoln Benefit Life Company," July 17, 2013.
- Allstate press release, "Allstate Closes Sale of Lincoln Benefit Life," April 1, 2014.
- Allstate, "The Allstate Corporation Q1 2013 Earnings Conference Call," dated May 2, 2013.
- Allstate, "The Allstate Corporation Q4 2013 Earnings Conference Call," dated February 6, 2014.

**Books and Journal Articles**
- Giulio Girardi, Kathleen Weiss Hanley, Stanislava Nikolova, Loriana Pelizzon, and Mila Getmansky Sherman, "Portfolio Similarity and Asset Liquidation in the Insurance Industry," SAFE Working Paper, No. 224. Available at https://ssrn.com/abstract=3239362.
- Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, 3rd ed., John Wiley & Sons, Inc., Hoboken, NJ, 2012.

**Analyst Reports**
- Bank of America Merrill Lynch, "Loss cost remains elevated; expect action; Growth solid," May 5, 2015.
- Bank of America Merrill Lynch, "Core beat even bigger than headline; PO raised," October 30, 2013.
- Drexel Hamilton, "EPS Changes Post Call; Target to $51," May 7, 2013.
- Drexel Hamilton, "Solid 3Q on Low CATS; Buybacks," November 4, 2013.
- Evercore, "Growth continues, Beat despite bad weather, Reducing EPS for lower NII," February 6, 2014.
- Evercore, "Downgrading to Equal-Weight," September 19, 2014.

**Appendix B**
**Materials Considered**

- MKM Partners, "Everything Going Their Way," February 6, 2014.
- MorningStar, "Allstate Finishes 2013 on a Good Note, Pivots Toward Growth," February 6, 2014.
- RBC Capital Markets, "Strong execution," February 6, 2014.
- RBC Capital Markets, "Past initiatives bearing fruit," July 31, 2014.
- SunTrust, "4Q Results Show Growth in Topline (And Losses)," February 6, 2014.
- Wells Fargo, "ALL: First Look At Q4 Results; Positioned For Strong 2014," February 5, 2014.
- William Blair, "Strong Finish to 2013 and 2014 Looks Promising," February 7, 2014.
- William Blair, "2014 Personal Lines Preview: We Continue to Like Allstate, but Progressive Has More Upside Potential," May 2, 2014.
- William Blair, "Auto Acquisition Cost Report Highlights Winners; Rotating From Allstate Into Progressive," July 28, 2014.

**Exhibit 1**
**Securities Analysts' Commentaries on Allstate's Q4 2014 Investment Income**

Wells Fargo, February 4, 2015

Overall net investment income was $779 million, lower than both $823 million in Q3 2014 and $1.03 billion in Q4 2013. **The shortfall in investment income was primarily in the non-life insurance segment.** The decline in investment income from last year does **partially reflect the absence of investment income from Lincoln Benefit Life** (which added $126 million last year). Limited partnerships added $115 million of investment income, down from $202 million in Q4 2013 and $162 million in Q3 2014.

ALL's investment portfolio totaled $81.1 billion at December 30, 2014, up from $80.7 billion at September 30. Within the fixed income portfolio ALL increased its corporate holdings and lowered its asset-backed securities in the quarter. ALL also lowered its equity securities and increased its limited partnerships and other investments in the quarter. (Emphasis added.)

UBS, February 4, 2015

Compared to our estimates, the EPS downside mainly involved a worse underlying loss ratio ($0.22/sh), higher underwriting expenses ($0.04/sh), and **lower investment income ($0.02/sh),** partially offset by lower catastrophe losses ($0.19/sh), more favorable reserve development ($0.04/sh), and higher life insurance operating income ($0.05/sh). BVPS fell 0.1% sequentially to $48.24 (vs. UBSe $49.44) on an increase in pension liability. Share buyback was better than expected at $251mm and the company announced a new $3bb share repurchase authorization.

We also believe the low interest rate environment will continue to pressure investment income and ROEs for most P&C insurers in the near term. (Emphasis added.)

Deutsche Bank, February 4, 2015

**Investment income was lower than in recent quarters due to weaker returns on mortgage loans and limited partnerships.** (Emphasis added.)

