**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| In re: THE ALLSTATE CORPORATION SECURITIES LITIGATION | Case No. 16-cv-10510 Hon. Robert W. Gettleman |

**REPLY IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

John J. Clarke, Jr.
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
212.335.4500

Kenneth L. Schmetterer
Yan Grinblat
Emily D. Gilman
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
312.368.4000

*Attorneys for Defendants
  The Allstate Corporation,
  Thomas J. Wilson, and
  Matthew E. Winter*

Charles F. Smith
Laura Bernescu
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 N. Wacker Drive
Chicago, Illinois 60606
312.407.0700

*Attorneys for Defendant
  Thomas J. Wilson*

Dated: June 13, 2022

# Table of Contents

Page

Preliminary Statement .................................................................................................. 1

Argument ...................................................................................................................... 3

I.  The Challenged Statements Were Not False or Misleading. ............................. 3

    A.  The October and December 2014 Statements Were Not Misleading. ................... 3

    B.  Statements in February and May 2015 Accurately Reported Conclusions
        Reached in Allstate's Contemporaneous Internal Analyses. ................................ 7

    C.  August 2015 Statements Were Not Admissions of Prior Falsity ....................... 11

II.  No Defendant Acted With Scienter. ................................................................ 12

    A.  Mr. Wilson's Option Exercise Does Not Reveal Any Motive to Defraud. ......... 14

    B.  Plaintiffs Have No Evidence That Mr. Winter Acted With Scienter .................. 17

III.  Plaintiffs' Surreptitious Amendment of Their Securities Fraud Theory Should
     Be Rejected. .................................................................................................. 19

Conclusion .................................................................................................................. 20

# Table of Authorities

Page(s)

## Cases

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
496 F. Supp. 3d 952 (E.D. Va. 2020) ......................................................................4

*Carpenters Pension Tr. Fund v. Allstate Corp.*,
2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ....................................................4, 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................13

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)............................................................................11

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) .......................................................................4, 17

*Cornielsen v. Infinium Capital Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) ............................................................................14

*Danis v. USN Commc'ns, Inc.*,
121 F. Supp. 2d 1183 (N.D. Ill. 2000) ..............................................................13

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ................................................................17

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ..........................................................................5

*Gallagher v. Abbott Labs*,
269 F.3d 806 (7th Cir. 2001) .....................................................................1, 4, 5

*Gert v. Elgin Nat'l Industs., Inc.*,
773 F.2d 154 (7th Cir. 1985) ............................................................................13

*Golub v. Gigamon Inc.*
847 F. App'x 368 (9th Cir. 2021) ......................................................................5

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ..................................................................... *passim*

*In re EveryWare Global, Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd*, 849 F.3d 325 (6th Cir. 2017)..........11

*In re Fed. Nat'l Mortg. Ass'n*,
892 F. Supp. 2d 59 (D.D.C. 2012) ..................................................................2, 14

*In re Genzyme Corp. Sec. Litig.*,
  754 F.3d 31 (1st Cir. 2014) ................................................................12

*In re HealthCare Compare Corp. Sec. Litig.*,
  75 F.3d 276 (7th Cir. 1996) ...............................................................7

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................17

*In re NeoPharm, Inc. Sec. Litig.*,
  705 F. Supp. 2d 946 (N.D. Ill. 2010) .................................................4

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ...........................................................9, 19

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..............................................19

*In re St. Jude Med., Inc., Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009) ................................................20

*In re Sybase, Inc. Sec. Litig.*,
  48 F. Supp. 2d 958 (N.D. Cal. 1999) .................................................9

*Levie v. Sears, Roebuck & Co.*,
  676 F. Supp. 2d 680 (N.D. Ill. 2009) .................................................5

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ............................................................14

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  735 F. Supp. 2d 856 (N.D. Ill. 2010) .................................................9

*Mathews v. Centex Telemgmt., Inc.*,
  1994 WL 269734 (N.D. Cal. June 8, 1994) .........................................9

*Modrowski v. Pigatto*,
  712 F.3d 1166 (7th Cir. 2013) ..........................................................13

*N.J. Carpenters Pension & Annuity Funds v. Biogen-Idec, Inc.*
  537 F.3d 35 (1st Cir. 2008) ...............................................................6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .........................................................................11

*Pension Tr. Fund for Oper. Engin'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ............................................................17

<u>Page(s)</u>

*Pugh v. Trib. Co.*,
  521 F.3d 686 (7th Cir. 2008) ........................................................12, 19

*Renovitch v. Kaufman*,
  905 F.2d 1040 (7th Cir. 1990) ...............................................................13

*S.E.C. v. Bluepoint Inv. Couns.*,
  2021 WL 719647 (W.D. Wis. Feb. 24, 2021)..........................................4

*S.E.C. v. Pasternak*,
  561 F. Supp. 2d 459 (D.N.J. 2008) .......................................................19

*S.E.C. v. Shanahan*,
  646 F.3d 536 (8th Cir. 2011) ....................................................2, 13, 18

*S.E.C. v. Ustian*,
  2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ..........................................7

*S.E.C. v. Woodruff*,
  778 F. Supp. 2d 1073 (D. Colo. 2011)...................................................14

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ......................................4, 13, 17, 18

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) .......................................... *passim*

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)......................................................................5

*Waldridge v. American Hoechst Corp.*,
  24 F.3d 918 (7th Cir. 1994) ...................................................................13

*West v. Ehealth, Inc.*,
  2016 WL 948116 (N.D. Cal. Mar. 14, 2016)..........................................11

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  299 F. Supp. 3d 1055 (D. Minn. 2018) ..................................................14

<u>Statutes</u>

15 U.S.C. § 78u–4(b)(1) .............................................................................19

<u>Other Authorities</u>

Fed. R. Evid. 407 .......................................................................................12

iv

## PRELIMINARY STATEMENT

Claims of securities fraud require "fraud" – that is, **lying** (or its functional equivalent). Plaintiffs' opposition papers confirm there is no evidence of that here. They do not dispute that: (i) Allstate accurately disclosed its auto claim frequency statistics for each quarter at issue; (ii) statements attributing an increase in Allstate's frequency to external factors, including miles driven and weather, were based on, and consistent with, the conclusions reached in Allstate's internal analyses; (iii) Allstate's largest public competitors – GEICO and Progressive – experienced similar frequency increases that they attributed to the same external factors; and (iv) Mr. Winter – who made many of the challenged statements as the head of Allstate's auto insurance business – pressed repeatedly for his team to reexamine the evidence as new information became available and insisted that Allstate's disclosures be updated accordingly. Pl. Resp. 56.1 ¶¶ 10, 37, 40, 49-51, 55, 60, 63, 64-65, 71-73, 75-76. Plaintiffs offer no answer for these fundamental points. Their arguments instead rely on hindsight second-guessing, factual distortion, and the misstatement of governing legal standards.

