IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|   |   |
|---|---|
| IN RE THE ALLSTATE CORPORATION SECURITIES LITIGATION | ) ) ) ) Case No.  16 C 10510 <br> Judge Robert W. Gettleman |

# MEMORANDUM OPINION & ORDER

Plaintiffs Carpenters Pension Trust Fund for Northern California and Carpenters Annuity Trust Fund for Northern California, bring this two-count securities fraud class action against defendant Allstate Corporation ("Allstate"), Allstate's Chief Executive Officer ("CEO"), Chairman, and 2005-15 President Thomas Wilson, and Allstate Financial's CEO and President since 2015 Matthew Winter (collectively, "defendants"). Count I alleges that defendants violated Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II, brought against only Wilson and Winter, alleges control person liability under Section 20(a) of the Exchange Act.  15 U.S.C. § 78(a).  Defendants have moved for summary judgment on both counts.  For the reasons stated below, defendants' motion (Doc. 456) is granted in part and denied in part.

# BACKGROUND

The details of plaintiffs' claims and the procedural history of this case have been set out in decisions of this court and the Seventh Circuit, and are accordingly discussed herein only to the extent necessary to explain this court's reasoning.  See In re Allstate Corp. Sec. Litigation, 966 F.3d 595 (7th Cir. 2020); Carpenters Pension Trust Fund for Northern California v. Allstate Corp., 2018 WL 1071442, (N.D. Ill. Feb. 27, 2018).  Plaintiffs' principal allegation is that

defendants made material misstatements and omissions regarding the proximate cause of a spike in auto claims frequency, which they allege had a material negative impact on Allstate's financial condition and stock price.

In 2013, Allstate implemented an aggressive strategy to grow its auto insurance business. While the complaint refers primarily to softening underwriting standards, plaintiffs now claim that Allstate loosened its underwriting standards in connection with the implementation of several pricing initiatives, such as "Broaden the Target" ("BTT") and "Complementary Group Rating" ("CGR"). In 2013, Allstate noted that an increased growth strategy could cause "some pressure" on auto claims "frequency," but assured the market that Allstate would closely monitor it.

According to plaintiffs, Allstate began to experience a frequency increase as early as September 2014. On October 29, 2014, Allstate announced its financial results for third quarter 2014, reporting strong profitability. The next day, on October 30, 2014, Allstate had an earnings call with securities analysts, and defendants Wilson and Winters addressed the potential effect of low gas prices on claim frequency. Winters stated, in part: "I don't really have much to add as far as the gas price impact….we don't expect it to be a core driver. That being said, our frequency so far has been extremely favorable to prior year. It's within our historical ranges, it's broad geographically. So our frequency trends are – have been good." Plaintiffs allege that Winter's statement was false and misleading because frequency had already increased earlier that autumn.

Similarly, at a Goldman Sachs Investor Conference on December 9, 2014, when an analyst asked defendant Wilson about Allstate's auto rates and profitability, Wilson stated, "So I feel good about auto insurance in general terms of profitability. It doesn't mean frequency won't

2

tick up, or we won't mess up in some State, or we don't mess up in some channel." Plaintiffs argue that this statement was misleading because Allstate had already experienced a "tick up" in claims frequency, and defendants Wilson and Winters knew about this increase.

As evidence of scienter, plaintiffs point to defendant Wilson's sale of nearly $33 million in Allstate stock in November 2014. Defendants note that Wilson exercised a stock option that had been granted to him in February 2009, and he did so at the behest of his financial advisor. Defendants further note that Wilson cleared the trades with Allstate's general counsel, Susan Lee, and filed an SEC Form 4 to report the transaction. Plaintiffs respond that this transaction was aberrant for Wilson, as he had not exercised any stock options in more than nine years. Further, it appears that Wilson's financial advisor had "implored" Wilson for two years to exercise this particular option, yet Wilson did not do so until November 2014. Plaintiffs also find it unusual that neither Wilson nor Lee can recall any details of Wilson's meeting to clear his trades.[1]

Allstate first disclosed an increase in claims frequency in a February 4, 2015, press release. The next day, Allstate had its earnings call with analysts. In response to an analyst question about the increased frequency, Wilson stated that he "has been waiting anxiously for your question, because he spent [an] untold number of hours over the last really three months since we saw a tick-up in October." Wilson and Winter proceeded to assuage analysts' concerns by making a series of statements regarding the causes of Allstate's frequency increase. Specifically, defendants denied that there was any connection between the increase and Allstate's growth strategy, and instead claimed the increase was caused solely by external factors