Morgan Stanley, February 4, 2015

ALL reported Op EPS of $1.72, above $1.68 consensus but shy of our $1.77 estimate. Combined ratio of 89.9% includes $76m (1.0pts) of reserve releases (vs. $55m MS est.) and $95m (1.3pts) of catastrophes (vs. $300m MS est.). Core underwriting margin (ex. cats and reserve releases) deteriorated 190bps YoY to 89.6%. Premiums grew +5% YoY, primarily due to +2.9% PIF growth in auto and +0.5% in homeowners. **Net investment income decreased -23% YoY due to lower investment yield and partnership returns.** Book Value decreased -0.1% to $48.24 (+6.5% YoY), largely due to ~$750m or ~$1.80/share increase in pension liabilities. Op ROE was 14.3%. (Emphasis added.)

**Exhibit 1**
**Securities Analysts' Commentaries on Allstate's Q4 2014 Investment Income**

Morgan Stanley, February 5, 2015

Op EPS of $1.72 was above $1.68 consensus but below our $1.77 estimate. Core underwriting margin of 89.6% (deteriorated 190bps YoY) vs. 86.8% MS est. Cat losses were $95m vs. $300m MSe. P&C premiums grew +4.9% YoY as Policies-In-Force (PIF) growth improved in both Allstate auto (+2.9% vs. +2.6% in 3Q) and homeowners (+0.5% vs. +0.1% in 3Q). **P&C net investment income decreased -23% YoY to $294m due to lower partnership income.** ALL repurchased ~$250m of shares in (~1% of outstanding). BV decreased -0.1% sequentially to $48.24 (+6.5% YoY). Operating ROE was 14.3%. (Emphasis added.)

Compass Point, February 6, 2015

Lower investment income. Investment income of $779mm was below our estimate for the quarter as **the average investment portfolio of $81.8B was slightly lower** than estimated and the **investment yield (primarily in the P&C segment) was much lower** than expected. Our calculated yield for the entire investment portfolio declined to 3.81% from 4.04% in 3Q14.

Investment income weaker than estimated. Average invested assets were $81.8B with a calculated investment yield of 3.81% in the quarter. The calculated yield for the year was 4.23%, which we expect to continue to decline through 2014. Life premiums were lower than we expected and we expect slower growth from this segment in future periods as interest rates remain low and the Company brings on outside life products to sell. (Emphasis added.)

RBC, February 5, 2015

Investment income still a headwind: Investment income declined again at a double-digit rate as the company continues to **stay short in duration and new money yields remain weak**. Allstate has looked to other investments (like real estate, private investments) to try to compensate for the low-rate impact, but this could prove challenging if rates stay at current levels. We also would not be surprised to see a decline in limited partnership income in 2015, indicative of tough comparisons.

Net investment income declined 24% to $779 million, short of our $820 million assumption. The decline mainly came from the **a lower invested asset balance (due to the sale of Lincoln Benefits)** as well as **very low investment yields**.

Limited partnership income declined to $115 million, down from $162 million in Q3 and $202 million during the same period a year ago. There were declines in both private equity/debt funds and real estate income. (Emphasis added.)

**Exhibit 1**
**Securities Analysts' Commentaries on Allstate's Q4 2014 Investment Income**

Janney, February 4, 2015

    Investment income of $292 mn (-23%) was near our expectations ($296 mn). Partnership income was $57 mn (9.3% annual yield) vs. $112 mn in Q3 and our forecast of $55 mn.

Sources: Wells Fargo Securities, "ALL: Q4 First Look—Frequency Blip Overshadows Earnings Beat," February 4, 2015; UBS Securities, "Allstate Corp., Earnings in Line, but Auto Frequency and Severity Tick Up," February 4, 2015; Deutsche Bank Securities, "4Q14 EPS In-Line: 87-89% 'Core' Combined Ratio for 2015," February 4, 2015; Morgan Stanley & Co., "Allstate Corporation: 4Q14: Strong Results Marred by Uptick in Auto Frequency," February 4, 2015; Janney Capital Markets, "Allstate, Initial Thoughts on 4Q14 Results," February 4, 2015; Morgan Stanley & Co., "2015 Guidance Points to Limited EPS Growth," February 5, 2015; RBC Capital Markets, "Staying on Board; Dialing up Capital Management," February 5, 2015; Compass Point Research & Trading, "Lower CAT Losses Help Beat, 2015 Goals Look A Lot Like 2014," February 6, 2015.