*First*, plaintiffs disregard controlling authority in contending that Allstate was required to disclose early signs of a fourth quarter frequency increase while the quarter was underway. Pl. Opp. at 20; *see Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007); *Gallagher v. Abbott Labs*, 269 F.3d 806, 809 (7th Cir. 2001). Plaintiffs do not dispute that Allstate accurately reported its fourth quarter frequency experience in February 2015 – when it reported its quarterly results. Pl. Resp. 56.1 ¶ 40. The securities laws do not require clairvoyance or the intra-quarter disclosure of an issue that – in perfect hindsight – only had begun to develop.

*Second*, plaintiffs cannot avoid summary judgment for statements in February and May 2015 discussing the perceived causes of the frequency increase by challenging the validity of Allstate's internal analyses. Plaintiffs' concessions that Allstate conducted those analyses and that

the challenged statements were consistent with them are sufficient to defeat any claim of fraud. Pl. Resp. 56.1 ¶¶ 37, 49; *see In re Fed. Nat'l Mortg. Ass'n*, 892 F. Supp. 2d 59, 73 (D.D.C. 2012) (granting summary judgment for CEO who relied on internal reports); *S.E.C. v. Shanahan*, 646 F.3d 536, 544 (8th Cir. 2011) (executives may "[d]epend[] on others to ensure the accuracy of disclosures"). The assertion that Allstate's internal analyses were "deficient," based on an expert's flawed opinions and a few internal documents that do not conflict with Allstate's consensus conclusions, does not give rise to either a "battle of the experts" or a genuine issue of material fact.

Plaintiffs also have no answer for, and therefore avoid, the undisputed fact that GEICO and Progressive reported similar frequency increases, which they, like Allstate, attributed to increased miles driven and weather. Pl. Opp. at 30 n.15; Pl. Resp. 56.1 ¶¶ 54-55, 71-72. It is irrelevant that those companies reported their own frequency increases at slightly different times. The undisputed fact that they shared the same experience defeats plaintiffs' false central premise – that Allstate's frequency increase was unique because it resulted from Allstate's business decisions.

*Finally*, plaintiffs mischaracterize the undisputed evidence in discussing Mr. Wilson's November 2014 stock option exercise, which does not reveal any motive to lie. Plaintiffs do not dispute, but conveniently omit, that Mr. Wilson decided to exercise the option after his investment advisor sent him an analysis showing that the option was "so deep in the money that it ha[d] nominal [remaining] 'optionality[.]'" Def. 56.1 ¶ 22 & Exh. 12; Pl. Resp. 56.1 ¶ 22. Nor do plaintiffs dispute that Mr. Wilson waited until an open trading window after Allstate announced third quarter results to execute the transactions and that contemporaneous documents show Allstate's legal department authorized them. Pl. Resp. 56.1 ¶¶ 28, 30. That Mr. Wilson and Susan Lees, Allstate's general counsel, could not recall details about their pre-clearance conversation in depositions taken five years later does not raise a disputed issue of fact. Undisputed evidence shows the pre-clearance conversation took place.

More centrally, plaintiffs have no evidence that Allstate's claim frequency played any role in Mr. Wilson's investment decision. His compliance with Allstate policies, his retention of more than three million shares of Allstate stock, and the fact that Allstate's stock price was higher after disclosure of fourth quarter frequency all defeat plaintiffs' unfounded speculation. In addition, there is no allegation, or evidence, that *Mr. Winter* – who made most of the challenged statements – even knew about Mr. Wilson's personal financial decisions. In fact, Mr. Winter substantially increased his Allstate holdings during the class period – the opposite of fraud.

The undisputed facts show that Allstate experienced an increase in claim frequency over several quarters in 2014-15, that Allstate was transparent and accurately disclosed its experience and the perceived reasons for it, and that Allstate's stock price dropped significantly in August 2015 after it accurately disclosed a third consecutive quarter of increased frequency (and, for the first time in the class period, an earnings miss). Those undisputed facts do not add up to securities fraud. The Court should enter summary judgment for the defendants on all of plaintiffs' claims.

## ARGUMENT

## I. THE CHALLENGED STATEMENTS WERE NOT FALSE OR MISLEADING.

### A. The October and December 2014 Statements Were Not Misleading.

On an October 30, 2014 conference call discussing Allstate's third quarter results, Mr. Winter stated that Allstate's auto "frequency so far has been extremely favorable to prior year" and "frequency trends are – have been good." Pl. Resp. 56.1 ¶ 13. During an investor conference on December 9, 2014, Mr. Wilson said that given recent "rate changes," he "fe[lt] good about auto insurance, in general, in terms of its profitability. It doesn't mean frequency won't tick up, or we won't mess up in some state, or we don't mess up in some channel." *Id.* ¶ 34. Contrary to plaintiffs' arguments, neither statement was materially misleading as a matter of law or fact.