---

[1] Allstate's general counsel also exercised stock options and sold Allstate common stock in November 2014, which plaintiffs claim required defendant Wilson's approval.

such as miles driven and precipitation. Most damning, in plaintiffs retelling, is that Allstate spoke unequivocally, making statements like: "we saw nothing to indicate it's a quality of business issue or that it's being driven by growth…we saw nothing in there that would indicate that it was a quality of business or growth related issue"; and "in no way are we concerned that it's a quality issue"; and finally, "we are confident that we have analyzed this to death, some might say. We understand the drivers."

In May 2015, Allstate disclosed a second consecutive quarter of increased claims frequency. Allstate again stated that it thoroughly reviewed internal and external data, and determined that the cause was related to miles driven and weather. Allstate stated that it expected its competitors to have similar results.[2]

At the end of the class period on August 4, 2015—after Allstate had experienced three consecutive quarters of increased frequency—Winters admitted that Allstate's growth had contributed "to the higher frequency we are seeing" and, in response, Allstate would "tighten[] some of our underwriting parameters." Plaintiffs argue that this was a powerful admission that Allstate's frequency increase was not caused solely by temporary external factors, and that Allstate's aggressive growth strategies were at least partly to blame for the increase. As a result, Allstate's stock dropped 10% the next day.

## **LEGAL STANDARD**

Summary judgement is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the

---

[2] According to defendants, two other major insurance companies, GEICO and Progressive, also noted an increase in claims frequency and attributed that increase to miles driven and weather conditions.

nonmoving party exists to permit a jury to return a verdict for that party." Brummett v. Sinclair Broadcast Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005). When considering a motion for summary judgment, the court must construe the evidence and make all reasonable inferences in favor of the non-moving party. Hutchinson v. Fitzgerald Equip. Co., Inc., 910 F.3d 1016, 1021 (7th Cir. 2018).

## DISCUSSION

Allstate moves for summary judgment on both counts, arguing that the uncontested facts prove that the statements were factually accurate or an expression of honest opinion or belief, there was no material omission, and the parties lacked intent to defraud. Allstate also complains that plaintiffs have impermissibly broadened their claims at the summary judgment stage. The court will address each argument in turn.

### I. New Theories of Liability Not in the Complaint

As a preliminary matter, Allstate argues that plaintiffs cannot assert new theories of securities fraud not alleged in the original pleadings. See In re Oracle Corp. Sec. Litig., 2009 WL 1709050, at *18 (N.D. Cal. June 19, 2009), aff'd, 627 F.3d 376 (9th Cir. 2010). Plaintiffs' complaint alleges that "greatly reduced underwriting standards" were the undisclosed cause of Allstate's claim frequency increase. The complaint does not explicitly mention the BTT and CGR pricing initiatives.

Plaintiffs counter Allstate's argument by demonstrating that this court, the Seventh Circuit, and defendants all understood that plaintiffs' allegations are based on the impact of Allstate's "aggressive growth strategy," which involved more than just changes to Allstate's underwriting standards. See In re Allstate Corp. Sec. Litig., 966 F.3d 595, 601 (7th Cir. 2020) ("The August 3, 2015 announcement prompted the sharp stock price drop because, as plaintiffs

5

see things, Allstate finally came clean and admitted that its aggressive growth strategy and not bad weather or more driving, had been to blame all along") (emphasis added); see also In re Allstate Corp. Sec. Litig., 2020 WL 7490280, at *3 (N.D. Ill. Dec. 21, 2020) ("According to the plaintiffs, Allstate's stock was artificially inflated because Allstate failed to disclose both the increase in auto-claim frequency and the fact that Allstate's growth strategy cased that increase.") (emphasis added). It further appears that, during discovery, defendants proposed search terms that included "BTT," suggesting that even defendants understood plaintiffs' claims to include Allstate's growth strategy more generally. Consequently, defendants cannot plausibly claim prejudice.

The court finds that plaintiffs are not invoking an "unpled" and "entirely new theory" of securities fraud. Oracle, 2009 WL 1709050, at *18. Rather, the complaint contained sufficient particularity for defendants and the court to understand that plaintiffs' allegations related to Allstate's growth strategy more generally.