Plaintiffs concede Allstate accurately disclosed its fourth quarter frequency increase in February 2015, after the quarter end, *id.* ¶ 40, when Allstate "ha[d] a full story to reveal." *Higginbotham*, 495 F.3d at 761. Defendants had no duty to disclose that information any earlier, as the Seventh Circuit repeatedly has held. *Id.* (prior financial statements not misleading where issuer discovered ongoing fraud, investigated it, and disclosed results of investigation in following quarter); *Gallagher*, 269 F.3d at 810-11 (no duty to supplement "accurate" statements "about past performance" with "results for [current financial period] as they came in"); *see also City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013) (no duty to disclose problems with previously disclosed product launch until material delay was "a reasonable certainty").[1]

Plaintiffs mischaracterize this Court's previous decision as holding that the defendants had "a legal duty to disclose" Allstate's intra-quarter claim frequency information. Pl. Opp. at 19. That prior ruling addressed a motion to dismiss, where the Court was required to accept as true plaintiffs' unfounded allegation that an alleged "failure to mention Allstate's *reduction in underwriting standards* ma[de] these statements misleading[.]" *Carpenters Pension Tr. Fund v. Allstate Corp.*, 2018 WL 1071442, at *3 (N.D. Ill. Feb. 27, 2018) (emphasis added). Plaintiffs have abandoned that allegation, Pl. Opp. at 18 (only challenge to statement is the alleged "fail[ure] to disclose Allstate's frequency increase"), but pleading deference no longer applies in any event.

---

[1] The Seventh Circuit held the same in a case plaintiffs cite. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (disclosing "the structure and nature of the securities transaction" did not "create[] a duty to disclose the other material facts regarding the transaction") (affirming summary judgment for defendant). Plaintiffs' other citations are inapposite. In *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 963 (E.D. Va. 2020), the district court held there was "a duty to disclose" the defendant's knowingly "illegal conduct," but there is no "illegal conduct" alleged here. The defendants in *In re NeoPharm, Inc. Sec. Litig.*, 705 F. Supp. 2d 946, 967 (N.D. Ill. 2010), made continuing statements about a new drug after they knew of impediments to its approval by the FDA. There are no similar facts here. And *S.E.C. v. Bluepoint Inv. Couns.*, 2021 WL 719647, at *16 (W.D. Wis. Feb. 24, 2021), was a motion to dismiss decision in which the court was required to accept plaintiff's well-pleaded allegations. Plaintiffs must now provide proof, which they cannot; pleading-stage inferences can no longer protect them.

*Levie v. Sears, Roebuck & Co.*, 676 F. Supp. 2d 680 (N.D. Ill. 2009) (Gettleman, J.) (granting summary judgment after previously denying motion to dismiss based on alleged duty to disclose). The Seventh Circuit's holdings in *Higginbotham* and *Gallagher* govern.

Nor did Mr. Winter assume a duty to discuss developing fourth quarter frequency information by commenting on Allstate's historical experience. *See Golub v. Gigamon Inc.* 847 F. App'x 368, 373 (9th Cir. 2021); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011). It is indisputable that the October 30th call was limited to "Allstate third quarter 2014 earnings," Def. Exh. 19 (call transcript) at 3, which means the statements on the call were governed by *Gallagher*. In addition, Mr. Winter's words clearly indicated he was talking only about the past. Pl. Resp. 56.1 ¶ 13 ("frequency *so far* has been extremely favorable" and "frequency trends are – *have been* good") (emphasis added). Plaintiffs' assertion that securities analysts in *other* quarters "interpreted" *other* comments "to contain commentary regarding the then-current quarter" is not evidence that Mr. Winter's *specific* statement did so. Pl. Opp. at 20.[2]

Mr. Winter was not "'aware' of" Allstate's October frequency by that time in any event, nor had he or Allstate identified any turning point in frequency, as plaintiffs misleadingly suggest. Pl. Opp. at 23. Results for October were not "posted" until November, Wilson Dep. 207:13-209:13, and Mr. Winter testified that, even when they were, "[w]hat we saw was very unclear beginnings of volatility"; it was only "*[i]n retrospect*," that "we know this [increase] began somewhere around October." Winter Dep. 213:23-214:17 (emphasis added). Many months later, in "June 2015," after Mr. Winter was able to "review the data over the last 9 months," he observed

---

[2] Item 303 only governs disclosures required in SEC filings and does not apply to press releases, conference calls, or investor presentations. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). In any event, plaintiffs did not respond to, and therefore concede, that a "few weeks of [frequency] experience" is "far too short" to constitute a "known trend" under Item 303 as a matter of law. Def. Mem. at 21-22. Plaintiffs' contention that "materiality" is "inappropriate for summary judgment" does not address that point. Pl. Opp. at 21 n.12.

there had been a "dramatic 'step function' change" in claim frequency beginning around October. Pl. Opp. at 7 (quoting Pl. Exh. 24); *see* Def. Resp. 56.1 ¶ 14.[3] There is no dispute that Allstate accurately disclosed the changes in auto claim frequency over that period when it reported results for Q3 and Q4 2014 and Q1 2015. Pl. Resp. 56.1 ¶¶ 11, 12, 40, 50-51.[4]

Similarly unfounded are plaintiffs' assertions about Mr. Wilson's December 9 comment – the first of his they challenge and one he made *two weeks after* his stock option transaction. Plaintiffs cite no evidence to support their contention that Mr. Wilson "knew" of "a dramatic frequency increase," Pl. Opp. at 18, when he said, "[i]t doesn't mean frequency won't tick up" when listing numerous potential effects on Allstate's profitability. Mr. Wilson testified that at the time of his statement, he would have had "no idea . . . what happened" with frequency in November or December. Wilson Dep. 294:95-295:19. In fact, there was not a "dramatic" increase in frequency by then. Allstate's property damage frequency for Q4 2014 increased only 0.5%, versus Q4 2013, while bodily injury frequency increased 4.0% versus Q4 2013 but was still "in line with prior year" for 2014 as a whole. Pl. Opp. 56.1 ¶ 37. Even putting aside the rule emphasized in *Higginbotham* and *Gallagher*, Mr. Wilson had no duty to qualify his passing comment about

---

[3] Plaintiffs misstate an email chain discussing Allstate's September results, in which Allstate's chief financial officer speculated about a possible frequency increase that month. Pl. Opp. at 18, 23. Plaintiffs do not dispute that Allstate accurately reported its Q3 2014 results, including frequency through September, on October 29, 2014. A later email in the same chain shows that after further investigation Allstate's underlying combined ratio "in September was very good." Winter Dep. 123:7-18; *see id.* 117:18-124:8 (frequency did not affect September results).