**II.     Count I – Securities Fraud**

Count I brings a claim for securities fraud under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a sale of a security; (4) reliance upon the misrepresentation or omissions; (5) economic loss; and (6) loss causation." Makor Issues & Rts., Ltd. v. Tellabs, Inc., 775 F.Supp.2d 856, 902 (N.D. Ill. 2010).

Here, plaintiffs allege two theories of securities fraud. For statements made before February 4, 2015, plaintiffs base their claims on alleged omissions, primarily that defendants did

not disclose a claim frequency increase that began in October 2014. For statements on or after February 4, 2015, plaintiffs assert that defendants lied when they attributed Allstate's claim frequency increase to external factors, such as weather and miles driven.

### a. Statements made in October and December 2014

For the October 2014 and December 2014 statements, defendants argue that they are entitled to summary judgment because: (1) their statements were factually accurate because Allstate correctly reported is Q3 results; (2) Allstate had no duty to disclose the frequency increase for the quarter then in-progress; and (3) Winters and Wilson did not act with the requisite scienter, and Wilson's stock sale does not demonstrate improper motive. The court can easily dispose of the first argument because it misconstrues plaintiffs' claims. Plaintiffs are not alleging that defendants incorrectly reported Allstate's Q3 results. Rather plaintiffs are alleging that defendants failed to disclose that they had already experienced an increase in claims frequency.[3]

Defendants' second argument—that Allstate had no duty to disclose the frequency increase for the quarter then in-progress—is more compelling. As defendants note, the securities laws provide for a system of "periodic rather than continuous" disclosure. Gallagher v. Abbott Labs., 269 F.3d 806, 808, 809-10 (7th Cir. 2001) ("a corporation does not commit fraud by standing on its rights under a periodic-disclosure system"). "Firms regularly learn financial information between quarterly reports, and they keep it under their hats until the time arrives for

---

[3] Defendants similarly argue that the December 2014 statement was factually accurate because Wilson did "feel good" about auto insurance profitability. But that argument again mischaracterizes plaintiffs' claims by focusing on the first sentence of the statement ("I feel good about auto insurance in terms of profitability") while ignoring the problematic portion ("[i]t does not mean frequency won't tick up"). Plaintiffs allege that it was misleading for Wilson to warn that Allstate's frequency might "tick up" when he knew Allstate had already experienced a frequency increase. Thus, arguing that defendants believed the statements were true misses the mark.

disclosure," because there is no rule requiring periodic "reports to be updated on any cycle other than quarterly." Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 760 (7th Cir. 2007). An issuer thus does not have a duty to continuously update the public.

However, if an issuer "speaks, he must speak the whole truth." Allstate, 2018 WL 1071442, at *4 (quoting Stransky v. Cummings Engine Co., 51 F.3d 1329, 1331 (7th Cir. 1995)). Indeed, Rule 10b-5 proscribes "omissions that render affirmative statements misleading; thus, incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." Schlifke v. Seafirst Corp., 866 F.2d 935, 944 (7th Cir. 1989); see also Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc., 496 F.Supp.3d 952, 963 (E.D. Va. 2020) (holding that because defendant "chose to speak about its pricing strategy, it had a duty to 'tell[] the whole, material truth' about it, regardless of the level of detail used on the topic").

Here, Allstate argues that it had no duty to disclose a fourth quarter frequency increase because the fourth quarter was still in progress. Allstate also claims that it did not engage in a "half-truth," because the October 2014 and December 2014 statements referred only to Allstate's third-quarter results and Allstate did not speak about its ongoing fourth quarter. For the October 30, 2014, statement, the court agrees with Allstate. Allstate had no duty during its third-quarter earnings call to make any statements regarding a potential frequency increase in the fourth quarter, and Allstate spoke only about its third-quarter results. Contrary to plaintiffs' assertion, Allstate did not speak about the fourth quarter, and there is no evidence that analysts assumed

8

that Allstate was speaking about the fourth quarter.[4] Consequently, no reasonable jury could find the October 30, 2014, statements to be misleading, or the basis for securities fraud.