[4] Even if Mr. Winter *had been* aware of a two or three week increase in frequency, as plaintiffs mistakenly assert, he could not have known it was an indication of a longer-term trend. Winter Dep. 61:11-62:9 ("we would expect [frequency] to bounce around. Sometimes you would have volatility in a week or a month. You get some smoothing by three months so you can see real trend lines."). As Judge Posner observed, "[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention." *Higginbotham*, 495 F.3d at 760-61; *see also N.J. Carpenters Pension & Annuity Funds v. Biogen-Idec, Inc.* 537 F.3d 35, 45 (1st Cir. 2008) ("A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it.").

Allstate's profitability because no facts showed "the certainty or finality" of Allstate's intra-quarter data. *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 282-83 (7th Cir. 1996).[5]

**B.     Statements in February and May 2015 Accurately Reported Conclusions Reached in Allstate's Contemporaneous Internal Analyses.**

Plaintiffs do not and cannot dispute that statements in February and May 2015 concerning the perceived causes of Allstate's increased frequency accurately communicated the conclusions reached in Allstate's internal analyses.  Pl. Resp. 56.1 ¶¶ 37, 40-42, 49-52.  Plaintiffs' after-the-fact challenges of those analyses do not raise a genuine issue of material fact.

In Allstate's February 5, 2015 earnings call, Mr. Winter explained that, to rule out "quality-of-business" or "growth" as possible causes of its fourth quarter frequency increase, Allstate had looked at "new to renewal ratios," "state mix ratio," and "rating plan relativities" (e.g., CGR), and "saw nothing in there that it was a quality-of-business or growth-related issue."  *Id.* ¶ 41.  The earnings call preparation materials Mr. Winter reviewed before the call supported those statements.  They stated that year-over-year increases during the fourth quarter in both PD and BI frequency were "***seen proportionally*** across open / closed, new renewal, CGR / non-CGR and growth / non-growth" markets.  *Id.* ¶ 37 (emphasis added).[6]

During the February call, Mr. Winter asked: "So what's it likely related to?"  He explained:

> Well, we went back and ***looked historically*** over the last 7 to 8 years, and a couple of things emerged.  First, [two] factors traditionally drive PD frequency, miles driven and precipitation, especially precipitation during peak driving times.  Between those [two], miles driven has about roughly 3x the impact of precipitation.

---

[5] Plaintiffs mistakenly cite *S.E.C. v. Ustian*, 2019 WL 7486835, at *38 (N.D. Ill. Dec. 13, 2019), in which, unlike here, the plaintiff presented "countervailing circumstantial evidence" that could have conflicted with challenged statements.

[6] Allstate writes insurance through subsidiaries organized under the laws of various states.  *See* Def. Exh. 37 at 11.  "Closed" companies no longer write policies for new customers, meaning that "growth" and "new business" could not have been a factor in any frequency increase for those companies, Ballinger Dep. 48:1-3 [Pl. Exh. 7], but there were similar frequency increases in them.

*Id.* ¶ 41 (emphasis added). The preparation materials again included the same information. They reported, "based on historical trend," that there was a "strong likelihood of increased miles driven going forward" due to the rare combination of "low unemployment and low gas prices." *Id.* ¶ 37. The materials included charts comparing miles driven against changes in unemployment and gas prices over a number of years leading up to 2015. *Id.*

The same alignment is seen between challenged public statements in May 2015 and the preparation materials provided to Mr. Winter beforehand. During that call, Mr. Winter explained the analyses Allstate had undertaken "to ensure that the increases in frequency we're seeing are proportional and consistent across multiple segments of the business, no matter how you cut it." *Id.* ¶ 52. He told listeners that Allstate had:

> looked at new and renewal business, we looked [at] higher growth states versus lower growth states. We looked across quality characteristics . . . driver age, household composition, insurance scores, full coverage versus liability, across different rating plan[s] [e.g., CGR] to see whether or not perhaps, the rating plans had influenced it.

*Id.* "And all of that review has showed that this trend is externally driven, primarily by miles driven." *Id.* Mr. Winter further explained: "miles driven year-to-date was 3.9% above prior year," and the "12-month moving average on miles driven is 2.8% above the five-year average." *Id.*

The preparation materials for the May 2015 call summarized the same information. *Id.* ¶ 49 ("Breaking down year over year Frequency increase by quality segments shows widespread pressure across segments"; "No distinction between Open/Closed, CGR/non-CGR and high/no growth states in terms of frequency increases"; "Increases in BI Frequency have been experienced across brands within Allstate"; "Increases in quarter seen proportionally across: open / closed, new / renewal, CGR / non-CGR, growth / non-growth.").

Plaintiffs do not dispute that Allstate performed the analyses Mr. Winter described or that Mr. Winter accurately conveyed the results of those analyses. Pl. Resp. 56.1 ¶¶ 37, 41, 49, 52.

Instead, they quibble with Allstate's conclusions based on their expert Tyler Leverty's opinion that

"█████████████████████ caused at most ████ of Allstate's frequency increase" and "████████

████████ caused the remainder." Pl. Opp. 29. But Leverty conceded that the challenged

statements were "███████████" Allstate's analyses. Leverty Dep. [Def. Exh. 108] 129:15-130:6.