The court disagrees with Allstate, however, about the December 2014 statements. During the Goldman Sachs Investor Conference, when an analyst asked defendant Wilson about Allstate's auto rates and profitability, Wilson stated, "[s]o I feel good about auto insurance in general terms of profitability. It doesn't mean frequency won't tick up, or we won't mess up in some State, or we don't mess up in some channel." Plaintiffs argue that it was misleading for Wilson to warn that Allstate's frequency might "tick up" when he knew that Allstate had already experienced a frequency increase. Further, unlike the October statement, it is not clear that Wilson was speaking only about the third quarter. Instead, Wilson appears to have been addressing the potential trends with claims frequency, including those for current quarter. Having chosen to address the potential frequency increase, Wilson was required to tell "the whole, material truth." Cambridge Ret. Sys., 496 F.Supp.3d at 963. A reasonable jury could very well find the December statement to be a misleading omission.

The court turns to Allstate's next argument, that defendants lacked scienter. "[A]s a general matter, determinations as to lack of scienter are typically—though not categorically— inappropriate at the at the summary judgment stage." Silverman v. Motorola, Inc., 798 F.Supp.2d 954, 958 (N.D. Ill. 2011). Indeed, "[t]he court could grant Defendants' summary judgment motion on this ground only 'if no reasonable jury could conclude that the requisite scienter exists.'" Id. (citing In re Miller Indus., Inc., 120 F.Supp.2d 1371, 1383 (N.D. Ga.

---

[4] Plaintiffs cite to statements from February 2015 to argue that securities analysts in other quarters interpreted other statements "to contain commentary regarding the then-current quarter." But those examples say nothing about the October 30, 2014, statements, and whether the October statements referred to the then-current quarter.

2000)). In support of their argument, defendants cite to deposition testimony from both Wilson and Winters, in which Wilson and Wilson testified that they believed their statements were true and they genuine believed that Allstate was performing well. Defendants additionally argue that Wilson's stock option does not evidence a motive to defraud, because Wilson complied with Allstate's insider trading policy and undertook the option at his financial advisor's suggestion—not because he knew of an increase in claims frequency. Of course, plaintiffs see things differently, pointing to the suspicious timing and aberrant nature of the sale (Wilson had not made such a sale in many years, and Wilson's financial advisor had been "imploring" Wilson to do so for some time), and Wilson and Lee's questionable lapses in memory regarding Wilson's trade clearance meetings. Plaintiffs also lambast defendants' testimony about their beliefs as being "self-serving."

Ultimately, defendants' argument fails, and the court need not address the minutia of the parties' scienter arguments, because those arguments require the court to make credibility determinations and weigh the evidence in ways that are inappropriate on a motion for summary judgment. See Silverman, 798 F.Supp.2d at 968 (collecting cases). Accepting defendants' arguments that they lacked scienter "would require the court to find [defendants'] testimony…concerning their understanding of the allegedly misleading statements credible, which the Court cannot do at the summary judgment stage, particularly given the…presentation of countervailing circumstantial evidence." S.E.C. v. Ustian, 2019 WL 7486835, at *38 (N.D. Ill. Dec. 13, 2019). Given the circumstantial evidence and questions of credibility, the court cannot find as a matter of law that no reasonable jury could conclude that the requisite scienter exists. In fact, a reasonable jury could very well find that defendants acted with the requisite scienter. The court declines to grant summary judgment to defendants on this basis.

b.  **Statements made on or after February 4, 2015**

The court next turns to the statements made on February 4, 2015, and later.  For these statements, defendants argue that they are entitled to summary judgment because the statements were opinions or expressions of honest belief, defendants' lacked scienter, and the August 2015 statements were not admissions of prior falsity.

In ruling on the motion to dismiss (Doc. FIX), this court already rejected defendants' first argument, holding that the statements on and after February 4, 2015, were not statements of opinion under Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 183 (2015).  The court sees no reason to reconsider its earlier holding.  Read together and in context, the statements expressed a level of confidence and certainty that cannot be fairly characterized as mere opinion.  For example, defendant Winter identified "miles driven and precipitation" as the two main factors impacting Allstate's frequency and, when asked by a Goldman Sachs analyst whether a "third factor" might contribute to the increase, Winter did not even acknowledge the possibility, stating, "[W]e are confident we have analyzed this to death… we understand the drivers."  Winter additionally stated: "we saw nothing to indicate that it's a quality of business issue or that it's being driven by growth, …we saw nothing in there that would indicate that it was a quality of business or growth related issue."