As Magistrate Judge Weisman recognized earlier in this case, Leverty's hindsight opinions

would not raise a genuine issue of material fact even if they were right. Def. Exh. 109 [Sep. 25,

2019 Hrg. Tr.] at 46:1-7 ("Mr. Hoffman, when you keep saying, [Allstate] got it wrong, they

should have done . . . it a different way . . . that does not sound in securities fraud"); *see Makor*

*Issues & Rights, Ltd. v. Tellabs Inc*., 735 F. Supp. 2d 856, 910-11 (N.D. Ill. 2010) (no triable issue

whether CEO knew forecast was false that was "result of a consensus recommendation"; striking

expert opinion as to what company should have concluded); *Mathews v. Centex Telemgmt., Inc.*,

1994 WL 269734, at *5 (N.D. Cal. June 8, 1994) (expert's opinion about how reserves should have

been calculated was "not evidence of misstatements or material omissions"); *see also In re Oracle*

*Corp. Sec. Litig.*, 627 F.3d 376, 389-90 (9th Cir. 2010) (rejecting plaintiffs' hindsight challenges

to defendants' analyses); *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 962 (N.D. Cal. 1999)

(declining to "second-guess" which analyses defendants should have relied on).[7]

Plaintiffs' similar argument that Allstate could have performed better analyses also misses

the mark. Pl. Opp. at 33-36. "Securities laws protect investors against fraud; they do not provide

---

[7] During the May call, Mr. Winter added that Allstate had done a "very intense deep dive
into our business to ensure that the increases in the frequency we're seeing are proportional and
consistent across multiple segments of the business," and "all of that review has showed that this
trend is externally driven." Pls. Resp. 56.1 ¶ 52. This was a reference, in part, to the BI Frequency
Task Force, which had issued a report several weeks earlier reaching that conclusion. *See* Pls.
Resp. 56.1 ¶ 45 (rejecting hypothesis that BTT was driving frequency increase because the "mix
of key quality indicators . . . has remained stable and is not driving a material frequency impact").
Plaintiffs' quibbles with the genesis of the task force and its conclusions are just that. *See* Pls.
Opp. at 35 n.18. The task force's analyses bolstered the conclusions of Allstate's Protection
Finance team that external factors were driving the frequency increase. Pls. Resp. 56.1 ¶ 49.

investors with a recourse against unsuccessful management strategies." *Searls v. Glasser*, 64 F.3d 1061, 1069 (7th Cir. 1995). Plaintiffs' assertions that "averages lie" and that "year-over-year" statistics can be confusing, Pl. Opp. at 34, ignore that Allstate *only* reported frequency on a national basis and in comparison to the same quarter in the prior year. *See, e.g.*, Def. 56.1 ¶¶ 40, 50, 64.

Plaintiffs have no explanation for – and therefore avoid discussing – the undisputed fact that GEICO and Progressive ascribed their own claim frequency increases during the same general period to the same external causes Allstate cited – miles driven and weather. Pl. Opp. at 30 n.15; Pl. Resp. 56.1 ¶¶ 55, 71-72. Plaintiffs also do not dispute that GEICO and Progressive announced those similar frequency increases during 2015. Pl. Resp. ¶¶ 55, 71, 72. Puzzlingly, plaintiffs assert that Allstate "[n]ever attempted to examine the factors" that caused the frequency increases their competitors experienced. Pl. Opp. at 30 n.15. There was no reason to doubt competitors' explanations that their frequency increases *also* were due to "increases in miles driven" and "weather conditions," just as Allstate had concluded. Pl. Resp. 56.1 ¶ 71-72 (Progressive: "based on the data we have collected, we know that miles driven have been higher all year").

Finally, no genuine issue of material fact is raised because state managers in Oregon, Iowa, and a few other markets requested permission to increase rates (and one of those managers suggested without analysis that new business was the cause), or that in the process of analyzing frequency some Allstate employees asked if recent growth or new business might be contributing to the increase. Pl. Opp. at 34-36, 40-41. Plaintiffs have not come forward with evidence that *anyone* within Allstate disagreed with its publicly communicated conclusions about the causes of the frequency increase, much less relayed such disagreements to Mr. Wilson or Mr. Winter. Indeed, the two Allstate officers whose early email messages plaintiffs cite for this argument both testified that, after working through the issue with their colleagues, they agreed with the consensus conclusions about the causes of the frequency increase. Pl. Opp. at 40-41; *see* Def. 56.1 ¶¶ 46, 70.

Even if that were not the undisputed evidence, the securities laws have never required that internal views within a corporation be unanimous. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (no duty to disclose opinion of "a single junior attorney . . . when six of his more senior colleagues" disagree "even if the minority position ultimately proved correct"); *see City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 171 (3d Cir. 2014) (no duty to disclose CEO's disagreement with company strategy); *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016) ("employee's disagreement with management" not evidence of scienter), *aff'd*, 849 F.3d 325 (6th Cir. 2017).

Defendants' honestly held opinions regarding the perceived reasons for Allstate's frequency increase, which plaintiffs do not dispute were based on Allstate's internal analyses, are not actionable misstatements. *Omnicare*, 575 U.S. at 186, 194 ("honestly held" opinions inactionable as a matter of law); *West v. Ehealth, Inc.*, 2016 WL 948116, at *7 (N.D. Cal. Mar. 14, 2016) (statements conveying "analysis" of ongoing issue are opinions).

### C. August 2015 Statements Were Not Admissions of Prior Falsity.

Defendants' arguments concerning statements made in August 2015 do not "boil[] down" to a loss causation argument, as plaintiffs mistakenly contend. Pl. Opp. at 42. Defendants are not making a loss causation argument. Instead, the evidence establishes that plaintiffs' allegation that the August 2015 disclosures were "a key admission that [Allstate's] prior, greatly reduced underwriting standards were causing the increase in claims frequency" is demonstrably false. Compl. ¶ 106; *see* Def. Mem. at 33-35.

In his remarks during an earnings call held on August 4, 2015, Mr. Winter stated that "[w]hat we've observed in the second quarter ***confirmed***" that "increases in our auto claim frequency . . . appeared to be driven primarily by external factors[.]" Pl. Resp. 56.1 ¶ 66. He added that, based on Allstate's most recent analyses, it appeared "that [Allstate's] new business

growth rate is having between half a point and a point impact on the auto loss ratio" (a small portion of the 6-point overall increase). *Id.* Allstate's second quarter earnings release made the same two points. *Id.* ¶ 64.