Defendants spoke with a similar level of certainty on the May 6, 2015, earnings call.  For example, when analysts questioned why external factors were not impacting Allstate's competitors, Wilson insisted, "we don't see anything [in] the way we have done our business… we can slice and dice [our data] a whole bunch of ways and we do think its comprehensive."  Other statements on the May 2015 earnings call included: "[t]his analysis also reinforces our conclusion that recent frequency fluctuations are due primarily to macroeconomic trends and

weather"; "all of that review has showed that this trend is externally driven"; "so we validated it with our internal data, we validated it with our external data. And then, we looked to other sources to ensure that, that is in fact, true"; and finally, "we don't see anything in the way we have done our business."

These statements were not expressions of belief, but rather statements of fact purportedly supported by Allstate's internal data and rigorous analysis. Defendants' subjective testimony on the matter—that they were merely expressing their own opinions—is irrelevant. "Whether a statement is misleading depends on the perspective of a reasonable investor: the inquiry…is objective." Omnicare, 575 U.S. at 186-87. As this court previously held: "[e]ven if defendants' statements were couched in uncertain terms such as 'we believe' and 'we think,' and many were not, those statements, coupled with defendants' assurances that they had considered all possible reasons for the increase, would not have been understood by reasonable investors as uncertain." Allstate, 2018 WL 1071442, at *3-4 (citing Omnicare, 575 U.S. at 186-87). The alleged statements were not expressions of belief, and the court declines to grant summary judgment for defendants on this basis.

As with the October and December statements, defendants argue that they lacked scienter for the February and May statements. Defendants claim that when Wilson, Winters, and other members of Allstate's senior management recognized a troubling frequency increase, Allstate investigated the issue thoroughly. Defendants further argue that Wilson and Winters relied on internal analyses, data, and an internal task force when making their statements on earnings calls. See S.E.C. v. Shanahan, 646 F.3d 536, 544 (8th Cir. 2011) (no scienter when defendant "relied on the ESSI Finance and accounting departments, outside and general counsel, and the company's independent auditors" to ensure accuracy of financial disclosures). Plaintiffs counter

with evidence of internal emails that question the veracity of the internal investigations and the cause of the frequency increase, as well as evidence that the task force was created after defendants made the February statements.

As with the October and December statements, this court cannot conclude as a matter of law that defendants' lacked scienter and that no reasonable jury could find that defendants acted with scienter. Again, given the circumstantial evidence and need for credibility determinations, the court declines to grant summary judgment to defendants on the issue of scienter.

Finally, defendants argue that they are entitled to summary judgment for the August 2015 statements, because those statements did not reveal any previously concealed information about claims frequency.[5] During the August 2015 earnings call, Winter stated that Allstate's growth strategy partially contributed to the higher frequency and that Allstate would tighten its underwriting standards as a result. Plaintiffs claim that these statements were an admission that the increase in frequency was not caused solely by temporary external factors, and that Allstate's growth strategy was at least partially to blame.

The crux of defendants argument is that the August 2015 statements were not a corrective disclosure or an admission of prior falsity. Plaintiffs have provided evidence that analysts—and the market—disagreed. Analyst reports appear to have understood the August 2015 statements to have been a crucial admission, and Allstate's stock price dropped 10% the next day. For example, one analyst report stated: "Increasingly, Allstate looks like it has a company specific issue with its auto insurance underwriting that relates to both auto claim frequency and catastrophe loss exposure." Another stated: "Given that new business is less profitable than

---

[5] Plaintiffs characterize defendants' argument as an argument about loss causation and respond to it as such. However, defendants state in their reply brief that they are not making any argument about loss causation.

13

renewals, we expect that the growth is contributing to the underlying deterioration and uptick in frequency." Given this evidence, a reasonable jury could very well find that the August 2015 statements constitute a corrective disclosure.

### III. Count II – Control Person Liability

Count II brings a claim for control person liability against defendants Wilson and Winters. A control person claim under Section 20 of the Securities Exchange Act must be based on an underlying violation of the securities laws or the rules promulgated under them. Defendants move for summary judgment on this count on the basis that plaintiffs have failed to establish their securities fraud claims. However, for the reasons discussed above, a reasonable jury could find an underlying securities law violation. Consequently, defendants' motion for summary judgment on Count II is denied.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (Doc. 456) is granted in part and denied in part. The court grants partial summary judgment on Count I for the October 2014 statements. Defendants' remaining motions and arguments for summary judgment are denied.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:  July 26, 2022**

14