There is no genuine issue of material fact that Allstate performed new analyses soon before the August disclosures suggesting the possibility that recent growth was a minor contributor to the frequency pressure, even though external factors were the primary cause. *See id.* ¶¶ 60-62. There also is no dispute that when he saw these analyses, Mr. Winter insisted that "we have to quantify for [investors] the impact of growth," which Allstate did. *Id.* ¶ 63. Examining an emerging issue, and updating disclosures based on new information, is the opposite of fraud. *See, e.g.*, *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 44 (1st Cir. 2014).

Allstate's August 2015 disclosure that it would be "tightening" its "underwriting parameters" to address the impact of frequency also was not an "admission." *See* Compl. ¶ 106. Allstate announced *identical* profitability measures in its disclosures for Q1 2015. Def. 56.1 ¶ 52. But even if plaintiffs were right (they are not), they do not dispute that Federal Rule of Evidence 407 precludes the use of all of these end-of-period statements "as liability evidence." Pl. Opp. at 43 n.25; *see Pugh v. Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (refusing to infer control deficiency based on subsequent disclosures); *Higginbotham*, 495 F.3d at 760 (refusing to infer control deficiency from retention of accounting firm to help "beef up financial controls").

## II.    NO DEFENDANT ACTED WITH SCIENTER.

Summary judgment must be granted for the moving party when, as here, the opposing party fails to "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (summary judgment may be granted based on the "absence of evidence").

Contrary to plaintiffs' arguments, this bedrock principle applies equally to summary judgment motions directed to the required element of scienter in securities fraud actions. *See Searls*, 64 F.3d at 1068; *Renovitch v. Kaufman*, 905 F.2d 1040, 1046 (7th Cir. 1990); *Schlifke*, 866 F.2d at 946; *Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000). Even in *Silverman v. Motorola, Inc.*, cited by plaintiffs, Judge St. Eve granted summary judgment for one defendant because the plaintiffs had not come forward with "sufficient evidence of scienter to create a genuine issue of material fact." 772 F. Supp. 2d 923, 936 (N.D. Ill. 2011).

This motion does not require the Court to weigh evidence or draw inferences, as plaintiffs mistakenly argue. Pl. Opp. at 21-22. Defendants have shown that the evidence refutes scienter, and plaintiffs have failed in response to identify evidence that would "support a finding" of "intent to defraud or recklessness." *Gert v. Elgin Nat'l Industs., Inc.*, 773 F.2d 154, 157 (7th Cir. 1985). There is no dispute that the challenged public statements were based on, and consistent with, the work of Allstate's internal teams to analyze and understand the issue before it was discussed with investors. *See supra* at 7-11. "Depending on others to ensure the accuracy of disclosures . . . is not severely reckless conduct." *Shanahan*, 646 F.3d at 544 (affirming summary judgment). Indeed, the district court granted summary judgment for the chief executive officer of Fannie Mae in a case concerning that company's $6.3 billion financial restatement because the plaintiffs did not dispute that others within the company had repeatedly reassured him "that everything was in order" with the company's disclosures. *Fed. Nat'l Mortg. Ass'n*, 892 F. Supp. 2d at 73. Tellingly, plaintiffs ignore defendants' citation to this decision, which they cannot distinguish.[8]

---

[8] Plaintiffs place mistaken reliance on *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008). Pl. Opp. at 39, 41. In *Tellabs*, unlike this case, the plaintiffs came forward with specific "facts" showing "the danger [of misleading investors] was either known . . . or so obvious that the defendant[s] must have been aware of it." 513 F.3d at 704. The undisputed evidence shows the opposite here.

Further, both Mr. Wilson and Mr. Winter testified – under oath and subject to cross-examination by plaintiffs' counsel – that they believed their statements were truthful when they made them and that they still believe that today.  Def. 56.1 ¶ 69; *see* Wilson Dep. 285:5-20; Winter Dep. 319:25-320:6.  That uncontradicted testimony is probative, whether or not plaintiffs believe it to be "self-serving."  Pl. Opp. at 22-23.

In evaluating scienter in a multi-defendant case, the scienter of *each* defendant must be examined based on the evidence offered by the plaintiff *for that defendant*.  *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 601-02 (7th Cir. 2019) (motion to dismiss); *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 299 F. Supp. 3d 1055, 1064-72 (D. Minn. 2018) (summary judgment); *S.E.C. v. Woodruff*, 778 F. Supp. 2d 1073, 1088-97 (D. Colo. 2011) (summary judgment).  That presents an insuperable obstacle for plaintiffs here. Their only allegations concerning Mr. Wilson are that he exercised a stock option before he made any challenged statement, while the only allegations against Mr. Winter are that he made some of the statements– as the evidence now shows – based on the analysis performed by his team.  There is no evidence to link the statements by Mr. Winter and the trade by Mr. Wilson.

### A.  Mr. Wilson's Option Exercise Does Not Reveal Any Motive to Defraud.

In their opposition, plaintiffs avoid discussion of key undisputed facts concerning Mr. Wilson's November 2014 stock option exercise.  The reason for plaintiffs' omissions is obvious.  When examined in light of *all* of the undisputed evidence, rather than plaintiffs' misleadingly incomplete recitation, the facts do not suggest that the transaction was "calculated to maximize the personal benefit from undisclosed inside information."  *Silverman*, 772 F. Supp. 2d at 936 (granting summary judgment).  As Judge Posner observed, "[m]anagers sell stock all the time[.]"  *Higginbotham*, 495 F.3d at 759.  Plaintiffs need a lot more than a stock option transaction to get to trial on their claims of fraud – and the undisputed evidence shows they do not have it.

In an effort to portray Mr. Wilson's transaction as suspicious or unusual, plaintiffs assert that Mr. Wilson's financial advisor, Marc Steinman, "had '*implored*'" Mr. Wilson "for two years" to exercise the option in order to diversify his investments given his other significant holdings of Allstate equity, but according to plaintiffs' false narrative Mr. Wilson "did not respond to Mr. Steinman until October 24, 2014," which was "just *six days* before" Allstate reported third quarter results. Pl. Opp. at 9-10.

In reality, as plaintiffs do not dispute, Mr. Steinman raised the issue of exercising the option again at a meeting on September 3, 2014 and, for the first time, sent Mr. Wilson a Black-Scholes valuation analysis on September 24, 2014 showing that the option was "so deep in the money that it has nominal 'optionality' beyond the current profit.'" Pl. Resp. 56.1 ¶¶ 19, 22 (recited facts not disputed). On October 20, 2014, Mr. Wilson informed Mr. Steinman he was thinking of exercising the option during the trading window after Allstate reported third quarter results and retaining $5 million of the resulting shares of Allstate common stock. He asked for a meeting to discuss the proposed transaction so he could be ready to discuss it with Allstate's board of directors in advance. *Id.* ¶ 23 (admitted). On November 6, 2014, Mr. Wilson asked Mr. Steinman for a summary of his Allstate stock sales and option exercises to facilitate a discussion of the proposed transaction with the board; Mr. Steinman provided the information that day. *Id.* ¶ 26 (admitted).

These facts – admitted by plaintiffs but never addressed in their arguments – defeat the nefarious inference plaintiffs would like to draw. Plaintiffs' assertion that Mr. Wilson had "no legitimate reason" for the transaction, Pl. Opp. at 25 n.13, disregards that diversification was a legitimate reason. *See Searls*, 64 F.3d at 1068 (affirming summary judgment where officer's "accountant advised him to take the SARs in cash in order to diversify his portfolio"). Plaintiffs do not dispute that after the transactions, Mr. Wilson *still* beneficially owned more than 3 million shares of Allstate stock (including vested options and restricted stock units). Pl. Resp. 56.1 ¶ 32.

Plaintiffs then assert that there is a genuine issue of material fact because Mr. Wilson and Ms. Lees could not recall the details of the pre-clearance conversation that *they both testified they had*. Pl. Opp. at 26; *see* Pl. Resp. 56.1 ¶ 27. However, plaintiffs do not dispute that another Allstate lawyer (Katherine Smith) testified that the conversation occurred, which was why she sent the administrator of the stock option program a written notification that Mr. Wilson was authorized to trade. Pl. Resp. 56.1 ¶ 28; *see* Smith Dep. 142:9-17 ("Q. Before you sent [your e-mail] to Fidelity, did you know that Mr. Wilson had been pre-cleared to engage in that transaction? A. Yes. That would have been my – it's the one I would have always made sure of before sending this because this would have enabled a trade to go through. So before I would enable a trade to go through, I would ensure that the preclearance requirement was met.").[9]

The undisputed evidence also does not support plaintiffs' assertions that the timing was suspicious. In the first place, the transactions could not show that Mr. Wilson "was motivated to make misstatements," as plaintiffs argue, Pl. Opp. at 26, when he made his earliest challenged statement on December 9, 2014, *two weeks after* the transactions. Pl. Resp. 56.1 ¶ 34; *see In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (sales pre-dating all alleged false statements did not suggest "improper motives"). There is no evidence that Mr. Winter – who made most of the challenged statements – even *knew* about Mr. Wilson's personal investment decisions. *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005) (if defendants "were acting in concert to inflate [company's] stock price and increase their personal wealth, why would [co-defendant] hold on to stock[?]").

---

[9] The deposition testimony they cite contradicts plaintiffs' assertion that Mr. Wilson approved a November 2014 stock option transaction by Ms. Lees. *See* Lees Dep. Tr. 78:2-24 ("It's not the trade he's approving, it's the form." Lees's pre-clearance discussion held with Dan Gordon, another Allstate lawyer); *id.* 84:10-85:5 (explaining purpose of form was to show compliance with executive stock ownership policy).

Similarly, the fact that Allstate's stock price was higher in February 2015, *after* Allstate disclosed its fourth quarter frequency results, is not an argument that "Wilson failed to time his insider sales to maximize his financial benefit." Pl. Opp. at 27. Instead, that undisputed fact belies plaintiffs' unfounded assertion that disappointing fourth quarter frequency was the reason for the sale. The 10% stock drop that is the centerpiece of plaintiffs' claims did not occur until ten months later. *See Pension Tr. Fund for Oper. Engin'rs v. Kohl's Corp.*, 895 F.3d 933, 940 (7th Cir. 2018) (stock sales 14 months before corrections not evidence of scienter).

## B. Plaintiffs Have No Evidence That Mr. Winter Acted With Scienter.

Plaintiffs admit that Mr. Winter acquired 10,000 shares of Allstate common stock during the class period and that they have no evidence or arguments as to Mr. Winter's "motive." Pl. Opp. at 27 n.14; Pl. Resp. 56.1 ¶ 59. "Without a motive to commit securities fraud, businessmen are unlikely to commit it." *Boeing*, 711 F.3d at 758. Plaintiffs contend they did not allege Mr. Winter's scienter "based on 'motive and opportunity.'" Pl. Opp. at 27 n.14. But they never have offered *any* explanation why Mr. Winter would have lied about Allstate's claim frequency experience, and the undisputed evidence precludes any finding that he acted "with recklessness so severe that it is the functional equivalent of intent." *Searls*, 64 F.3d at 1066; *see Schlifke,* 866 F.2d at 946 ("it is the 'danger of misleading buyers [that] must be known or so obvious that any reasonable man would be legally bound as knowing'").

No reasonable jury could find that Mr. Winter was reckless. His statements on Allstate earnings calls hewed closely to conclusions provided to him by knowledgeable Allstate employees who had analyzed the business results. Pl. Resp. 56.1 ¶¶ 9-13, 37, 41, 49, 52, 60-66. Before speaking publicly, and before signing off on any of Allstate's corporate statements concerning frequency, he (and Mr. Wilson) made sure the statements had been reviewed and approved by a cross-disciplinary team that included investor relations, the controller, the deputy general counsel,

and the "validation team." *Id.* ¶ 38. When new data raised questions, Mr. Winter directed his team to look at the issues again and from different perspectives. *Id.* ¶ 61. When the results of additional analyses suggested the information Allstate had provided to investors needed to be revised, he insisted that the revised information be disclosed. *Id.* ¶ 63.

Plaintiffs' attempts to cast doubt, in hindsight, on the validity of Allstate's internal analyses do not raise a genuine issue of material fact as to Mr. Winter's scienter for the same reason they did not do so as to falsity. *See supra* at 7-11. If anything, plaintiffs' alleged evidence of contrasting opinions is even less probative of an intention to defraud because it shows the active examination of the issue – the opposite of a deliberate indifference to the truth "that is the functional equivalent of" fraudulent intent. *Searls*, 64 F.3d at 1066.[10]

Plaintiffs have not identified any disputed fact that could justify subjecting Mr. Winter to the burden of trial. *Shanahan*, 646 F.3d at 544 (no scienter where defendant "relied on the . . . finance and accounting departments, outside and general counsel, and . . . independent auditors"); *Oracle*, 627 F.3d at 389 (no scienter where defendants relied on company's "thorough forecasting process"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1239 (S.D. Cal. 2010) (no scienter where CEO "relied on the accounting department"); *S.E.C. v. Pasternak*, 561 F. Supp. 2d 459, 514 (D.N.J. 2008) (no scienter where defendant "relied on his compliance and legal departments").

Having raised no disputed issue of material fact concerning the scienter of the individual defendants, plaintiffs also fail to establish Allstate's corporate scienter. *Pugh*, 521 F.3d at 697 (corporate scienter focuses on "state of mind of the individual corporate official or officials who make or issue the statement").

---

[10] These points apply with equal force to Mr. Wilson, of course, who the undisputed evidence also shows relied in good faith on Allstate's internal processes to ensure that his public statements were accurate and materially complete. Def. 56.1 ¶¶ 38-39.

### III. PLAINTIFFS' SURREPTITIOUS AMENDMENT OF THEIR SECURITIES FRAUD THEORY SHOULD BE REJECTED.

Plaintiffs cannot escape their own complaint – they allege 58 times that undisclosed changes to Allstate's "underwriting standards" were the proximate cause of Allstate's frequency increase.[11]  This Court denied defendants' motion to dismiss based almost entirely on these allegations.  *See Allstate*, 2018 WL 1071442, at *3 ("Defendants' failure to mention Allstate's reduction in underwriting standards makes these statements misleading.") (discussing Q3 2014 and Q4 2014 statements); *id.* at *4 ("defendants did not disclose that Allstate decreased its underwriting standards while simultaneously asserting that the increase in claims frequency was attributable to external factors") (discussing Q1 2015 statements); *see also id.* at *5-6 (holding that defendants adequately alleged scienter and loss causation based on defendants' alleged nondisclosure of "reduced underwriting standards").

This history belies plaintiffs' argument that what they *really* alleged was that Allstate's "aggressive growth strategy" was to blame.  Pl. Opp. at 15-16.  According to the complaint, underwriting changes were the *only* component of that strategy.  *See* Compl. ¶ 58 ("to implement Defendants' aggressive growth strategy, Defendants caused Allstate to underwrite riskier and less profitable business").  Plaintiffs *never* alleged that Allstate's *pricing*, or two publicly disclosed pricing plans (BTT and CGR) caused its frequency increase.  They "may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory" at summary judgment.  *In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009).[12]

---

[11] *See* Compl. ¶¶ 3, 4, 5, 7, 10, 12, 13, 14, 16, 34, 36, 39 (heading), 42, 44 (heading), 47 (heading), 52, 57 (heading), 59 (heading), 60, 65, 67, 70, 73, 75, 79, 84, 86, 91, 96, 97, 103, 104, 106, 107, 110, 115, 118, 119, 123, 126, 127, 130, 131, 135, 137, 142(g), 146.

[12] Plaintiffs concede, through silence, that summary judgment should be granted on their controlling person claims because Messrs. Wilson and Winter relied in good faith on the analyses of Allstate personnel regarding the perceived causes of the frequency increase.  Pl. Opp. at 44.

## CONCLUSION

For the foregoing reasons and the reasons in defendants' opening brief, the Court should grant summary judgment for all defendants on all claims asserted in the second amended complaint.

Dated: Chicago, Illinois              DLA PIPER LLP (US)
       June 13, 2022

Of Counsel:                     By:  */s/ Kenneth L. Schmetterer*
                             Kenneth L. Schmetterer (IL-6201860)
John J. Clarke, Jr.*                      kenneth.schmetterer@dlapiper.com
john.clarke@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas       Yan Grinblat
New York, New York 10020-1104    yan.grinblat@dlapiper.com
212.335.4500                     Emily D. Gilman
                                emily.glman@dlapiper.com
* Admitted *pro hac vice*           444 W. Lake Street
                                Chicago, Illinois 60606-0089
                                312.368.4000

                                *Attorneys for Defendants*
                                 *The Allstate Corporation,*
                                 *Thomas J. Wilson, and*
                                 *Matthew E. Winter*


                             SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP


                     By:  */s/ Charles F. Smith*
                               Charles F. Smith (IL-6195537)
                               charles.smith@skadden.com

                     Laura Bernescu (IL-6316545)
                     laura.bernescu@skadden.com
                     155 N. Wacker Drive
                     Chicago, Illinois 60606-1720
                     312.407.0700

                     *Attorneys for Defendant Thomas J. Wilson*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 13, 2022, I electronically filed the foregoing document using the ECF System for the United States District Court for the Northern District of Illinois. Notice of this filing will be sent by operation of the Court's electronic filing system to all counsel of record registered on the ECF system.

 */s/ Kenneth L. Schmetterer*
Kenneth L. Schmetterer (IL-6201860)
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089